UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x

BOARD OF TRUSTEES OF THE CITY OF :    Civil Action No. 09-cv-03617 (RJS)
FORT LAUDERDALE GENERAL : 
EMPLOYEES' RETIREMENT SYSTEM, :    ECF CASE
TEAMSTERS LOCAL 807 LABOR : 
MANAGEMENT PENSION FUND, LOCAL :    <u>CLASS ACTION</u>
138 PENSION TRUST FUND, and THE CITY : 
OF WESTLAND POLICE AND FIRE :    **CONSOLIDATED SECOND AMENDED**
RETIREMENT SYSTEM, Individually and On :    **CLASS ACTION COMPLAINT**
Behalf of Themselves and All Others Similarly : 
Situated, : 
    : 
          Plaintiffs, : 
    : 
    vs. : 
    : 
MECHEL OAO, IGOR V. ZYUZIN, : 
STANISLAV A. PLOSCHENKO and : 
VLADIMIR A. POLIN, : 
    : 
          Defendants. : 

———————————————————— x

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION AND OVERVIEW .......................................................................1

JURISDICTION AND VENUE ...........................................................................................6

PARTIES ...........................................................................................................................7

SUBSTANTIVE ALLEGATIONS .......................................................................................9

POST CLASS PERIOD EVENTS.......................................................................................55

DEFENDANTS ENGAGED IN ILLEGAL ANTICOMPETITIVE CONDUCT AND
TAX EVASION...............................................................................................................66

MECHEL'S VIOLATION OF U.S. GAAP RULES IN ITS FINANCIAL
STATEMENTS FILED WITH THE SEC...............................................................................74

LOSS CAUSATION........................................................................................................78

ADDITIONAL SCIENTER ALLEGATIONS.........................................................................84

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET
DOCTRINE .................................................................................................................103

PLAINTIFFS' CLASS ACTION ALLEGATIONS................................................................105

NO SAFE HARBOR .....................................................................................................106

COUNT I ....................................................................................................................107

COUNT II ...................................................................................................................107

PRAYER FOR RELIEF ..................................................................................................111

JURY TRIAL DEMANDED............................................................................................112

Plaintiffs, Board of Trustees of the City of Fort Lauderdale General Employees' Retirement System ("Fort Lauderdale"), Teamsters Local 807 Labor Management Pension Fund, Local 138 Pension Trust Fund, and the City of Westland Police and Fire Retirement System ("Pension and Retirement Group" and together with Fort Lauderdale, "plaintiffs" or "Lead Plaintiffs") allege the following based upon the investigation by plaintiffs' counsel, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, official Russian government documents and press releases, wire and press releases published by and regarding Mechel OAO ("Mechel" or the "Company"), securities analysts' reports and advisories about the Company, and information readily available on the Internet. Plaintiffs believe that substantial additional evidentiary support exists for the allegations set forth herein and will be available after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1.    This is a securities fraud class action brought on behalf of all purchasers of Mechel's securities traded on the New York Stock Exchange ("NYSE") between October 3, 2007 and July 25, 2008, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act"). Mechel is a vertically integrated, open joint-stock company incorporated under the laws of the Russian Federation, specializing in mining, steel, ferroalloys and power. Mechel conducts business through a number of subsidiaries. The defendants are Mechel and several of its top insiders: Igor V. Zyuzin (Chief Executive Officer), Stanislav A. Ploschenko (Chief Financial Officer) and Vladimir A. Polin (Chief Executive Officer of Mechel's subsidiary in charge of operations) (collectively, the "Individual Defendants").

2.     Mechel was incorporated on March 19, 2003 and has been listed on the NYSE since 2004.  Since 2004, Mechel has sold American Depositary Receipts ("ADRs"), also referred to as American Depositary Shares ("ADSs"), under the symbol MTL.  During the Class Period, approximately 25% of Mechel's outstanding shares were held in the form of ADRs and purchased on the NYSE.

3.     Plaintiffs allege that throughout the Class Period defendants misrepresented Mechel's financial results, including margins, loss contingencies, production costs, costs of goods sold, income and revenue.  In addition, throughout the Class Period defendants falsely represented that Mechel was experiencing record financial results due to favorable pricing environments and Mechel's strategies to increase revenue and profitability.  Defendants' positive statements drove Mechel's stock price from $18.04 on October 3, 2007 to a Class Period high of $57.62 per share in May 2008.

4.     Contrary to the positive statements defendants were making publicly, they knew, but failed to disclose, material adverse facts about the Company's business, financial well-being and prospects.  Specifically, defendants failed to disclose or indicate the following: (1) that the Company had engaged in anticompetitive conduct by employing a discriminatory pricing policy for raw material sales between domestic and foreign steel firms; (2) that the Company had engaged in anticompetitive conduct by fixing and maintaining coking coal and/or coking coal concentrate prices at artificially high levels and unreasonably – without economic or technological grounds – refusing to enter into supply contracts or to perform on its existing contracts; (3) that the Company's anticompetitive practices in the coking coal market violated Russia's competition law, and as they were discovered, the Company could incur a significant level of fines, be ordered to cut prices and be forced to enter into long-term coking coal and/or coking coal concentrate supply contracts below

- 2 -

market prices; (4) that a significant portion of the Company's margins, income and revenue was derived from anticompetitive conduct, and when such actions were discovered, the Company's margins, income and revenue would significantly decline in future periods; (5) that the Company had artificially inflated its margins, income and revenue through a sophisticated sales and distribution scheme involving offshore trading companies, including Kompass Tranzits SIA ("Kompass") and Mechel's subsidiaries (Mechel International Holdings AG ("Mechel International"), Mechel International Holdings, Mechel Energy AG ("Mechel Energy") and Eagle Energy SA ("Eagle Energy")), to avoid properly accounting for loss contingencies and as part of a scheme to evade paying taxes on a significant portion of its revenue; (6) that Mechel was violating the Russian Federation Tax Code's transfer pricing rules by selling coking coal and coking coal concentrate to its own offshore trading companies and other offshore trading companies at prices that were more than 20% lower than the prices charged by the trading companies to customers abroad; (7) that the Company's financial statements were not prepared in accordance with United States Generally Accepted Accounting Principles ("U.S. GAAP"); and (8) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

5.    Moreover, knowing that both Russia's competition law and transfer pricing rules had been strengthened immediately prior to the Class Period, that the Federal Antimonopoly Service of the Russian Federation ("FAS Russia") had put the Company on notice that it held a dominant position in the market for coking coal, including coking coal concentrate, and that FAS Russia's non-routine investigation of Mechel's improper pricing practices started as early as March 2008 and

was escalating, defendants continued to misrepresent Mechel's financial results and liabilities under Russian competition and tax laws.[1]

6.    Further, Mechel's pricing, contracting and transfer pricing schemes were so profitable that Mechel was able to secure billions in financing during the Class Period for the acquisition of a number of coal and mining assets, including the large coal mines of Yakutugol and Elgaugol. Defendants cited these acquisitions as responsible in part for both generating record financial results and transforming Mechel into ***the largest producer of coking coal*** in Russia.  What defendants failed to disclose was the importance of maintaining an artificially inflated financial statement to sustain both the Company and the personal wealth of defendant Zyuzin.  Almost 70% of Zyuzin's personal net worth came from his Mechel stock and almost 26% of his personal holdings in Mechel were pledged to secure the aforementioned financing.  Thus, defendants continued to engage in their undisclosed, illegal schemes in order to obtain financing for Mechel's acquisitions, secure their personal fortunes and pay down Mechel's massive debts.

7.    Unbeknownst to investors, starting as early as March 6, 2008, FAS Russia initiated a non-routine investigation into Mechel's anticompetitive pricing and contracting practices.

8.    On July 15, 2008, FAS Russia disclosed that it had enough evidence to charge three Mechel subsidiaries with violations of Russia's competition law.  One week later, Mechel had to cancel an IPO of its preferred shares in response to this investigation.  This caused Mechel shares to drop from $46.50 on July 14, 2008 to $36.61 by July 23, 2008.

9.    On July 24, 2008, upon discovering that Mechel had sold raw materials to Russian customers at twice what it had sold raw materials to non-Russian customers, Russian Prime Minister

---

[1]    FAS Russia is the government body charged with protecting competition.

Vladimir Putin called for antimonopoly authorities to investigate Mechel's raw material pricing policy and profit margins, and in particular its coking coal and coking coal concentrate sales.  Prime Minister Putin also recommended that Mechel's profit margins be examined for criminal liability by the special committee of the General Prosecutor.  News of Prime Minister Putin's concerns, which proved to be well-founded as defendants later ***admitted to violations of Russia's competition law***, caused the Company's shares to fall $13.77 per share, or over 37.6%, to close on July 24, 2008 at $22.84 per share, on unusually heavy trading volume.

10.    Then, on July 28, 2008, Prime Minister Putin revealed that Mechel had also engaged in a transfer pricing scheme involving its own offshore traders to minimize tax payments – a clear violation of the Russian Federation Tax Code.  According to the Prime Minister, Mechel sold coal to its Swiss trading unit at a quarter of domestic prices, contributing to a coal shortage and higher steel prices in Russia.  The *Associated Press* quoted Prime Minister Putin as stating that "it's a reduction of the tax base within the country, it's tax evasion.  It's creating a shortage on the domestic market and leads to an increase in the price of metallurgical products."

11.    Also on July 28, 2008, FAS Russia declared they "had enough evidence" to fine Mechel for its competition law violations and that "***the Company must be punished***."

12.    Thus, by the end of July 2008, investors had learned through a series of disclosures that Mechel was the target of an FAS Russia investigation into anticompetitive practices, that Mechel cancelled its IPO, that Mechel maintained artificially inflated profit margins through an illegal transfer pricing scheme involving its own offshore traders to minimize tax payments, that Mechel had in fact engaged in behavior that violated competition, tax and criminal laws, and that FAS Russia "had enough evidence" to fine Mechel for its antimonopoly law violations – a fine that could be up to 15% of the previous year's sales.  As a result of these developments, FAS Russia

accelerated its investigation of Mechel's pricing and contracting practices, and Mechel's stock fell

from its Class Period high of $57.62 per share to as low as $19.50 per share on July 28, 2008.

13.     As a result of defendants' wrongful acts, statements and omissions, and the

precipitous decline in the market value of the Company's securities, plaintiffs and other Class

Members have suffered significant losses and damages.

## JURISDICTION AND VENUE

14.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the

Exchange Act (15 U.S.C. §§78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R.

§240.10b-5).

15.     This Court has jurisdiction over the subject matter of this action pursuant to §27 of

the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

16.     Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15

U.S.C. §78aa and 28 U.S.C. §1391(b).  Mechel's securities actively trade on the NYSE in this

District, and the Company has appointed CT Corporation Systems, 111 Eighth Avenue, New York,

New York as its "authorized agent upon which process may be served for any suit or proceeding

arising out of or relating to our shares, as well as the ADSs and the GDSs or the deposit agreement

related thereto."

17.     In connection with the acts, conduct and other wrongs alleged in this Consolidated

Second Amended Class Action Complaint ("Complaint"), defendants, directly or indirectly, used the

means and instrumentalities of interstate commerce, including but not limited to, the United States

mails, interstate telephone communications and the facilities of the national securities exchange.

**PARTIES**

18.    Lead Plaintiff, Board of Trustees of the City of Fort Lauderdale General Employees' Retirement System, as set forth in the certification previously filed in this action and incorporated by reference herein, purchased Mechel's securities at artificially inflated prices during the Class Period and has been damaged thereby.

19.    Lead Plaintiff, Teamsters Local 807 Labor Management Pension Fund, as set forth in the certification previously filed in this action and incorporated by reference herein, purchased Mechel's securities at artificially inflated prices during the Class Period and has been damaged thereby.

20.    Lead Plaintiff, Local 138 Pension Trust Fund, as set forth in the certification previously filed in this action and incorporated by reference herein, purchased Mechel's securities at artificially inflated prices during the Class Period and has been damaged thereby.

21.    Lead Plaintiff, the City of Westland Police and Fire Retirement System, as set forth in the certification previously filed in this action and incorporated by reference herein, purchased Mechel's securities at artificially inflated prices during the Class Period and has been damaged thereby.

22.    Defendant Mechel is a Russian Federation group of companies engaged in the production and export of coal and steel.  The Company's principal executive offices are located at Krasnoarmeyskaya Street 1, Moscow 125993, Russian Federation.  The Company has appointed CT Corporation Systems, 111 Eighth Avenue, New York, New York as its "authorized agent upon which process may be served for any suit or proceeding arising out of or relating to our shares, as well as the ADSs and the GDSs or the deposit agreement related thereto."  In addition, some of the

- 7 -

Company's "reports and other information can also be inspected at the offices of the NYSE at 20 Broad Street, New York, New York 10005."

23.     Defendant Igor V. Zyuzin ("Zyuzin") was at all relevant times the Company's Chief Executive Officer/General Director and Chairman of the Management Board.  Zyuzin was also Chairman of the Board of Directors of Southern Kuzbass Coal Company OAO ("Southern Kuzbass") and a board member of Yakutugol Holding Company OAO ("Yakutugol"), which are Mechel's primary mining subsidiaries.  Zyuzin was Chairman of Mechel's Board of Directors from March 2003 until December 2006.  At all relevant times, Zyuzin directly and indirectly owned between 71% and 73% of Mechel.  The Company reported that Zyuzin received RUR 7,864,751,378 (U.S. $320,406,066) in dividends in 2007, and RUR 1,680,443,370 (U.S. $57,174,273) in dividends in 2008.

24.     Defendant Stanislav A. Ploschenko ("Ploschenko") was, at all relevant times, the Company's Chief Financial Officer ("CFO").  Between June 2006 and June 2007, Ploschenko was Mechel's Deputy CFO and Deputy Treasurer for Corporate Lending.

25.     Defendant Vladimir A. Polin ("Polin") was, at all relevant times, the CEO of Mechel Management Company OOO, Mechel's wholly owned subsidiary which manages Mechel's subsidiaries, and a member of Mechel's Board of Directors.  Between July 2003 and June 2006, Polin was Senior Vice President of Production of Mechel.  Between July 2002 and June 2003, Polin was Executive Director-First Deputy General Director of Beloretsk Metallurgical Plant, a Mechel subsidiary.

26.     Defendants Zyuzin, Ploschenko and Polin are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Mechel's reports to the SEC,

- 8 -

press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. Each defendant had access to copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.

## SUBSTANTIVE ALLEGATIONS

**Background**

27.     According to Mechel's Form 6-K dated March 26, 2008, Mechel is the largest producer of coking coal in Russia, with a 64% market share for hard coking coals, and Russia's largest exporter of coking coal concentrate. As explained below, coking coal concentrate is coking coal that has been processed. Through its management company, Mechel Management Company OOO, Mechel operates a vertically integrated group of companies consisting of coal, iron ore, and nickel mines, coal and steel production, power plants, railway freight and forwarding companies, ports, and sales, trading and export units.

28.     Mechel describes its coal mining business and products as follows:

Our mining business consists of coal, iron ore and nickel mines in Russia. Our subsidiary Southern Kuzbass Coal Company and its subsidiaries operate coal mines located in the Kuznetsky Basin, near the city of Mezhdurechensk in southwestern Siberia. We have four open pit mines – Krasnogorsk, Tomusinsk, Olzherassk and Sibirginsk – and three underground mines – Lenin, Sibirginsk and New-Olzherassk. In the Sakha Republic in eastern Siberia, our subsidiary Yakutugol operates the Nerungrinsk and Kangalassk open pit mines and the Dzhebariki-Khaya underground mine, and also holds the license rights to mine the undeveloped Elga coal deposit, which we plan to mine using the open pit method after making certain necessary infrastructure improvements.

- 9 -

We also provide coal washing services, both to our coal-mining subsidiaries and to third parties; according to the Central Dispatching Department of the Fuel and Energy Complex (the "Central Dispatching Department"), a Russian state enterprise that provides statistics and analytical information to Russia's Ministry of Energy and to Russian fuel and energy companies, at the end of 2007 we controlled 26% of Russia's overall coal-washing capacity.

*    *    *

**Mining Business**

**Mining process**

**Coal.**

Coal is mined using open pit or underground mining methods. Following a drilling and blasting stage, a combination of shovels and draglines is used for moving coal and waste at our surface mines. Production at the underground mines is predominantly from longwall mining, a form of underground coal mining where a long wall of coal in a seam is mined in a single slice. After mining, depending upon the amount of impurities in the coal, the coal is processed in a wash plant, where it is crushed and impurities are removed. Coking coal concentrate is then transported to steel plants for conversion to coke for use in steel-making. Steam coal is shipped to utilities which use it in furnaces for steam generation to produce electricity. Our main products comprise coking and steam coal concentrate, steam coal, iron ore concentrate and ferronickel. Among the key advantages of our mining business is the high quality of our coking coal, the low level of volatile matters in our steam coal and our modern coal washing facilities, primarily built during the 1970s and 1980s, including facilities built as recently as 2001-2002.

*    *    *

**Coking coal and coking coal concentrates**.

Coking coal is washed, low-phosphorous bituminous coal designated for further processing into coke in coking furnaces, which in turn is used in the blast furnace in the production of pig iron, a precursor of steel in integrated steel mills. Coking coals have high plasticity, meaning that they are amenable to being softened, liquefied and resolidified into hard and porous lumps when heated in the absence of air. From our Southern Kuzbass Coal Company we offer coking coal of marks OS (meager and caking), KS (coking and caking), KS (blend) and KO (coking and meager). We process coking coal into coking coal concentrate to reduce ash content and increase volatility and plasticity. We offer coking coal concentrate of marks OS (meager and caking), K (coking), KS (coking and caking), GZh (gas and fat) and Zh (fat).

- 10 -

29.     Mechel's primary coal producing units are Southern Kuzbass which is 93.5% owned by Mechel, and Yakutugol, which is a wholly owned subsidiary of Mechel.

30.     Mechel's primary sales units are wholly owned subsidiaries, including Mechel Trading House ("Mechel Trading"), located in Moscow, Russia, and Mechel International Holdings AG ("Mechel International"), formerly known as Mechel Trading AG, located in Zug, Switzerland. Mechel Trading purchases coking coal and steel products from other Mechel subsidiaries in Russia and sells the products to domestic companies.  Mechel International purchases coking coal and steel products from Mechel subsidiaries in Russia and exports the products to companies worldwide. Mechel International also has three other offshore subsidiaries to which it sells its coking coal products: Mechel International Holdings (formerly Mechel Trading Ltd.), a branch of Mechel International, located at Im Alten Riet 102, FL 9494, Schaan, the Principality of Lichtenstein, Mechel Energy AG, located at Baarerstrasse 8, 6300 Zug, Switzerland, and Eagle Energy SA, located at rue d L'ile Monsin 129, 4020 Liége, Belgium.

31.     Russia's competition law which was substantially revised in November 2006, applies to relations "affecting competition on commodities and financial services markets" in the Russian Federation.  The law specifically applies in the event of:

- *Monopolistic Activities*: (i) unfair competition; (ii) abuse of dominant position; (iii) anticompetitive agreements/coordinated actions between/among market participants; (iv) anticompetitive agreements with/acts of governmental authorities; and (v) anticompetitive actions during auctions/tenders;

- *Economical Concentration on the Market*: (i) establishment of business entities; (ii) mergers and acquisitions; (iii) purchasing of shares or participatory interests; (iv) acquiring of "rights to determine business activities" of business entities; and (v) acquisitions of certain fixed and intangible assets;

- *Selection of Financial Organizations* that will provide financial services to state and municipal bodies, as well as to "natural monopolies" such as major utilities; and

- *Distribution of State Aid*.

- 11 -

Article 3 of the law expressly provides that the new law applies to agreements between Russian and foreign persons or organizations made outside the Russian Federation, provided that the following conditions are met in the aggregate: (1) the agreements are reached in respect of certain production facilities and/or intangible assets located in Russia, or in respect of shares or participatory interests in Russian business entities or other rights relating to Russian profit-making organizations; and (2) the agreements lead or can lead to restriction of competition in the Russian Federation. Violations of Russian competition law may result in the imposition of civil liability, or financial, "administrative" and/or criminal penalties.

32.    Mechel's subsidiaries had engaged in and were engaging in activities which were violations of Russia's competition law. In fact, unbeknownst to investors, as early as March 2008, defendants knew that the Company held a dominant position in the market for coking coal, including coking coal concentrate, and that FAS Russia had initiated a non-routine investigation of Mechel based on information indicating possible competition law violations. On July 15, 2008, FAS Russia announced it had "enough evidence" to charge Mechel with violating Russia's competition law related to Mechel's suspicious raw material pricing policy and other anticompetitive behavior. As a result, Mechel was forced to cancel a planned IPO on July 22, 2008. This caused Mechel shares to drop from $46.50 on July 14, 2008 to $36.61 by July 23, 2008.

33.    Two days after Mechel cancelled its IPO, on July 24, 2008, Russian Prime Minister Vladimir Putin revealed that Mechel's raw material pricing policy, and in particular its coking coal and coking coal concentrate sales, violated Russia's competition law. Prime Minister Putin stated that Mechel's violation included its practice of selling raw materials to customers in Russia at more than twice what it had sold raw materials to non-Russian customers. Prime Minister Putin also instructed FAS Russia and the special committee of the General Prosecutor to examine Mechel's

- 12 -

pricing practices and profit margins when enforcing Russia's competition and criminal laws.  On this news, the Company's shares fell $13.77 per share, or over 37.6%, to close on July 24, 2008 at $22.84 per share, on unusually heavy trading volume.

34.     Significantly, Mechel did not protest Prime Minister Putin's statements about the Company's pricing policies.  Rather, the following day, Mechel announced that it was "ready for cooperation with federal authorities."  *Reuters* reported Mechel said it "would never ***again*** charge a different price for coking coal on the domestic market than it did abroad."

35.     Violating Russia's competition law had severe consequences.   Under Russia's competition law, it was clear that Mechel was facing a significant administrative fine of up to 15% of the Company's total revenue from the previous year's sales in the market where Russia's competition law was violated.

36.     As reported in Mechel's 20-F annual report for 2007, Mechel's coking coal concentrate revenue was $622.9 million in 2007 and $518.3 million in 2006.

37.     In addition, the fact that Mechel's pricing policy violated the competition law meant that, in order to comply with the law, Mechel would no longer be able to charge artificially inflated prices for coking coal domestically.  Such compliance with the law would significantly reduce Mechel's future revenues and income.

38.     As set forth in FAS Russia's August 14, 2008 judgment against Mechel, certain Russian consumers opined to FAS Russia that Mechel sold coking coal to them at prices that were artificially inflated by as much as 20%.  Analysts and the media also reported that, as a result of Mechel's competition law violations, FAS Russia could mandate a 30% reduction in Mechel's coking coal and/or coking coal concentrate prices for the remainder of 2008.

506629_1

39.     Moreover, Mechel's revenue and income could further deteriorate if FAS Russia exercised its enforcement power under Russia's competition law by ordering Mechel to switch to long-term contracts at much less profitable prices.

40.     Three days later, investors learned more bad news about Mechel.  On July 28, 2008, Prime Minister Putin revealed that Mechel had also engaged in a transfer pricing scheme involving its own offshore traders to minimize tax payments – a clear violation of the Russian Federation Tax Code.  According to the Prime Minister, Mechel sold coal to its Swiss trading unit at a quarter of domestic prices, contributing to a coal shortage and higher steel prices in Russia.  The *Associated Press* quoted Prime Minister Putin as stating that "it's a reduction of the tax base within the country, it's tax evasion.  It's creating a shortage on the domestic market and leads to an increase in the price of metallurgical products."  That same day, FAS Russia declared they "had enough evidence" to fine Mechel for its competition law violations and that "the Company must be punished."  On this news, the Company's shares fell an additional $6.70 per share, or over 25.5%, to close on July 28, 2008 at $19.50 per share, on unusually heavy trading volume.

41.     On July 31, 2008, more was learned about the gravity of Mechel's situation as *Russia & CIS Metals and Mining Weekly* published an article entitled "Mechel, Coking Coal Producers Under Investigation Over Prices" in which it stated that "Tax authorities could slap coal and steel producer Mechel with profit tax claims that are about four times what the company has paid."

42.     It was clear that Mechel was facing a significant tax liability since it reported a profit tax of $356.32 million in 2007, and a net profit of $913.05 million.  As a result of defendants' illegal transfer pricing schemes, Mechel was faced with paying an additional $1.42 billion in tax claims, plus penalties and interest.

43.    On August 14, 2008, Mechel **admitted to** and was found guilty by FAS Russia of violating Russia's competition law and faced a stiff fine and price cuts from regulators as a result of its conduct. FAS Russia stated that Mechel violated competition law by discriminating against Russian consumers, unreasonably refusing contracts, and maintaining a monopoly in the coal market. Mechel's competition law violations were punishable by a fine of up to 15% of the previous year's sales in the market where the violation occurred. Additionally, FAS Russia could order Mechel to cut prices starting in 2008 and switch to long-term coking coal and/or coking coal concentrate supply contracts below market prices starting in 2009.

44.    On August 20, 2008, FAS Russia issued a press release in which it announced that it had imposed a fine of RUR 797,735,291 (U.S. $34 million) on Mechel equal to 5% of its revenue, and ordered Mechel to cut its coking coal, including coking coal concentrate, prices by 15%.

45.    Earlier, on August 14, 2008, *Reuter News* published a release entitled "Russia punishes Mechel with enforced coal price cuts." The release reported that FAS Russia could have implemented price cuts as high as 30% and that such price cuts would be very damaging to Mechel's revenues. The release reported, in relevant part:

> More damaging [than the FAS fine], said analysts, would be the loss of potential revenues incurred as a result of a [FAS-imposed 30%] reduction in [Mechel's] coal prices. Dmitry Smolin, mining analyst at UralSib, said **Mechel could miss out on $600 million in second-half revenues**. Another analyst, UniCredit Aton's Marat Gabitov, said **losses in revenue could amount to $950 million for the whole of 2008**.

46.    Similarly, as reported by *Banking and Stock Exchange, Finance, Economics (Russia)* in August 2008, Deutsche Bank analysts had estimated that a 30% decrease in Mechel's coking coal and coking coal concentrate prices would result in a 2% reduction of Mechel's profit in 2008 and an 8% reduction of Mechel's profit in 2009.

- 15 -

47.     In fact, following Mechel's forced compliance with Russia's Competition Law, Mechel's overall net operating margin dropped from 32.7% for the first nine months of 2008 to just 2.8% for the first nine months of 2009.

48.     In addition, Mechel's Mining Segment reported that its operating income dropped by 91.3% from the first nine months of 2008 to the first nine months of 2009.

49.     On August 20, 2008, UniCredit analyst, Marat Gabitov, reported that investors' "main [remaining] concern regarding Mechel is the tax authorities' investigation of alleged transfer pricing and tax evasion, which could have more far-reaching consequences and remains unresolved."

50.     In July 2009, the Audit Chamber of Russia announced that it had investigated Mechel's (and other top coal exporters') use of offshore entities to carry out coal exports and planned on submitting the results of its investigation to the Ministry of the Interior, Federal Customs Service and Federal Tax Service.

51.     Mechel has yet to be assessed back taxes and fined for the transfer pricing tax avoidance scheme discussed above.

52.     Further, the Investigations Committee of the Prosecutor General's Office initiated a criminal investigation into what was described by Russia Prosecutor General Yury Chaika as "scandalous conduct" and that investigation is still pending.

**Materially False and Misleading Statements and Omissions During the Class Period**

53.     The Class Period begins on October 3, 2007.  On this day, the Company issued a press release entitled "Mechel Reports First Half 2007 Financial Results."  Therein, the Company, in relevant part, stated:

- *Revenues increased 55% to $2.99 billion*

- *Operating income more than tripled to $738.9 million*

- 16 -

- ***Net income increased 169% to $489.5 million, $3.53 per ADR or $1.18 per diluted share***

Mechel OAO (NYSE: MTL), a leading Russian integrated mining and steel group, today announced results for the first half ended June 30, 2007.

\*        \*        \*

Igor Zyuzin, Mechel's Chief Executive Officer, commented: "During the first half of 2007, ***Mechel continued to move forward with its plans for scaling up production volumes and increasing profitability***.  In addition, the Company expanded its existing production capacity and acquired new assets that complement Mechel's current operations.  ***The Company's operational progress, coupled with the ongoing favorable market conditions, enabled Mechel to achieve record financial results for the first half of 2007, tripling its operating income when compared to the same period last year***."

## Consolidated Results

Net revenue in the first half of 2007 rose 55.0% to $2.99 billion, from $1.93 billion in the first half of 2006, reflecting increased production volumes and strong selling prices across the Company's primary product categories.  Operating income rose by 252.8% to $738.9 million, or 24.7% of net revenue, versus operating income of $209.5 million, or 10.9% of net revenue, in the first half of 2006.

***For the first half of 2007, Mechel reported consolidated net income of $489.5 million, or $3.53 per ADR ($1.18 per diluted share)***.

Consolidated EBITDA rose by 136.0% to $813.7 million in the first half of 2007 from $344.7 million a year ago. . . .

\*        \*        \*

## Mining Segment Results

\*        \*        \*

***Mining segment revenue from external customers for the first half of 2007 totaled $897.8 million, or 30.1%, of consolidated net revenue, an increase of 46.3% compared with segment revenue from external customers of $613.5 million, or 31.8%, of consolidated net revenue, in the first half of 2006.  The increase in revenues reflects increased total output, strong market positions, and a favorable pricing environment***.

Operating income for the first half of 2007 in the mining segment rose 334.9% to $419.3 million, or 33.9% of total segment revenue, compared to operating income of $96.4 million, or 12.6% of total segment revenues a year ago.  ***This increase in profitability reflects Mechel's enhanced cost control efforts, as well as the overall***

- 17 -

*efficiency of the Company's mining operations as revenue levels increased*. EBITDA in the mining segment for the first half of 2007 was $449.7 million, 206.0% higher than segment EBITDA of $146.9 million in the first half of 2006. The EBITDA margin for the mining segment increased to 36.3% compared to 19.2% in the same period of last year.

Mr. Zyuzin commented on the results of the mining segment: ". . . *Net income in the mining segment increased by 237.4% compared with first half results a year ago, due to the positive trends that we continue to see in key customer markets. Supported by the current favorable pricing environment and the outlook for the coal and iron ore markets, we intend to maintain our pace of production output in line with our annual plan, and anticipate continued strong operating performance from the mining segment through the remainder of this year*[.]"

\* \* \*

Mr. Zyuzin concluded, ". . . *Overall, based on the demand for Mechel's products that we are seeing across the steel and mining segments and the current pricing environment, we are optimistic about the growth prospects for the Company throughout the remainder of the year*."

54.    Also on October 3, 2007, Mechel filed a copy of the press release in ¶53 with the SEC on Form 6-K. The Company's Form 6-K was signed by defendant Zyuzin, and reaffirmed the Company's financial results for the second quarter and first half of fiscal 2007.

55.    On October 3, 2007, Mechel held a conference call for Mechel shareholders, analysts, money managers and the financial media, in which defendants Zyuzin, Ploschenko, Polin and Alexander Tolkach ("Tolkach" – Head of International Relations & Investor Relations at Mechel) participated. During the conference call, Zyuzin, Ploschenko, Polin and Tolkach reaffirmed the Company's financial results for the second quarter and first half of fiscal 2007. Their statements included the following:

[Zyuzin:] . . . In the first half of 2007, we will continue our strategy of increasing outputs in the mining segment and overall costs in our steel segment. . . . Our financial results clearly show that even today the strategies help us increase revenue and margin. . . . And if we're talking about the quality side of Mechel's business, one should note that *we achieved a new record for operating margin which reached 24.7%*.

\* \* \*

- 18 -

[Ploschenko:] . . . **The main factors contributing to our growth were pricing, adding $823 million**, while the growing physical volumes brought in another $237 million.

In the mining segment, we were the only player pushing third-party sales up 46% to almost $900 million.

*       *       *

**The average FCA [Free Carrier] prices for coking coal grew by 31% year-on-year**, steam coal by 40%, iron ore concentrate by 100% and nickel by 170% for the same period.

Being the third largest Russian coal producer and producer of the best-quality steam coal grade, we always focus on flexibility of our sales policy, maximizing the positive effects of the demand trends for our products in different geographical markets.

*       *       *

Talking about the cost side, I am happy to note our success in keeping [our] cost of sales under control, which allowed us to increase the gross margin in both segments. In the mining segment, the gross margin grew more than a third to 52%, while in the steel segment the gross margin increased to 29%.

*       *       *

[Caller:] . . . on your realized prices, could you provide average prices for second quarter '07, not for first half, for coal and iron ore, and if possible, to comment at what level they were during the third quarter and your outlook for the rest of the year?

[Polin:] . . . So if we move from – compare the first half 2006 with first half 2007, for coking coal concentrate the prices grew and they grew at approximately [inaudible].  And also if you see that they will grow in the third quarter, though not significantly, [inaudible] significant growth in the fourth quarter.

56.    The statements contained in ¶¶53-55 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that the Company had engaged in anticompetitive conduct by employing a discriminatory pricing policy for raw material sales between domestic and foreign steel firms; (2) that the Company had engaged in anticompetitive conduct by fixing and maintaining coking coal and/or coking coal concentrate prices at artificially high levels

- 19 -

506629_1

and unreasonably – without economic or technological grounds – refusing to enter into supply contracts or to perform on its existing contracts; (3) that the Company's anticompetitive practices in the coking coal and/or coking coal concentrate market violated Russia's competition law, and as they were discovered, the Company could incur a significant level of fines, be ordered to cut prices and be forced to enter into long-term coking coal and/or coking coal concentrate supply contracts below market prices; (4) that a portion of the Company's income and revenue was derived from anticompetitive conduct, and when such actions were discovered, the Company's margins, income and revenue would significantly decline in future periods; (5) that the Company had artificially inflated its margins, income and revenue through a sophisticated sales and distribution scheme involving offshore trading companies, including Kompass and Mechel's subsidiaries (Mechel International, Mechel International Holdings, Mechel Energy and Eagle Energy), to avoid properly accounting for loss contingencies and evade paying taxes on a significant portion of its revenue; (6) that Mechel was violating the Russian Federation Tax Code's transfer pricing rules by selling coking coal and/or coking coal concentrate to its own offshore trading companies and other offshore trading companies at prices that were more than 20% lower than the prices charged by the trading companies to customers abroad; (7) that the Company's financial statements were not prepared in accordance with U.S. GAAP; and (8) that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

57.     On December 11, 2007, the Company issued a press release entitled "Mechel Reports Nine Months 2007 Results." Therein, the Company, in relevant part, stated:

- ***Revenue of $4.6 billion***

- ***Operating income of $1.1 billion***

- ***Net income of $706.0 million, $5.09 per ADR, or $1.70 per diluted share***

- 20 -

Mechel OAO (NYSE: MTL), a leading Russian integrated mining and steel group, today announced results for the nine months ended September 30, 2007.

*    *    *

Igor Zyuzin, Mechel's Chief Executive Officer, commented: "In the first nine months of 2007, Mechel has demonstrated strong financial results, supported by steadily rising production output and a favorable environment across our customer markets. *Today we can say with certainty that 2007 will be the second year in a row when the Company will achieve record financial results. Net income for the first three quarters of this year far exceeded net income for the whole year of 2006, which was the best year for financial performance in Mechel's history*."

**Consolidated Results**

Net revenue for the first nine months of 2007 amounted to $4.6 billion, as compared to $3.1 billion in the first nine months of 2006. Operating income was $1.1 billion, or 22.6% of net revenue, compared to operating income of $483.0 million, or 15.4% of net revenue, in the prior year period. The main contributing factors were strong market demand and related increases in selling prices for all of Mechel's major product groups, increase in production of high value-added products as well as decreasing cost per tonne on some of the Company's core product groups.

For the first nine months of 2007, Mechel's consolidated net income nearly doubled to $706.0 million, or $5.09 per ADR ($1.70 per diluted share), compared to consolidated net income of $372.1 million, or $2.76 per ADR ($0.92 per diluted share) for the year-ago period. One American Depositary Share is equivalent to three diluted shares.

*    *    *

*Mining segment revenue from external customers for the first nine months of 2007 totaled $1.3 billion, or 27% of consolidated net revenue, an increase of 33% over segment revenue from external customers of $952.3 million, or 30%, of consolidated net revenue, for the first nine months of 2006*.

Operating income in the mining segment for the first nine months of 2007 more than tripled to $604.1 million, or 34.1% of segment revenues, compared to total operating income of $185.5 million, or 15.5% of segment revenues, a year ago.

EBITDA in the mining segment in the first nine months of 2007 was $654.1, which is 156.6% higher than segment EBITDA of $254.9 million for the same period in the prior year. The EBITDA margin of the mining segment during the first nine months of 2007 also rose to 36.9% compared to 21.3% for the comparable nine months period in 2006.

- 21 -

Igor Zyuzin commented on the results of the mining segment: "Growing demand and positive pricing trends in the global coal and iron ore markets continued into the third quarter. . . . The increase in production output and the strong pricing environment enabled Mechel's mining segment to record operating profit three times higher than operating income for the same period of last year. *Today we are witnessing further price increases for coal products on the back of rising demand in Asian markets and infrastructural challenges faced by major coal exporting counties. We expect to capitalize on the existing favorable market conditions*, while further expanding sales volumes, maintaining our focus on controlling the segment's operating costs and optimizing our logistics operations.

* * *

Igor Zyuzin concluded: "The production and financial results delivered for the first nine months of 2007 and the demand trends in our main markets give us further confidence in our prospects for the full year of 2007. The recent acquisition of Yakutugol not only strengthens our position as a producer of high quality hard coking coal, but allows us to benefit from the current favorable market conditions for coal products. We will continue to develop the Company and enhance our production assets, sales and management. *I am confident that after the Company's record performance in 2007, we will be well positioned to further improve our financial performance*."

58.    Also on December 11, 2007, Mechel held a conference call for Mechel shareholders, analysts, money managers and the financial media, in which Zyuzin, Ploschenko, Polin and Tolkach participated. During the conference call, Zyuzin, Ploschenko, Polin and Tolkach reaffirmed the Company's financial results for the third quarter and first nine months of fiscal 2007. Their statements included the following:

[Ploschenko:] . . . At the same time, the market situation undoubtedly played a significant role in the revenue growth, bringing $1.17 billion, while the increase in sales volume fetched another $115 million. *The price factor was, by far, dominating in the mining segment, pushing the revenue up 33%, to $1.266 billion*. . . . Sales of coking coal went up by 59%, and iron ore concentrate up by 27%.

* * *

*We succeeded to take full advantage of growth in coking coal and iron ore prices increasing the profitability of our mining segment with operating margins doubling to exceed to 34%, and EBITDA margin growing to almost 37%.*

* * *

- 22 -

[Caller:] . . . First question was on the Yakutugol and its volumes and trends of mining for nearly three years and how much of it will be sold in the Russian markets? . . .

[Zyuzin:] . . . So The Yakutugol trends for mining, we are trying to increase the mining output of Yakutugol operations . . . . So as far as the markets are concerned for equity in coal, current portfolio of about 50% export, 50% domestic sales plus/minus 10% we see as an optimal one.  But of course we may shift it somewhat if we see higher prices for coking coal domestically available, sell more coking coal domestically.

\*     \*     \*

[Caller:] . . . So, first question was if we can divide our gross margin and amortization into different segments? . . .

[Company's Answer:] . . . Gross profit for the segments – for the mining segments made up $920 million to-date in the first nine months of this year.

\*     \*     \*

[Caller:] . . . Yeah.  Hi.  I have a few questions regarding your coal assets.  What kind of spot prices you currently see for the coking coal in Russia for J, K and KS grades? . . .

[Zyuzin:] So for the coking coal prices, they are currently both for Russia and Ukraine within spot prices for them, within the level of 140 to $150 [per ton] on FCA [Free Carrier] basis, and in 2008, of course, we foresee them to increase. . . .

[Tolkach:] So the question is on our coking coal prices.  As we at our operation, if we can save the significant increase already in the fourth quarter or on the beginning of 2008 after Yakutugol company changes its sales to the new long-term contracts? . . .

[Zyuzin:] So, we hope that even in the fourth quarter, we have already witnessed it has a increase in sales prices for Yakutugol's operations, for which we have their both spot and long-term contracts, and while we'll have to finish the long-term contracts as of the end of the year, we will be able to increase prices on the spot basis.

59.     On December 13, 2007, Mechel filed a copy of the press release in ¶57, dated December 11, 2007, with the SEC on Form 6-K.  The Company's Form 6-K was signed by defendant Zyuzin, and reaffirmed the Company's financial results for the third quarter and first nine months of fiscal 2007.

- 23 -

60.    The statements contained in ¶¶57-59 were materially false and misleading when made for the reasons stated in ¶56.

61.    On January 24, 2008, the Company issued a press release entitled "Mechel Announces Appointment of Senior Vice President on Economics and Management." Therein, the Company, in relevant part, stated:

> Mechel OAO (NYSE: MTL), one of the leading Russian mining and metals companies, announces the appointment of Mukhamed Tsikanov as its Senior Vice President on Economics and Management.
>
> *    *    *
>
> Mechel OAO Chief Executive Officer Igor Zyuzin said, "We are pleased that such a respected, professional and highly experienced economist and executive will continue working in our team in the new senior level position. The appointment of Mr. Tsikanov to the position of Senior Vice President on Economic and Management ***confirms the importance and significance of a high quality and efficient operating management and control system for Mechel***. With such an extensive network of subsidiaries and a wide marketing and sales infrastructure, it is difficult to overestimate the role of professional economic management for Mechel. We are confident that Mr. Tsikanov's knowledge and competence ***will enable the Company to implement management accounts policies and principles more efficiently, thus further enhancing the development of Mechel's business***."

62.    The statements contained in ¶61 were materially false and misleading when made for the reasons stated in ¶56.

63.    On May 29, 2008, the Company issued a press release entitled "Mechel Reports Record Results for 2007 Full Year Period." The press release, in relevant part, stated:

- ***Revenues increased 52.0% to $6.7 billion***

- ***Operating income increased 92.59% to $1.4 billion***

- ***Net income increased 51.4% to $913.1 million, or $2.19 per ADR / diluted share***

> Mechel OAO (NYSE: MTL), a leading Russian integrated mining and steel group, today announced financial results for the full year ended December 31, 2007.
>
> *    *    *

- 24 -

Igor Zyuzin, Mechel's Chief Executive Officer, commented on the full year results: "We achieved record financial results for the second consecutive year and benefited from our balanced business model, combining mining and steel assets. Based on our strategy of developing our base of raw materials and increasing market share of high value added products, we ramped up production volumes and improved our financial performance, nearly doubling operating income for the year. Mechel's strong performance was also due to synergistic acquisitions that supported our production capability and created a foundation for future growth.

**Consolidated Results**

Net revenue in 2007 rose by 52.0% to $6.7 billion from $4.4 billion in 2006. Operating income rose 92.6% to $1.4 billion, or 20.9% of net revenue in 2007, compared to operating income of $725.7 million, or 16.5% of net revenue in 2006.

For 2007, Mechel reported consolidated net income of $913.1 million, or $2.19 per ADR / diluted share, an increase of 51.4% over consolidated net income of $603.2 million, or $1.48 per ADR / diluted share, in 2006.

\*      \*      \*

**Mining Segment Results**

\*      \*      \*

***Mining segment revenue for 2007 totaled $1.8 billion, or 28% of consolidated net revenue, an increase of 41.3% over segment revenue of $1.3 billion, or 30% of consolidated net revenue in the [sic] 2006***. The increase in revenue reflects production growth at our principal coal producer Southern Kuzbass, production growth at Yakutugol, and the acquisition of the remaining assets of Yakutugol, the largest Russian coking coal producer. ***These factors resulted in strengthened market position and increased sales of mining products to third parties for the year***.

Operating income in the mining segment in 2007 increased by 177.9% to $886.7 million, or 34.7% of total segment sales, compared to operating income of $319.0 million, or 19.0% of total segment sales a year ago. EBITDA in the mining segment in 2007 increased by 146.0% to $995.7 million compared to EBITDA of $404.7 million in 2006. The EBITDA margin of the mining segment was 38.9% for the 2007 full year period, versus 24.1% in 2006.

Igor Zyuzin commented on the mining segment operating results: "***Mechel's mining segment experienced a breakthrough year in 2007. As demand and the pricing environment continued to improve significantly***, Mechel increased production, successfully raising coal production by 25% and nickel production by 19%. With the acquisition of strategic assets, such as Yakutugol and Elgaugol, we have strengthened Mechel as global company with significant growth potential. ***As a***

- 25 -

*result of favorable pricing and increased production, net income for 2007 increased 3 times compared to 2006*. Profitability in the mining segment was also positively affected by cost control efforts and successful execution of the technical upgrade program for segment's mining plants technical upgrade program. As a part of the program, new highly productive extractive equipment is being commissioned at our facilities on a regular basis. *Looking forward, favorable pricing at the end of last year has continued to improve in 2008. We intend to capitalize on the current market environment by increasing sales, controlling expenses and operating in the most attractive and promising markets*."

*       *       *

Igor Zyuzin concluded: "*Our results for 2007 demonstrate the advantages of Mechel's business-model*, which utilizes balancing of mining and steel assets. We plan to continue our strategy to grow our business through both organic growth and acquisitions, increasing shareholder's value. . . . In summary, our efforts to modernize existing capacities as well as increasing output, supported by current market trends, allow us to have a positive outlook for the future of our company."

64.     On May 30, 2008, Mechel filed a copy of the press release in ¶63 with the SEC on

Form 6-K. The Company's Form 6-K was signed by defendant Zyuzin, and reaffirmed the

Company's financial results for the full year ended December 31, 2007.

65.     Also on May 29, 2008, Mechel held a conference call for Mechel shareholders,

analysts, money managers and the financial media, in which defendants Zyuzin, Ploschenko, Polin

and Tolkach participated. During the conference call, Zyuzin, Ploschenko, Polin and Tolkach

reaffirmed the Company's financial results for the full year ended December 31, 2007. Their

statements included the following:

[Polin:] . . . As the commodities pricing environment continued to improve significantly during the year, we increased coal production by 25% supported by the Yakutugol acquisition at the year end among others.

*       *       *

Favorable commodity pricing at the end of last year has continued to improve in 2008. *Globally, coal prices have been driven by great demand among the steel producers and the limited supply generated by seaport infrastructure problems experienced in key exporting countries*. Currently retail prices remain at the current level for foreseeable future and even grow.

- 26 -

[Ploschenko:] . . . For the 2007 full year we reported record consolidated revenue of $6.7 billion, an increase of $2.3 billion versus 2006. . . . Despite fluctuating markets for our key products, overall pricing factored in positively and contributed $1.5 billion . . . .

\*    \*    \*

Our flexible sales strategy added to the success through the increase in sales to Europe, particularly sales of steam coal, as well as an increase of sales to CIS markets in Ukraine in 2007.

\*    \*    \*

Comparing the results of our two main segments reaffirms the benefits of our balanced business model.  *We succeeded to take full advantage of the price increases in coal, ferroalloys and iron ore, which contributed to a record profitability in our mining segment.  This balance allows us not only to level off the adverse affects of the cost inflation in the steel and power segments, but produce solid cash flow for continued investments and in modernization across all our segments irrespective of the trends in particular segment markets*.

\*    \*    \*

[Caller:] . . . The first question posed by Vasily was on the pricing for coal, on Yakut export structure and pricing of our annual contracts for Yakutugol and also on the market conditions in Russia for coking coal. . . .

[Tolkach:] . . . As far as the first question goes, *the prices for coking coal are growing and we think it will continue to grow even further*.  And as for Yakutugol coking coal concentrate production, we have already contracted 25% of it for the long-term contract.  And the rest we were going to sell this year and export.  And it's not right to say that Yakutugol will sell 100% of its coking coal output on the export markets.  We will continue to sell both in Russia and abroad. . . .  Okay.  *So the answer on this, prices for export markets, the answer was, it's more than 315 FOB basis. . . . As for domestic markets for coking coals, the price is also growing.  And we think that is going to try to reach the export market level.  But of course, it's still lower*.

\*    \*    \*

[Caller:] . . . So the first question was on the cash cost in our mining segment for coking coal concentrate and iron ore concentrate. . . .

[Ploschenko:] . . . In Southern Kuzbass, the cash cost per ton of coking coal concentrate an average to about $30 per ton . . . .  The coking concentrate at Yakutugol is around $48 per ton . . . .

- 27 -

66.    The statements contained in ¶¶63-65 were materially false and misleading when made for the reasons stated in ¶56.  Defendants' statements were also materially false and misleading when made because by May 29, 2008, defendants knew but failed to disclose that (1) FAS Russia had initiated a non-routine investigation into Mechel's anticompetitive pricing and contracting practices; and (2) Mechel had received at least four directives requiring defendants to disclose the anticompetitive pricing and contracting practices of Mechel's subsidiaries to FAS Russia.

67.    On June 19, 2008, Mechel filed its Annual Report with the SEC on Form 20-F.  The Company's 20-F was signed by defendant Zyuzin, and reaffirmed the Company's previously announced financial results.  Additionally, the Company, in relevant part, stated:

> The financial data set forth below as of December 31, 2007, 2006, 2005, 2004 and 2003, and for the years then ended, have been derived from our consolidated financial statements.  Our reporting currency is the U.S. dollar and *we prepare our consolidated financial statements in accordance with accounting principles generally accepted in the United States* ("U.S. GAAP").

*        *        *

| | Year ended December 31, | | | | |
|---|---|---|---|---|---|
| | 2007 | 2006 | 2005 | 2004 | 2003 |
| | (in thousands of U.S. dollars, except per share data) | | | | |
| **Consolidated income statement data:** | | | | | |
| *Revenue, net* | *6,683,842* | *4,397,811* | *3,804,995* | *3,635,955* | *2,028,051* |
| Cost of goods sold | (4,166,864) | (2,860,224) | (2,469,134) | (2,225,088) | (1,422,987) |
| | | | | | |
| *Gross Profit* | *2,516,978* | *1,537,587* | *1,335,861* | *1,410,867* | *605,064* |
| Selling, distribution and operating expenses | (1,119,385) | (811,889) | (820,133) | (660,060) | (407,383) |
| | | | | | |
| Operating income | 1,397,593 | 725,698 | 515,728 | 750,807 | 197,681 |
| Other income and expense, net | (12,146) | 139,135 | 10,131 | 794,288 | (21,555) |

- 28 -

| | | | | | |
|---|---|---|---|---|---|
| Income before tax, minority interest, discounted operations, extraordinary gain and changes in accounting principle | 1,385,447 | 864,833 | 525,859 | 1,545,095 | 176,126 |
| *Income tax expense* | *(356,320)* | *(230,599)* | *(136,643)* | *(175,776)* | *(47,759)* |
| Minority interest in loss (income) of subsidiaries | (116,234) | (31,528) | (6,879) | (11,673) | 18,979 |
| *Income from continuing operations* | *912,893* | *602,706* | *382,337* | *1,357,646* | *147,346* |
| * * * | | | | | |
| *Net income* | *913,051* | *603,249* | *381,180* | *1,342,706* | *143,508* |
| * * * | | | | | |
| *Net income per share* | *2.19* | *1.48* | *0.95* | *3.59* | *0.39* |
| * * * | | | | | |
| **Mining segment income statement data:** | | | | | |
| *Revenue, net* | *2,556,995* | *1,682,523* | *1,427,172* | *1,198,705* | *596,904* |
| Cost of goods sold | (1,241,665) | (1,008,806) | (715,875) | (556,878) | (419,619) |
| *Gross profit* | *1,315,330* | *673,717* | *711,297* | *641,827* | *177,285* |
| Selling, distribution and operating expenses | (428,632) | (354,669) | (315,713) | (259,409) | (115,327) |
| *Operating income* | *886,698* | *319,048* | *395,584* | *382,418* | *61,959* |

\*     \*     \*

### Year ended December 31, 2007 compared to year ended December 31, 2006

*Revenues*

Consolidated revenues increased by $2,286.0 million, or 52.0%, to $6,683.8 million in the year ended December 31, 2007, from $4,397.8 million in the year ended December 31, 2006.

\*     \*     \*

The following table sets forth our revenues by segment:

- 29 -

|  | Year ended December 31, | |
|---|---|---|
| **Revenues by segment** | **2007** | **2006** |
|  | **(in thousands of U.S. dollars, except percentages)** | |
| **Mining segment** |  |  |
| To third parties | 1,844,758 | 1,305,555 |
| To power segment | 11,272 | 399 |
| To steel segment | 700,965 | 376,569 |
|  |  |  |
| Total | 2,556,995 | 1,682,523 |
| * * * |  |  |
| Consolidated revenues | 6,683,842 | 4,397,811 |
|  |  |  |
| % from mining segment | 27.6% | 29.7% |
| % from steel segment | 64.9% | 69.2% |
| % from power segment | 7.5% | 1.1% |

*Mining segment*

Our total mining segment sales increased by $874.5 million, or 52.0%, to $2,557.0 million in the year ended December 31, 2007 from $1,682.5 million in the year ended December 31, 2006.

Coking coal concentrate sales to third parties increased by $104.6 million, or 20.2%, to $622.9 million in the year ended December 31, 2007 from $518.3 million in the year ended December 31, 2006, where a decrease in sales volumes offset a $150.4 million sales price increase by $45.9 million. ***The price increases occurred on both export and domestic markets, resulting from increasing coking coal demand and tight supply both in domestic and export markets due to accidents in several Russian coal mines which caused mine closures and cargo seaport capacity problems in Australia***. . . .

***Coking coal concentrate supplied to the steel segment increased by $220.3 million, or 117.5%, to $407.9 million in the year ended December 31, 2007*** from $187.6 million in the year ended December 31, 2006, *where $123.7 million of the increase was due to an increase in sales prices* and $96.6 million was due to an increase in sales volumes.

*    *    *

***Excluding intersegment sales, export sales were 55.4% of mining segment sales*** in the year ended December 31, 2007, compared to 49.7% in the year ended December 31, 2006. ***The increase in the proportion of our export sales was due to the higher export volumes of steam coal, nickel and iron ore due to higher sales prices on export markets***.

- 30 -

*    *    *

**Cost of goods sold and gross margin**

Consolidated cost of goods sold was 62.3% of consolidated revenues in the year ended December 31, 2007, as compared to 65.0% of consolidated revenues in the year ended December 31, 2006, resulting in an increase in consolidated gross margin to 37.7% in the year ended December 31, 2007 from 35.0% for the year ended December 31, 2006. Cost of goods sold primarily consists of costs relating to raw materials (including products purchased for resale), direct payroll, depreciation and energy. The table below sets forth cost of goods sold and gross margin by segment for the years ended December 31, 2007 and 2006, including as a percentage of segment revenues.

| Cost of goods sold and gross margin by segment | Year ended December 31, 2007 | | Year ended December 31, 2006 | |
|---|---|---|---|---|
| | Amount | % of segment revenues | Amount | % of segment revenues |
| (in thousands of U.S. dollars, except for percentages) | | | | |
| **Mining segment** | | | | |
| Cost of goods sold | 1,241,665 | 48.6% | 1,008,806 | 60.0% |
| Gross margin | 1,315,330 | 51.4% | 673,717 | 40.0% |

*Mining segment*

Mining segment cost of goods sold increased by $232.9 million, or 23.1%, to $1,241.7 million in the year ended December 31, 2007 from $1,008.8 million in the year ended December 31, 2006. *Mining segment gross margin increased from 40.0% in the year ended December 31, 2006 to 51.4% in the year ended December 31, 2007. The increase in the mining segment gross margin was principally due to (1) the increase in coking coal and iron ore sales prices in both export and domestic markets*, (2) an increase in nickel and steam coal sales prices in export markets and (3) a decrease in the production cash costs of coking coal concentrate at Southern Kuzbass Coal Company by 3.0% due to an increase in production volumes and a corresponding apportionment of fixed costs to larger production volumes. . . .

*Steel segment*

Steel segment cost of goods sold increased by $1,162.6 million, or 52.3%, to $3,387.0 million in the year ended December 31, 2007 from $2,224.4 million in the year ended December 31, 2006. Steel segment cost of goods sold was 76.2% of the segment's revenues in the year ended December 31, 2007, as compared to 72.1% in the year ended December 31, 2006, resulting in a decrease in gross margin from 27.9% to 23.8%. *Such decrease was primarily attributable to an increase in*

- 31 -

*production costs during the period under review, which was itself due to the growth in raw materials prices, particularly the prices of nickel and coking coal*.

\*       \*       \*

### Income tax expense

Income tax expense increased by $125.7 million, or 54.5%, to $356.3 million in the year ended December 31, 2007 from $230.6 million in the year ended December 31, 2006, while our effective tax rate in 2007 decreased to 25.7% from 26.7% in 2006. The increase in the absolute figure of income tax expenses was due to the increase in taxable income of our Russian subsidiaries in 2007.

\*       \*       \*

### Income taxes

A provision is made in the financial statements for taxation of profits in accordance with applicable legislation currently in force. We account for income taxes under the liability method in accordance with SFAS No. 109, "Accounting for Income Taxes," and related interpretations. Under the liability method, deferred income taxes reflect the future tax consequences of temporary differences between the tax and financial statement bases of assets and liabilities and are measured using enacted tax rates to apply to taxable income in the years in which those temporary differences are expected to be recovered or settled. The effect on deferred tax assets and liabilities of a change in the tax rates is recognized in income in the period that includes the enactment date. A valuation allowance is provided when it is more likely than not that some or all of the deferred tax assets will not be realized in the future. These evaluations are based on the expectations of future taxable income and reversals of the various taxable temporary differences.

On January 1, 2007, we adopted the provisions of Financial Accounting Standards Board ("FASB") Interpretation No. 48 ("FIN 48"), "Accounting for Uncertainty in Income Taxes – an interpretation of SFAS No. 109." FIN 48 prescribes the minimum recognition threshold a tax position must meet before being recognized in the financial statements and provides guidance on derecognition, measurement, classification, interest and penalties, accounting in interim periods, disclosure and transition. We accounted for $75.2 million, including interest and penalties for $19.3 million, as a cumulative adjustment of the adoption of FIN 48 to the January 1, 2007 retained earnings. As of December 31, 2007, we included accruals for unrecognized income tax benefits totaling approximately $79.2 million, including interest and penalties for $28.9 million, as a component of accrued liabilities. Interest and penalties recognized in accordance with FIN 48 are classified in the financial statements as income taxes.

- 32 -

68.    The Company's Form 20-F, filed with the SEC on June 19, 2008, also purported to inform investors of "Trend Information" and in particular, coal trends.  For instance, the Form 20-F stated:

> After major global suppliers negotiated a 16-22% reduction in contract prices in the beginning of 2007 the market turned radically upwards.  The situation with international traded coking coal supply deteriorated throughout 2007.  A snowstorm in Canada, mine accidents in Russia and decreasing exports from China made the market extremely tight.  ***As a result of the widening supply deficit, spot prices in the third quarter approached the record levels set early in 2005 ($130-140/tonne FOB for hard coking coal) and continued to grow***.  Rail and port infrastructure constraints in Australia prevented supplies of additional coking coal for the international market.  ***Contract prices for hard coking coal struck the $300 per tonne level at the beginning of the second quarter of 2008, according to MetalBulletin***.  We believe that the world steel market dynamics will continue to support coking coal prices in 2008.  We do not expect any significant coal price decreases until 2009-2010, when a resolution of capacity and infrastructure constraints in major export countries could change the supply/demand balance of international trade.

69.    The statements contained in ¶¶67-68 were also materially false and misleading when made for the reasons stated in ¶56.

70.    The Company's Form 20-F, filed with the SEC on June 19, 2008, also purported to inform investors of tax risks.  For instance, the Form 20-F stated:

> ***Characteristics of and changes in the Russian tax system could materially adversely affect our business, financial condition, results of operations and prospects and the value of the Shares***.
>
> *            *            *
>
> In practice, the Russian tax authorities generally interpret the tax laws in ways that rarely favor taxpayers, who often have to resort to court proceedings to defend their position against the tax authorities.  Recent events within the Russian Federation suggest that the tax authorities may be taking a more assertive position in their interpretations of the legislation and assessments.  Differing interpretations of tax regulations exist both among and within government ministries and organizations at the federal, regional and local levels, creating uncertainties and inconsistent enforcement.  Tax declarations, together with related documentation such as customs declarations, are subject to review and investigation by a number of authorities, each of which may impose severe fines, penalties and interest charges.

- 33 -

\*     \*     \*

***Vaguely drafted Russian transfer pricing rules and lack of reliable pricing information may potentially affect our results of operations***.

Russian transfer pricing rules effective since 1999 give Russian tax authorities the right to control prices for transactions between related entities and certain other types of transactions between unrelated parties, such as foreign trade transactions or transactions with significant price fluctuations if the transaction price deviates by more than 20% from the market price. Special transfer pricing rules apply to operations with securities and derivative instruments. The Russian transfer pricing rules are vaguely drafted, and are subject to interpretation by Russian tax authorities and courts. Due to the uncertainties in interpretation of transfer pricing legislation, the tax authorities may challenge our prices and make adjustments which could affect our tax position.

\*     \*     \*

In addition, we have identified possible tax liabilities arising out of differing interpretations of tax laws and regulations in the amount of up to approximately $37.0 million as of December 31, 2007, which are not accrued in our consolidated financial statements. See note 26(d) to our consolidated financial statements in "Item 18. Financial Statements."

\*     \*     \*

[Note 26(d)] The Group is subject to taxation to the largest extent in Russia, and secondarily in other jurisdictions. The Russian tax system continues to evolve. Applicable taxes include value-added tax, corporate income tax (profit tax), turnover-based taxes, payroll (social) taxes and others. Laws related to these taxes have been adopted only recently, in contrast to more developed market economies; and implementing regulations are often unclear or nonexistent. Many Russian tax laws and related regulations introduced in 2002 and previous years were not always clearly drafted and their interpretation is subject to the opinions of local tax authorities, the Central Bank and the Ministry of Finance. Instances of inconsistent opinions between local, regional and federal tax authorities and between the Central Bank and the Ministry of Finance are not unusual, and few precedents with regard to issues have been established. Tax declarations, together with other legal compliance areas (for example, customs and currency control matters) are subject to review and investigation by a number of authorities that are enabled by law to impose severe fines, penalties and interest charges. These facts create tax risks in Russia substantially more significant than typically found in countries with more developed tax systems.

\*     \*     \*

- 34 -

In other tax jurisdictions where the Group conducts operations or holds shares, taxes are generally charged on the income arising in that jurisdiction. In some jurisdictions agreements to avoid double taxation are signed between different jurisdictions; however, the *risk of additional taxation exists, especially in respect of certain domiciles where some of the Group entities are located and which are considered to be tax havens*.

*Management believes that it has paid or accrued all taxes that are applicable. Where uncertainty exists, the Group has accrued tax liabilities based on management's best estimate of the probable outflow of resources embodying economic benefits, which will be required to settle these liabilities.* In accordance with SFAS No. 5 . . . . *As of December 31, 2007, the Group does not believe that any other material tax matters exist relating to the Group, including current pending or future governmental claims and demands, which would require adjustment to the accompanying financial statements in order for those statements not to be materially misstated or misleading.* Possible liabilities, which were identified by management at the balance sheet date as those that can be subject to different interpretations of the tax law and regulations are not accrued in the consolidated financial statements could be up to approximately $37,000[,000] as of December 31, 2007.

71.    The statements contained in ¶70 were materially false, misleading and meaningless as the Company was actively engaged in the conduct complained of herein. The Company also had undisclosed *probable* tax liabilities that should have been paid or accrued. Moreover, defendants failed to disclose or indicate that the Company engaged in conduct that constituted clear violations of the Russian Federation Tax Code, including: (1) that the Company had artificially inflated its margins, income and revenue through a sophisticated sales and distribution scheme involving offshore trading companies, including Kompass and Mechel's subsidiaries (Mechel International, Mechel International Holdings, Mechel Energy and Eagle Energy), to avoid properly accounting for loss contingencies and evade paying taxes on a significant portion of its revenue; and (2) that Mechel was violating the Russian Federation Tax Code's transfer pricing rules by selling coking coal and coking coal concentrate to its own offshore trading companies and other offshore trading companies at prices that were more than 20% lower than the prices charged by the trading companies to customers abroad. Further, as of March 2008 at the latest, defendants knew FAS Russia was

- 35 -

conducting a non-routine investigation of the Company's anticompetitive pricing and contract practices, which could result in a significant level of fines, price cuts and penalties related to taxes. Therefore, the purported risk warnings above lacked any meaningful relevant cautionary language, and as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

72.    The Company's Form 20-F, filed with the SEC on June 19, 2008, also purported to warn investors of the "Risks Relating to the Russian Federation and Other Countries Where We Operate," and in particular, the political and social risks.   However, these warnings were meaningless as the Company was actively engaged in the conduct complained of herein, and therefore the purported risk warnings lacked any meaningful relevant cautionary language.   For instance, the Form 20-F stated:

> *Corruption and negative publicity could disrupt our ability to conduct our business.*
>
> The local press and international press have reported high levels of corruption in Russia, including the bribery of officials for the purpose of initiating investigations by government agencies.  Press reports have also described instances in which government officials engaged in selective investigations and prosecutions to further the commercial interests of certain government officials or certain companies or individuals.   Additionally, there are reports of the Russian media publishing disparaging articles in return for payment.  If officials make unlawful demands to us or *if we are accused of involvement in official corruption, it could result in negative publicity, disrupt our ability to conduct our business effectively and thus materially adversely affect our business, financial condition and results of operations and the value of our Shares*.
>
> *       *       *
>
> *Selective or arbitrary government action could have a material adverse effect on the investment climate in Russia and on our business, financial condition, results of operations and prospects and the value of our Shares.*
>
> Governmental and prosecutorial authorities in Russia have a high degree of discretion.  Press reports have cited instances of Russian companies and their major shareholders being subjected to government pressure through selective prosecutions of violations of regulations and legislation which are either politically motivated or

- 36 -

triggered by competing business groups. Selective or arbitrary government action, if directed at us or our major shareholders, could have a material adverse effect on our business, financial condition, results of operations and prospects and the value of our Shares.

73.    The Company's Form 20-F, filed with the SEC on June 19, 2008, also purported to

warn investors that "Regulation by the Federal Antimonopoly Service could lead to sanctions with

respect to the subsidiaries we have acquired or established, our prices or our sales volumes."

However, these warnings were meaningless as the Company was actively engaged in the conduct

complained of herein, and therefore the purported risk warnings lacked any meaningful relevant

cautionary language. For instance, the Form 20-F stated:

> Inclusion of our subsidiaries in the register of companies controlling more than 35% of a specific market, as well as the classification of us or any of our subsidiaries as monopolists or persons holding a dominant market position, does not by itself restrict our current activities or the activities of these subsidiaries. However, these subsidiaries may be subject to additional FAS oversight by reason of their having been deemed to have a dominant market position.

> On April 14, 2008, the FAS issued a directive ordering Yakutugol, Southern Kuzbass Coal Company and Mechel-Invest OOO ("Mechel-Invest"), as a group of companies holding a dominant position on the Russian coking coal market, to fulfill the following requirements:

> - to support certain production volumes and product lines;
>
> - *to provide, to the extent possible, equal supply terms to all customers without discrimination* against companies not forming part of the Mechel-Invest group of companies;
>
> - not to restrict other companies from supplying coking coal to the same geographical area of operations; and
>
> - *to notify the FAS prior to any increase in domestic prices of coking coal, steam coal and coking coal concentrate, if such increase amounts to more than 10% of the relevant price used 180 days before the date such increase is planned to take place, with submission to the FAS of the financial and economic reasoning for the planned increase of prices.*

> *Additionally, on March 6, 2008 we received from the FAS two directives related to the same subsidiaries, with one of them also being addressed to Elgaugol. These*

- 37 -

*directives contain requirements similar to the ones described above*, except for the requirement for prior notification of contemplated price increases. Under these two directives the companies are required to notify the FAS within ten days of a price increase exceeding 15% as compared to the prices used a year prior to such price increase.

*Furthermore, in connection with the establishment of Mechel-Mining OAO, the subsidiary into which certain mining assets are being consolidated, Mechel received a directive from the FAS dated May 13, 2008, which contains requirements* as to the activities of Mechel, Southern Kuzbass Coal Company and Korshunov Mining Plant OAO ("Korshunov Mining Plant"), which have been deemed by FAS to be a group of companies holding a dominant position on the Russian coking coal market. *The requirements repeat those described above pursuant to the directive issued to Yakutugol, Southern Kuzbass Coal Company and Mechel-Invest on April 14, 2008*.

Upon being notified of a planned price increase, the FAS may direct a less substantial price increase to be implemented instead of the planned increase, although to our knowledge FAS has not taken such action in the past.

*The FAS may treat a failure by one of our subsidiaries to carry out the FAS's directives as an abuse of such subsidiary's dominant market position.* In the event we are deemed to be abusive of our dominant market position, the FAS may impose certain restrictions and fines with respect to our subsidiaries, which could have an adverse impact upon the operations of these subsidiaries and materially adversely affect our business and results of operations.

74.     The FAS Orders dated March 6, 2008 (No. AG/4841), March 6, 2008 (No. AG/4844), and April 14, 2008 (No. AG/8632), and the FAS Directive issued on May 13, 2008, which are incorporated herein by reference, each described the Mechel group of companies as holding a dominant position on the coking coal market, which was defined by the FAS to include coking coal concentrate products:

> Elgaugol OJSC, Mechel Invest LLC, Yakutugol Holding Company OJSC, and South Kuzbass Holding Company OJSC are members of the same group of parties.

> The group of parties that includes Mechel Invest LLC, the group of parties that includes Yuzhkuzbassugol Coal Company OJSC, and the group of parties that includes Vorkutaugol OJSC have a dominant position on the market for coking coal (anthracite used as raw material in the metallurgical industry and its processed product, coal concentrate, used both for coking as well as a raw material in the metallurgical industry) in the Russian Federation (in accordance with article 5 of the Law "On Protection of Competition").

- 38 -

75.    Defendants' statements in ¶74 were materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that the FAS Russia directives they discussed were more than routine "FAS [Russia] oversight by reason of their having been deemed to have a dominant market position" when, in fact, the directives issued constituted a non-routine investigation; (2) that the Company had engaged in anticompetitive conduct by employing a discriminatory pricing policy for raw material sales between domestic and foreign steel firms; (3) that the Company had engaged in anticompetitive conduct by fixing and maintaining coking coal and/or coking coal concentrate prices at artificially high levels and unreasonably – without economic or technological grounds – refusing to enter into supply contracts or to perform on its existing contracts; and (4) that, as the Company's anticompetitive practices already constituted an abuse of its dominant position under Russian Competition Law and violated FAS Russia's directives, FAS Russia could impose a significant level of fines and price cuts and force the Company to enter into long-term coking coal and/or coking coal concentrate supply contracts below market prices.

76.    The Company's 20-F filed on June 19, 2008 also contained Sarbanes-Oxley required certifications, signed by defendants Zyuzin and Ploschenko, who stated:

I, [Igor V. Zyuzin / Stanislav A. Ploschenko], certify that:

I have reviewed this annual report on Form 20-F of Mechel OAO;

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the company as of, and for, the periods presented in this report;

The company's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as

- 39 -

defined in the Exchange Act Rules 13a-15(f) and 15d-15(f) for the company and have:

(a)    Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the company, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b)    Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c)    Evaluated the effectiveness of the company's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d)    Disclosed in this report any change in the company's internal control over financial reporting that occurred during the period covered by the annual report that has materially affected, or is reasonably likely to materially affect, the company's internal control over financial reporting; and

The company's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the company's auditors and the audit committee of the company's Board of Directors (or persons performing the equivalent functions):

(a)    All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the company's ability to record, process, summarize and report financial information; and

(b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the company's internal control over financial reporting.

*        *        *

Pursuant to 18 U.S.C §1350, as created by Section 906 of the Sarbanes-Oxley Act of 2002, the undersigned officer of Mechel OAO (the "Company") [Igor V. Zyuzin / Stanislav A. Ploschenko] hereby certifies, to such officer's knowledge, that:

(i)    the accompanying Annual Report on Form 20-F of the Company for the year ended December 31, 2007 (the "Report") fully complies with the

- 40 -

requirements of Section 13(a) or Section 15(d), as applicable, of the Securities Exchange Act of 1934, as amended; and

(ii)    the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

77.    The statements contained in ¶76 were also materially false and misleading when made for the reasons stated in ¶56.

78.    On July 7, 2008, the Company issued a press release entitled "Mechel Announces Preliminary 2008 First Quarter Financial Results." Therein, the Company, in relevant part, stated:

Mechel OAO (NYSE: MTL), a leading Russian integrated mining and steel company, today announced preliminary financial results for the first quarter ended March 31, 2008.

Consolidated net revenue in the first quarter of 2008 is expected to exceed $2.3 billion, an increase of more than 60% when compared with consolidated net revenue of $1.4 billion in the first quarter of 2007. Consolidated net income in the first quarter of 2008 is expected to be about $500 million, an increase of approximately 160% when compared with consolidated net income of $190 million in the first quarter of 2007. Consolidated gross profit is expected to exceed $1.0 billion, an increase of 97% when compared with gross profit of $545 million in the corresponding period of 2007, and consolidated operating income is expected to exceed $630 million, an increase of approximately 100% over consolidated operating income of $302 million in the first quarter of 2007. Consolidated EBITDA is expected to exceed $850 million for the first quarter of 2008 compared with consolidated EBITDA of $340.0 million in the first quarter of 2007. Consolidated EBITDA margin is expected to increase to over 36.5% in the first quarter of 2008 compared to 24% in the 2007 first quarter.

Net debt to EBITDA ratio is expected to be approximately 1.45 in the first quarter of 2008 compared to 0.14 in the first quarter of 2007.

Igor Zyuzin, Mechel's Chief Executive Officer, commented: "Mechel continues to rapidly grow its business and again expects to achieve record financial results. Our expected performance in the 2008 first quarter reflects the successful execution of our strategy, focused on the development of the mining segment through both organic growth and acquisitions, as well as the realization of efficiencies in the steel segment from facility modernization, cost savings and product line optimization initiatives. ***Mechel's strong performance in the first quarter was also due to favorable pricing trends in our major markets.***"

- 41 -

**Mining Segment Preliminary Results**

*Mining segment revenue from external customers in the first quarter of 2008 is expected to exceed $850 million, an increase of over 105% from segment revenues of $409.3 million in the first quarter of 2007*.  The mining segment net income in the first quarter of 2008 is expected to amount to over $300 million, an increase of over 170% compared to net income of $107 million in the corresponding period of 2007.  *Gross profit is expected to exceed $600 million, an increase of over 110% compared to gross profit of $280.6 million in the corresponding period of 2007*, and operating income is expected to exceed $410 million, an increase of over 130% compared to operating income of $176.6 million in the first quarter of 2007.  Mining segment EBITDA in the first quarter of 2008 is expected to be not less than $510 million, an increase of over 150% compared to EBITDA of $198.3 million achieved in the previous year's first quarter.  EBITDA margin is expected to increase to more than 49% in the first quarter of 2008 compared with 34.4% in the first quarter of 2007.  (EBITDA margin is calculated as a percentage of consolidated revenues of the segment, including intersegment sales.)

Vladimir Polin, Mechel Management Company's Chief Executive Officer, commented on the mining segment operating results: "Our anticipated financial results for the mining segment, which will represent another record for the Company, are due in part to the acquisition of Yakutugol at the end of 2007.  Compared with the corresponding period in 2007, coal production in the first quarter of 2008 rose over 60%.  Furthermore, *coking coal production was the main driver of our performance, with production increasing 94% compared to the first quarter of last year*.  Segment results were also positively affected by increased capacity in Mechel's Port Posiet terminal operation, where capacity in the 2008 first quarter was increased by over 50% due to operational improvements.  *We also benefited from a favorable price environment for coal products due to the fact that significant demand and supply imbalance appeared in consequence of environmental and infrastructural problems.  The mining segment saw coal pricing growth over the past six months, and looking forward we anticipate the existing price environment to continue given infrastructural restraints in the market*."

\*     \*     \*

Igor Zyuzin concluded: "Our anticipated financial results for the first quarter of 2008 demonstrate the effectiveness of Mechel's integrated business model and strategy, as well as a market environment that has continued to be favorable, as well as our investments aimed at productivity enhancements and increased output of high value added products.  In the first quarter we also moved forward with our plans to start construction of a railroad to Elga coal deposit.  The commencement of operations at this deposit will enable Mechel to strengthen its position as one of the world's coking coal market leaders.  *We believe that the record profit performance and our operational progress have created a strong foundation for Mechel to achieve good results for the full year*."

79.    On July 8, 2008, Mechel filed a copy of the press release in ¶78 with the SEC on Form 6-K. The Company's Form 6-K was signed by defendant Zyuzin, and reaffirmed the Company's preliminary financial results for the first quarter of fiscal 2008.

80.    The statements contained in ¶¶78-79 were also materially false and misleading when made for the reasons stated in ¶¶56 and 71. Defendants' statements were also materially false and misleading when made because they failed to disclose or indicate that on June 23, 2008 FAS Russia issued two more directives concerning its non-routine investigation of Mechel's anticompetitive pricing practices, which were addressed to Mechel's subsidiary holding company Mechel Mining and relating to its subsidiaries Yakutugol and Southern Kuzbass Coal Company.

81.    On July 14, 2008, the Company issued a press release entitled "Mechel Reports Results for the 2008 First Quarter." Therein, the Company, in relevant part, stated:

**MECHEL REPORTS RESULTS FOR THE 2008 FIRST QUARTER**

- *Revenues increased 64.1% to $2.3 billion*

- *Operating income increased 112.3% to $642 million*

- *Net income increased 162.2% to $500 million, or $1.20 per ADR / diluted share*

Mechel OAO (NYSE: MTL), a leading Russian integrated mining and metals group, today announced financial results for the first quarter ended March 31, 2008.

Igor Zyuzin, Chief Executive Officer, commented, "Our final results for the 2008 first quarter came in as we expected, and reflect strong operational and financial performance. Conditions in the markets we serve continue to be favorable and are driven by a combination of growth factors. We are very pleased to have reported record revenue and we remain focused on the successful execution of our operating strategy."

\*        \*        \*

**Consolidated Results**

Net revenue in the first quarter of 2008 rose by 64.1% to $2.3 billion from $1.4 billion in the first quarter of 2007. Operating income rose by 112.3% to $642.1

- 43 -

million, or 27.58% of net revenue, in the first quarter of 2008, compared to operating income of $302.5 million, or 21.32% of net revenue, in the first quarter of 2007.

For the first quarter of 2008, Mechel reported consolidated net income of $500 million, or $1.20 per ADR / diluted share, an increase of 162.2% over consolidated net income of $190.7 million, or $0.46 per ADR / diluted share, in the first quarter of 2007.

Consolidated EBITDA rose by 151.1% to $853 million in the first quarter of 2008, compared to $340 million in the first quarter of 2007.

*        *        *

***Mining segment revenue from external customers for the first quarter of 2008 totaled $856 million, or 36.8% of consolidated net revenue, an increase of 109.2% over segment revenue from external customers of $409 million, or 28.8% of consolidated net revenue, in the first quarter of 2007***.

Operating income of the mining segment in the first quarter of 2008 increased by 135.7% to $416.2 million, or 39.6% of total segment sales, compared to operating income of $176.6 million, or 30.6% of total segment sales, in the first quarter of 2007. EBITDA in the mining segment in the first quarter of 2008 increased by 158.6% to $512.9 million compared to EBITDA of $198.3 million in the first quarter of 2007. The EBITDA margin in the mining segment was 48.8% for the first quarter of 2008, compared to 34.3% in the first quarter of 2007.

82.    On July 15, 2008, Mechel filed a copy of the press release in ¶81 with the SEC on Form 6-K. The Company's Form 6-K was signed by defendant Zyuzin, and reaffirmed the Company's reported financial results for the first quarter of 2008.

83.    On July 14, 2008, Mechel held a conference call for Mechel shareholders, analysts, money managers and the financial media, in which Zyuzin, Ploschenko, Polin and Tolkach participated. During the conference call, Zyuzin, Ploschenko, Polin and Tolkach reaffirmed the Company's financial results for the first quarter of fiscal 2008. Their statements included the following:

[Polin:] . . . The mining segments was a clear out performer as its revenue from sales to front markets is doubled and the steel segment also performed well with revenue increasing by one-third. ***The pricing effects contributed $255 million in the steel segment and $182 million in the mining segment***.

- 44 -

\*        \*        \*

The mining segment demonstrated by far the most significant increase in revenue and profitability during the reported period.  The rising prices for coking and steam coal and iron ore combines with an addition of Yakutugol volumes of superior quality hard coking coal sales, drove gross margin to 58% of sales in the period.  With the addition of Yakutugol to our portfolio and the priority demand high margin coking coal to share this type of coal segments sales to third parties exceeded 50% during the period compared to only 33% in the first quarter last year.

\*        \*        \*

We are very pleased with our record profitability results in the first quarter of this year and regard to this performance as compelling proof of the success of the growth strategy we have chosen and continue to follow.  *We believe that the first quarter sets a good stage for the entire year especially after the strong pricing trends that we've seen recently in both the mining and steel segments have intensified in the first half of 2008 and are expected to continue*.

\*        \*        \*

[Caller:] . . . Just wondering on your mining division, if you could give us average realized prices for your met coal and your thermal coal in the first quarter, and also give us maybe a sense of how much additional pricing upside you may have in those two businesses?  Thank you.

   [Ploschenko:] . . . In the first quarter the average realized price on the FCA or Ex-Works basis for the coking coal was $145.  That's coking coal concentrate. . .

\*        \*        \*

[Caller:] . . . The first question was on the average prices for coal and iron ore considering for domestic consumers in Southern Kuzbass and – from Southern Kuzbass to Russia and Ukraine?

   [Polin:] . . . And first the questions.  Our prices for domestic consumers of coal for Southern Kuzbass as well as Ukrainian consumers are at the level of 5,500 to RUR5,600 . . . .

84.    On July 14, 2008, Mechel's stock closed at $46.50 per share.

85.    The statements contained in ¶¶81-83 were also materially false and misleading when made for the reasons stated in ¶¶56, 71 and 80.  Defendants' statements were also materially false and misleading when made because they failed to disclose or indicate the following: (1) that on

- 45 -

May 15, 2008, FAS Russia issued a press release that confirmed its non-routine investigation of Mechel was and would continue to be "conducted with the utmost seriousness," and "if any violations of antimonopoly laws are found, harsh sanctions [would] be imposed";[2] and (2) that on or around July 14, 2008, FAS Russia had enough evidence to charge subsidiaries of Mechel with violating Russia's competition law.

86.     On July 22, 2008, the Company issued a press release entitled "Mechel Announces That It Is Concluding Domestic Quarterly Coal Supply Contracts."  Therein, the Company, in relevant part, stated:

> Mechel OAO (NYSE: MTL), one of the leading Russian mining and metals companies, announces that it has concluded long term contracts to supply coking coal to a number of Russian customers and expects to secure additional contracts in the future.
>
> Mechel has concluded agreements on supplying coking coal to major Russian steel plants for a fixed price for the third quarter of this year.  Signing such agreements increases the transparency and predictability of the market, and has benefits for both coking coal producers and consumers.  Currently, Mechel is considering the possibility of concluding even longer term contracts on the domestic market.

---

[2]     FAS Russia's May 15, 2008 press service reported the following:

**Russian Federal Antimonopoly Service Concerned About Coking Coal Price Increases**

The Russian Federal Antimonopoly Service (Russian FAS) has sent inquiries to all the major producers of coking coal and coking coal concentrate in an effort to ascertain volumes of coal deliveries to the domestic market, pricing practices, and trends in delivery prices, as well as projected volumes and prices this year.

The move by Russian FAS was prompted by concern over potential price increases for coking coal and coal concentrate in the Russian market.

The review is being conducted with the utmost seriousness, and if any violations of antimonopoly laws are found, harsh sanctions will be imposed on the violators in the form of fines based on annual turnover.

87. The statements contained in ¶86 were also materially false and misleading when made for the reasons stated in ¶¶71, 80 and 85. Defendants' statements were also materially false and misleading when made because defendants failed to disclose or indicate the following: (1) that on or before July 15, 2008 FAS Russia opened a case and had enough evidence to charge three subsidiaries of Mechel – Mechel Trading, Southern Kuzbass and Yakutugol – with violating Russia's competition laws stemming from evidence demonstrating that (a) Mechel Trading may have unjustifiably suspended coal concentrate delivery to Novolipetsk Steel ("NLMK"); (b) Mechel Trading and Yakutugol may have refused to conclude coal concentrate delivery contracts with NLMK; and (c) Mechel Trading may have violated competition laws by establishing and maintaining monopolistic prices for coal concentrate; (2) also on July 22, 2008, the Company canceled its IPO for its preferred shares, originally set for July 23, 2008, in response to FAS Russia's mounting investigation; (3) that the Company had engaged in anticompetitive conduct by employing a discriminatory pricing policy for raw material sales between domestic and foreign steel firms; (4) that the Company had engaged in anticompetitive conduct by fixing and maintaining coking coal and/or coking coal concentrate prices at artificially high levels and unreasonably – without economic or technological grounds – refusing to enter into supply contracts or to perform on its existing contracts; and (5) that, as the Company's anticompetitive practices already constituted an abuse of its dominant position under Russian Competition Law and violated FAS Russia's directives, FAS Russia could impose a significant level of fines and price cuts and force the Company to enter into long-term coking coal and/or coking coal concentrate supply contracts below market prices.

88. The market for Mechel's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements, and failures to disclose, Mechel's securities traded at artificially inflated prices during the Class Period. Plaintiffs

- 47 -

and other members of the Class purchased or otherwise acquired Mechel's securities relying upon the integrity of the market price of Mechel's securities and market information relating to Mechel, and have been damaged thereby.

89.    During the Class Period, defendants materially misled the investing public, thereby inflating the price of Mechel's securities, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company's business, financial well-being and prospects, as alleged herein.

90.    At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiffs and other members of the Class.  As described herein, during the Class Period defendants made or caused to be made a series of materially false or misleading statements about Mechel's business, financial well-being and prospects.   These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Mechel's business, financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

**The Truth Begins to Emerge**

91.    On July 15, 2008, FAS Russia stated in a press release for the Russian media that it had enough evidence to open a case against Mechel and charge three subsidiaries of Mechel –

- 48 -

Mechel Trading, Southern Kuzbass and Yakutugol with violating Russia's competition laws. According to FAS Russia, the charges stemmed from evidence demonstrating that Mechel Trading may have unjustifiably suspended coal concentrate delivery to NLMK, and that Mechel Trading and Yakutugol may have refused to conclude coal concentrate delivery contracts with NLMK. FAS Russia also had evidence demonstrating that Mechel Trading may have violated competition laws by establishing and maintaining monopolistic prices for coal concentrate.

92.     On July 22, 2008, Mechel canceled its IPO for its preferred shares, originally set for July 23, 2008, in response to FAS Russia's mounting investigation.

93.     On this news, the Company's shares fell from $46.50 per share on July 14, 2008, to close on July 23, 2008 at $36.61 per share (a 22% decline). However, the Company's shares continued to be artificially inflated due to defendants' concealment that Mechel had engaged in illegal anticompetitive behavior.

94.     On July 24, 2008, Russian Prime Minister Vladimir Putin called for antimonopoly authorities to investigate Mechel's raw material pricing policy, as the Company had sold raw materials to customers in Russia at twice the price that it had sold raw materials to non-Russian customers. Reporting on this revelation, *Bloomberg* published an article on July 24, 2008, which in relevant part stated:

> OAO Mechel plunged in New York trading after Russian Prime Minister ***Vladimir Putin called for antitrust authorities to investigate the company and said the nation should end raw-material import duties***.
>
> Putin wants to cancel tariffs on iron ore and coal to curb soaring steel prices as the government embarks on record infrastructure spending. The former president has initiated projects to modernize Soviet-era car, aircraft and shipbuilding industries.
>
> Mechel, the steel and coal producer controlled by billionaire Igor Zyuzin, ***should be investigated because it sold raw materials in Russia in the first quarter at twice the price of exports, Putin said today at a government meeting*** in Nizhny Novgorod.

- 49 -

***Putin was referring to Mechel's domestic coking-coal sales***, Industry Minister Viktor Khristenko said after the meeting, Interfax reported.  The company is the biggest supplier of coal for steelmakers in Russia.

Mechel American depositary receipts, each representing one ordinary share, fell $13.77, or 37.6 percent, to $22.84 in New York, in the largest one-day drop ever, according to data compiled by Bloomberg.  Evraz Group, Russia's largest steelmaker, dropped 4.2 percent in London, and OAO Novolipetsk Steel dropped 6.9 percent.

### Proper Behavior

"***If the company behaves properly on the market, it will be fine***," billionaire Vladimir Lisin, who controls OAO Novolipetsk Steel, was quoted by Interfax news agency.  ***Putin has reacted to "a situation when someone falls out of mutually accepted norms of behavior in the market," Lisin said***.

"These companies are charging super-profits at a time of high inflation," said James Fenkner, managing director at Red Star Asset Management LP in Moscow.  "And it just shocked people how precarious these guys are."

Russia's six main steel producers – OAO Severstal, Evraz, OAO Magnitorgorsk Iron & Steel, Novolipetsk, OAO Metalloinvest and Mechel – are controlled by eight billionaires, and the state doesn't hold equity in any of them.

Zyuzin, who was invited to attend the meeting, "has suddenly fallen ill," Putin said. He urged Zyuzin to get well soon, "otherwise, we'll need to send him a doctor and clean up all these problems."

***Putin recommended Mechel's profit margins be examined by the antitrust authorities, and "if need be," the special committee of the General Prosecutor***.

95.    On this news, the Company's shares fell $13.77 per share, or over 37.6%, to close on

July 24, 2008 at $22.84 per share, on unusually heavy trading volume of over 33 million shares.

96.    In response to the Prime Minister's statements, on July 25, 2008, the Company issued

a press release entitled "Official Statement of Mechel OAO."  The press release, in relevant part,

stated:

Mechel OAO publishes its official statement.

Mechel shares concerns of the Government of the Russian Federation, steel plants and metallurgical industry in regard to a growth in prices for steel products and raw materials in the recent time.

- 50 -

As was previously announced, Mechel has started the process of forming long-term commercial relationships with key partners and have signed a number of agreements for delivery of its products to the end of this year.

Mechel is ready for cooperation with federal authorities of the Russian Federation and, if required, will provide complete information on any arising issues.

97.     On July 25, 2008, *Reuters* published an article entitled "Mechel Says to Work with [Government] After Putin Criticism."  The article, in relevant part, stated:

Russia's top coking coal miner Mechel responded to an attack on its pricing policy from Prime Minister Vladimir Putin by promising on Friday to work with the government, helping its shares to rally. . . .

***In the terse statement, Mechel did not protest about Putin's comments and said it would cooperate with the government***.

*                *                *

***Mechel's pricing policy is already subject to an investigation by Russian anti-monopoly authorities and the decline in investor confidence threatened to derail a preferred share placement planned for August***.

***Earlier on Friday, a statement carried on Russian state news agency RIA Novosti quoted Mechel as saying it would never <u>again</u> charge a different price for coking coal on the domestic market than it did abroad***.  Mechel said it had not released the statement and the remarks appeared on RIA's wire due to a technical error, tipping the stock off an intraday peak of $27.91.

98.     Also on July 25, 2008, *RIA Novosti* published an article entitled, "Mechel to Ensure Equal Domestic and Export Coking Coal Prices." The article, in relevant part, stated:

***Russian mining giant Mechel pledged on Friday to sell coking coal at the same price domestically and abroad***, a day after the prime minister criticized the company for overcharging in Russia.

99.     On July 26, 2008, *Reuters* published an article entitled "Russia Minister Sees Mechel Problem Settling Soon."  The article, in relevant part, stated:

[Russian Industry Minister] ***Khristenko told ORT First Channel television that the attack [by Putin for Mechel's pricing policy] had no political motivation and was prompted by complaints from Mechel's domestic consumers***.

- 51 -

"I think the situation will be solved soon after all the participants of this chain – suppliers and consumers – will build normal relationships based on long-term contracts," he said.

**Putin has ordered the anti-monopoly service to check Mechel's pricing policies and threatened punitive action against the firm's billionaire owner, Igor Zyuzin.**

100.    Then on July 28, 2008, Prime Minister Putin revealed new adverse information concerning Mechel – that Mechel had also used its own offshore traders to illegally minimize tax payments.  Further, the head of FAS Russia stated that the "the Company must be punished" since FAS Russia had opened a case following an investigation into whether Mechel had fixed coking coal prices, and "had enough evidence" to fine Mechel for its violations.  Reporting on this development, *Bloomberg* published an article entitled "Mechel Plunges After Putin Questions Offshore Traders." The article, in relevant part, stated:

> **OAO Mechel declined in New York trading after Vladimir Putin said the steel and coal producer used offshore traders to minimize tax payments.**
>
> Putin's comments to a meeting of government ministers and officials was broadcast today by state television channel Vesti- 24, four days after he said the company should be investigated for price fixing.  **Moscow-based Mechel has lost almost half its value in that time.**
>
> **The company must be punished, Igor Artemyev, head of the Federal Antimonopoly Service, or FAS, was shown by Vesti-24 as saying.  The FAS has enough evidence and may fine Mechel** a sum equal to at least 1 percent of its annual sales, Artemyev said.
>
> The Moscow-based company's American depositary receipts, each representing one ordinary share, fell $6.70, or 26 percent, to $19.50 as of 4:15 p.m. in New York, valuing Mechel at $8.12 billion.  Today's move was the biggest drop since July 24, when the shares slumped a record 38 percent.
>
> Mechel declined to comment, spokesman Ilya Zhitomirsky said by mobile phone.
>
> **The FAS said July 15 it "opened a case" following an investigation into whether Moscow-based Mechel fixed coking-coal prices.  The FAS will decide on the case "much earlier" than a previous deadline of Aug. 26, he said.**
>
> Mechel has threatened to halt coal deliveries, Artemyev said.  Other companies may also be probed and punished for price fixing, Vesti-24 broadcast him as saying.

- 52 -

> *Mechel sold coal to a Swiss trading unit at a quarter of domestic prices, contributing to a coal shortage and higher steel prices in Russia, Putin said today.*

101.    Also on July 28, 2008, the *Associated Press* published an article entitled "Putin Blasts

Steel Firm for Tax Evasion."  The article, in relevant part, stated:

> *Speaking at a televised government meeting, he [Putin] said the company had dodged taxes by selling its products cheaply abroad via offshore companies, which it owns.*  While he did not mention the company by name, he made clear that the firm in question was Mechel.

> "*It's a reduction of the tax base within the country, it's tax evasion.  It's creating a shortage on the domestic market and leads to an increase in the price of metallurgical products,*" *Putin said Monday.*

> *        *        *

> *He added that Mechel is cooperating with antitrust authorities, which recently opened an investigation into the company's activities.*

> "*We consider it a positive signal that the company has been cooperating with the anti-monopoly services these past weeks,*" *said Dvorkovich.*

102.    Additionally, on July 28, 2008, *Bloomberg* published an article entitled "Russian

Stocks Fall on Report Putin Says Mechel Avoided Taxes."  The article, in relevant part, stated:

> Stocks reversed earlier gains after Interfax said *Putin told a government meeting in Moscow that Mechel has minimized its taxes using offshore sales of raw materials. Mechel "reduced its taxable income within the country, avoiding taxes," Putin said, Interfax reported*. . . .

> Mechel fell 34 percent to $17 on the RTS.  Its American depositary receipts sank 28 percent as of 11:39 a.m. in New York.

103.    Similarly, on July 28, 2008, *Reuters* reported:

> Russian Prime Minister Vladimir Putin made a new attack on Mechel on Monday, *saying the country's largest coking coal miner had evaded taxes by selling products through offshore companies at vastly reduced prices.*

> A senior Kremlin aide, however, adopted a more conciliatory stance when *urging anti-trust authorities to uphold the rule of law when investigating the New York-traded miner*, which lost a third of its value after Putin's first comments last Thursday.

- 53 -

\*      \*      \*

But *Putin reinforced his criticisms at a government meeting Monday. Shown live on the domestic NTV channel, he said Mechel had sold coal to offshore companies at a quarter of the domestic price, before selling it on at world prices.*

"*It will not do. It means a decline in the taxable base within the country and tax evasion," said Putin*.

"*The budget does not get these funds. There is a deficit of products in the domestic market, and that means a rise in prices in the metallurgical industry*."

\*      \*      \*

*Dvorkovich [chief economic aide to President Dmitry Medvedev] said FAS had a legitimate right to punish Mechel if it found any wrongdoings in its operations*.

104.    Also on July 28, 2008, *Russia & CIS Business and Financial Newswire* reported, in relevant part:

The Mechel (RTS: MTLR) coal and steel group exported raw material through offshore companies in Switzerland at prices 75% below the domestic market price, Prime Minister Vladimir Putin said at a government session on Monday.

"I already mentioned at the meeting [on Thursday] that one company was exporting its product at a fraction of the domestic market price. *The domestic price was 4,100 rubles, and they were selling it to themselves, across the border, for 1,100 rubles, that is 75% less*," Putin said.

105.    Also on July 28, 2008, *Russia & CIS Business & Financial Daily* published an article entitled "Mechel Cooperating with FAS Probe into Price Policy – Dvorkovich." The article, in relevant part, stated:

*Artemyev [FAS Russia chief] has little doubt that Mechel is in violation. "We have gathered enough evidence. One mustn't blackmail steel plants, threatening to recall trainloads of coal in order to win a doubling of the price," he said*.

\*      \*      \*

Mechel subsidiaries

The FAS is planning on August 26 to consider cases against three subsidiaries of the Mechel - Trade House Mechel LLC, OJSC Southern Kuzbass and OJSC Yakutugol, FAS press secretary Yelena Nagaichuk told Interfax on July 28.

- 54 -

As part of an inspection into the coking coal market in mid-July, the FAS opened a case against these companies and charged them with violating antimonopoly legislation.

*The FAS said in a statement on July 15 that the charges stem from unjustified suspension of coal concentrate by Trade House Mechel to Novolipetsk Steel (NLMK), and the refusal of Trade House Mechel and Yakutugol to conclude coal concentrate delivery contracts with NLMK.*

*Trade House Mechel also established and maintained high prices on coal concentrate that were not economically justified.*

106.    On this news, the Company's shares fell $6.70 per share, or over 25.5%, to close on

July 28, 2008 at $19.50 per share, on unusually heavy trading volume of over 34 million shares.

## POST CLASS PERIOD EVENTS

107.    On July 29, 2008, *Russia & CIS Business and Financial Newswire* reported, in

relevant in part:

Russian Prosecutor General Yury Chaika said that the fact that Mechel (RTS: MTLR)'s products are four times cheaper on foreign markets than in Russia is scandalous.

"We also looked into this situation. *It is a scandalous thing when a company sells products to foreign markets four times cheaper than on the domestic one.* An investigation [into criminal liability] is underway but this does not mean that any radical measures should be taken on this issue," Chaika said.

108.    On July 30, 2008, *Forbes.com* published an article entitled "Russian Coal Producers

Under Scrutiny." The article, in relevant in part, stated:

The Russian government has found a sector to hold responsible for soaring raw material costs, as the country has struggled to keep a lid on double-digit inflation.

*Russia's Federal Anti-Monopoly Service announced it would be launching a formal inquiry into the pricing of coal by producers Evraz and Raspadskaya after prices began to rise "substantially" last year. "The case has been brought on by signs that the companies have abused their dominant market position on the coking coal market," said the anti-trust regulator in a statement on its Web site on Wednesday.* Raspadskaya is 40.0% controlled by Evraz.

*The watchdog had already announced that it would be looking into the pricing of steel and coal producer, Mechel. The company had $5.0 billion wiped off its*

- 55 -

*market capitalization in a single day after scathing criticism* and a personal attack from Prime Minister Vladimir Putin on its chief executive, Igor Zyuzin[.]

\*     \*     \*

Philip Hanson, an associate fellow at London-based foreign affairs think tank, Chatham House believes that the regulator may have extended the probe to Evraz and Raspadskaya to avoid singling out Mechel. "*I see the FAS as the good guys in the general gloom of the Russian business environment and have a good track record of doing the liberal, pro-market sort of thing*."

109.    Additionally, on July 31, 2008, *Russia & CIS Metals and Mining Weekly* published an article entitled "Mechel, Coking Coal Producers Under Investigation Over Prices." The article, in relevant part, stated:

**Quadrupled profit tax claim**

**Tax authorities could slap coal and steel producer Mechel with profit tax claims that are about four times what the company has paid, experts said on July 29**.

\*     \*     \*

If the [tax] authorities find that products for export were in fact underprices, that is, the price differed from the market price by more than 20%, then additional taxes will be charged on profits based on the market price, Tsib said. "About four times [the amount paid for this period]," he estimated, adding that the company could also face fines and penalties.

The senior analyst at FBK-Pravo, Igor Tokarev also said the tax authorities should look at the facts cited by Putin. "Based on this information, the tax authorities could conduct an audit and charge additional tax on profit based on market prices," he said.

\*     \*     \*

Another expert, who asked not to be named, said there would certainly be an audit of Mechel. The company artificially reduced its export earnings by about four times, so the profit tax was consequently reduced by about the same amount, he said.

If the price difference had been 20-30%, the company would have nothing to fear, he said. The tax authorities can charge additional tax based on market prices if the price of the deal differs from the market price by more than 20%. Right now, companies try to remain within these bounds. In some cases, the difference might be up to 30%, but only because it is difficult for the tax authorities to prove such a discrepancy, he said.

- 56 -

He also said that no additional VAT would be charged, as the VAT rate on exports is zero percent.

**_Mechel paid profit tax of $356.32 million in 2007, and reported a net profit to IFRS of $913.05 million_**.

110.     Then on August 14, 2008, FAS Russia issued a Judgment against Mechel in which it described in great detail the factual circumstances underlying the charges against Mechel and made the following conclusions, among others:

(1)     Mechel Trading, Southern Kuzbass and Yakutugol occupied a dominant position in the market for the K (K9) and OS+KS grades of coking coal concentrates in the Russian Federation;

(2)     Coking coals used for the production of metallurgical coke and, correspondingly, coking coal concentrates are divided into the following groups:

- grades of coking coals/concentrates (K, KO, OS);

- grades of caking coals/concentrates (Zh, GZh);

- additives reducing the cost of the coke consisting of weakly caking, gas, and lean grades of coals/concentrates (KSN, G, GZHo, TS);

(3)     The market for grades of coking coal concentrates (K (K9), KO, OS) in the Russian Federation is highly concentrated.  Three major producers of this product operate in the market: the Mechel group of companies, Sibuglemet Holding LLC, and Prokopyevskugol Coal Company OJSC.  The Mechel group of companies has a 58-67% share of sales of grades of coking coal concentrates (K (K9), KO, OS); Prokopyevskugol Coal Company OJSC's share is 21-22%; and Sibuglemet Holding LLC's share is 12-14%.  The share of each of the remaining participants in the market for grades of coking coal concentrates (K (K9), KO, OS) in the Russian Federation does not exceed 6%; and

(4)     The Mechel group of companies violated Article 10(1) (1, 5 and 8) of the Law on Competition by abusing their dominant position in the market for the K (K9) and OS+KS grades of coking coal concentrates by, among other things:

- the creation of discriminatory conditions for individual users of [coking coal concentrate], as a consequence, Russian consumers of coking coal concentrates were placed in an unequal position as compared to the businesses that are a part of a single group of entities with Mechel OJSC, and also in the groundless refusal of Mechel Trading to supply the OS+KS and K(K9) grades of coking coal concentrates to NLMK and Altay-Koks OJSC;

- 57 -

- an economically and technologically groundless rejection by Mechel Trading to conclude an agreement to supply the K(K9) and OS+KS grades of coking coal concentrates to Altay-Koks in 2008 when it was capable of supplying the corresponding products;

- establishing and maintaining a monopolistically high price for the OS+KS and K(K9) grades of coking coal concentrates from October 2007 to July 2008.

111.    The participants in the Mechel OJSC group of entities composed of Mechel Trading, Southern Kuzbass, Yakutugol, and Mechel International acknowledged that they violated the prohibition established in Article 10 of the Law on Competition and assisted the antimonopoly authority in the investigation.

112.    On August 14, 2008, FAS Russia also issued a press release entitled "Press-release of 14.08.2008 <<Mechel>> group of companies." The press release announced that ***Mechel admitted to, and FAS Russia found Mechel guilty of, breaking competition laws*** and stated:

On 13th August 2008, the Federal Antimonopoly Service (FAS Russia) recognized that the «Mechel» group of companies violated Article 10 of the Federal Law «On Protection of Competition» in terms of creating discriminatory conditions for individual consumers of the companies' products; economically and technologically unfounded refusal to enter into a product supply contract; and fixing and maintaining monopolistically high goods prices.

The group of persons including «Mechel» Trading House» Ltd., «Yuzhny Kuzbass» Coal Company» OJSC, «Yakutugol» Holding Company» OJSC and «Mechel Traiding [sic]» Company has the dominant position on the market of coking coal concentrates, grades (K (K9), KO, OC) in the Russian Federation. The case against the group of persons (for abusing dominant position) was initiated on 15th July 2008 upon a petition of «Magnitogorsk Iron & Steel Works» OJSC, «Altai-Coks» OJSC and «Novolipetsk Steel» OJSC.

Under Article 14.31 of the Code of the Russian Federation on Administrative Violations, abusing dominant position is liable with administrative fine upon legal persons amounted to 1-15% of the net sales of the violator on the market, where the violation occurred, in the year preceding the year when the violation was revealed.

Calculating the fine, FAS Russia will take into account that ***the «Mechel» group of companies admitted the fact of violating Article 10 of the Federal Law «On Protection of Competition»*** as well as companies' cooperation (assistance) in the

- 58 -

investigation and measures undertaken by the companies to eliminate the violations and their consequences.

113.    Also on August 14, 2008, *Bloomberg* reported that the Company may be fined as much as $130 million as a result of being found guilty of breaking competition laws by FAS Russia. Reporting on this development, *Bloomberg* published an article entitled "Mechel Faces as Much as $130 Million Fine After Probe."  The article, in relevant part, stated:

> OAO Mechel, attacked by Vladimir Putin for inflating Russian coking-coal prices, may be fined as much as $130 million after the nation's antitrust watchdog found the company guilty of breaking competition law.
>
> Mechel, the country's largest producer of the steelmaking ingredient, ***discriminated against Russian consumers, "unreasonably refused contracts" and maintained a monopoly in the coal market, the Federal Antimonopoly Service said in a statement on its Web site today.  The FAS said it would take into account Mechel's cooperation in the probe when setting the fine***.
>
> \*        \*        \*
>
> ***Abusing a dominant position is punishable by 1 to 15 percent of the previous year's sales in the market where the violation occurred***.  The company generated coking-coal revenue of $869 million, according to Marat Gabitov, an analyst at UniCredit SpA in Moscow.  Mechel is yet to provide a breakdown of 2007 earnings.
>
> \*        \*        \*
>
> ***The watchdog started the investigation into Mechel after complaints from steelmakers including OAO Magnitogorsk Iron & Steel and OAO Novolipetsk Steel***.  The FAS is also probing coal producer OAO Raspadskaya and steelmaker Evraz Group SA.

114.    Also on August 14, 2008, *Bloomberg* published an article entitled "Mechel Told to Cut Prices 'Considerably' After Probe." The article, in relevant part, stated:

> OAO Mechel, attacked by Vladimir Putin for inflating Russian coking-coal prices, ***was ordered to cut tariffs for domestic steelmakers "considerably" after an antitrust probe found the company violated competition law***.
>
> \*        \*        \*

- 59 -

*Mechel's domestic clients were charged less than export customers in only two of the past six months, according to Anatoly Golomolzin, deputy chief of the antitrust body*.

**Long-Term Accords**

The company, controlled by billionaire Igor Zyuzin, may have to pay the equivalent of 7 to 8 percent of domestic coal revenue and may agree to lower prices in Russia by 30 percent, Kommersant reported earlier today, citing unidentified people familiar with the results of yesterday's hearing.  Mechel spokesman Ilya Zhitomirsky declined to comment.

*FAS will order Mechel to switch to long-term contracts starting in 2009 and require it to agree on prices and sales volumes with steelmakers in the next three months*, Golomolzin said.  Once Mechel lowers coking-coal prices, the FAS will demand steelmakers cut their prices as well, Artemyev said.

Coking-coal prices almost doubled in the first quarter and averaged $145 a ton after rising 52 percent to $90 a ton in 2007, according to a Mechel presentation on its Web site.

115.    On August 19, 2008, the *Associated Press* reported:

Russian antitrust authorities said Tuesday that troubled miner *Mechel will have to cut tariffs for its coking coal by 15 percent and pay some $32 million for price-fixing*.

*Igor Artemyev, director of Russia's Federal Antimonopoly Service, said Mechel would be fined 5 percent of its annual profit and would have to cut prices on coking coal by 15 percent*.

*       *       *

*Vladimir Zhukov of Lehman Brothers said the fine is far lower the $150 million to $200 million he expected.  The announced price cut does not show how dramatically the tariffs will change.  "It's hard to say what the price they will be calculating the 15 percent from," Zhukov said*.

*The future of Mechel is, however, still up in the air as allegations of tax evasion have not been investigated yet.  "We need to see whether other probes will go ahead*," Zhukov said.  A bigger issue, the analyst said, is what Mechel will be considering the benchmark when signing new contracts for coking coal.

116.    In addition, on August 14, 2008, *Reuter News* published a release entitled "Russia punishes Mechel with enforced coal price cuts."  The release reported, in relevant part:

- 60 -

More damaging [than the FAS fine], said analysts, would be the loss of potential revenues incurred as a result of a [FAS-imposed 30%] reduction in [Mechel's] coal prices. Dmitry Smolin, mining analyst at UralSib, said *Mechel could miss out on $600 million in second-half revenues*. Another analyst, UniCredit Aton's Marat Gabitov, said *losses in revenue could amount to $950 million for the whole of 2008*.

117.    Similarly, as reported by *Banking and Stock Exchange, Finance, Economics (Russia)* in August 2008, Deutsche Bank analysts estimated that a 30% decrease in coking coal prices would result in a 2% reduction of Mechel's profit in 2008 and an 8% reduction of Mechel's profit in 2009.

118.    Finally, on September 1, 2008, *Reuters* reported:

Embattled Russian miner Mechel has complied with regulatory orders to cut prices and sign long-term supply deals for coking coal with its main local clients, a source familiar with the deals said on Monday.

*        *        *

The long-term deals, which the Federal Anti-monopoly Service (FAS) obliged Mechel to make following Putin's statements, were reached with three Russian steel majors – MMK, Severstal and Evraz – for 2009 to 2013, the source said.

*The price under the contracts will be at a discount to global coking coal prices*, the source added, but was unable to give a precise figure.

*Vedomosti business daily reported that the prices will be at a discount of 20-35 percent to those offered under FOB contracts by global mining giants BHP Billiton and Rio Tinto*.

*        *        *

*Mechel, Russia's largest coking coal miner, also complied with another order from the anti-monopoly watchdog, which called for the company to slash its domestic prices by 15 percent* under contracts reached between September and the end of the year, the source told Reuters.

*FAS officials said the order to lower prices had been issued after a thorough investigation*.

119.    On June 23, 2009, Mechel filed its Annual Report with the SEC on Form 20-F. In relevant part, the Company's 20-F contained, for the first time, the following partial admissions and warnings:

506629_1

*Risks Relating to Our Business and Industry*

\*       \*       \*

In addition, the length and pricing terms of our sales contracts on certain types of products are affected and regulated by orders issued by Russian antimonopoly authorities. . . .

\*       \*       \*

*Successful implementation of our strategy to expand our specialty long product sales and coal sales depends on our ability to increase our export sales of these products.*

While we expect continued growth of demand in the Russian market for specialty long products . . . . ***We face a number of obstacles to this strategy, including trade barriers and sales and distribution challenges as well as restrictions imposed by antimonopoly legislation and regulatory orders***. . . .

Likewise, our strategy to increase our sales of coal, particularly high-grade coking coal, is substantially dependent on our ability to increase our exports of these products from our coal assets in the Russian Far East to other countries. . . . ***Our ability to increase coking coal export volumes is also limited by our ability to first satisfy domestic Russian coal demand, pursuant to a FAS directive issued to us in August 2008***.

\*       \*       \*

*Regulation by the Federal Antimonopoly Service could lead to sanctions with respect to the subsidiaries we have acquired or established, our prices, our sales volumes or our business practices.*

\*       \*       \*

[O]n October 10, 2008, the FAS issued new directives to Mechel Mining Management ordering Mechel Mining Management, Yakutugol and Southern Kuzbass Coal Company to follow the FAS's requirements [(1) to support certain production volumes and product lines; (2) to provide, to the extent possible, equal supply terms to all customers without discrimination against companies not forming part of the Mechel-Invest group of companies; and (3) not to restrict other companies from supplying coking coal to the same geographical area of operations] in place of the original addressees. . . . ***Under these two directives, the companies are required to provide a justification of increases in the price of coking coal concentrate if the change in price is 10% more than the weighted average price over the previous six months***.

. . . . ***Additionally, on June 23, 2008 the FAS issued two more directives, which were addressed to our subsidiary holding company Mechel Mining and relating to its subsidiaries Yakutugol and Southern Kuzbass Coal Company***.    The

- 62 -

requirements under these two directives substantially repeat those described above [(1) to support certain production volumes and product lines; (2) to provide, to the extent possible, equal supply terms to all customers without discrimination against companies not forming part of the Mechel-Invest group of companies; (3) not to restrict other companies from supplying coking coal to the same geographical area of operations to support certain production volumes and product lines; and (4) to notify the FAS prior to any increase in domestic prices of coking coal, steam coal and coking coal concentrate, if such increase amounts to more than 10% of the relevant price used 180 days before the date such increase is planned to take place, with submission to the FAS of the financial and economic reasoning for the planned increase of prices].

\*       \*       \*

In the event of breach of the terms of business conduct set forth by the FAS by our companies, the FAS may seek to impose liability for violation of antimonopoly legislation and of administrative legislation, which would materially adversely affect our business and results of operations. Such liability may take the form of an administrative fine of up to 15% of the proceeds of sale of all goods, works and services on the market where such violation, was committed, but not more than 2% of gross proceeds of sale of all goods, works and services. ***Russian legislation also provides for criminal liability for violations of antimonopoly legislation resulting in damage over one million rubles***. Furthermore, for systematic violations a court may order, pursuant to a suit filed by the FAS, a compulsory split-up or spin-off of the violating company, and no affiliation can be preserved between the new entities established as result of such a mandatory reorganization. The imposition of any such liability on us or our subsidiaries could materially adversely affect our business, results of operations, financial condition or prospects.

***Negative publicity associated with any antimonopoly, administrative, criminal or other investigation or prosecution carried out with respect to our business practices, regardless of the outcome, could damage our reputation and result in a significant drop in the price of our shares and ADSs and could materially adversely affect our business and prospects***.

\*       \*       \*

*Regulation by the Federal Antimonopoly Service could lead to sanctions with respect to the subsidiaries we have acquired or established, our prices, our sales volumes or our business practices*.

\*       \*       \*

*Selective government action could have a material adverse effect on the investment climate in Russia and on our business, financial condition, results of operations and prospects and the value of our shares and ADSs*. . . .

- 63 -

In mid-2008, Mechel came under public criticism by the Russian government. Repeated statements were made accusing Mechel of using tax avoidance schemes and other improprieties. Ultimately the allegations regarding tax avoidance were not confirmed by the tax authorities, but the antimonopoly investigation resulted in imposition of a fine and a number of FAS directives regarding our business practices.

*       *       *

*Domestic Sales*

*       *       *

Pursuant to a directive from the FAS dated August 14, 2008, we entered into long-term coking coal supply contracts with some of our major domestic customers. These new contracts provide for the supply of coking coal concentrate under a fixed price based on the price of premium hard coking coal under one-year contracts under FOB terms from Australian ports, excluding the costs of transshipment and rail transportation with the application of a coefficient representing the quality of the coal concentrate. Previously, the delivery terms for most of our major domestic customers provided for sale at spot market prices.

The long-term contracts were entered into with MMK, EvrazResurs, Severstal, KOKS, Metalltrade for terms of four and five years for a total annual volume of delivery from four to five million tonnes of coking coal.

*       *       *

*Mining Segment*

*       *       *

Taxes other than income tax include property and land taxes, as well as other taxes. ***Taxes other than income tax increased by $56.6 million, or 1,484.4%, to $60.4 million in the year ended December 31, 2008 from $3.8 million in the year ended December 31, 2007.  The increase was mainly due to the recognition of $34.0 million in tax penalties and fines imposed by FAS under antimonopoly legislation on Mechel Trading House, Southern Kuzbass Coal Company and Yakutugol***.

*       *       *

*Antimonopoly*

In the summer of 2008, in the course of a regulatory inquiry into business practices on the Russian coking coal market, the FAS initiated an antimonopoly investigation into the business of our subsidiaries Mechel Trading House, Southern Kuzbass Coal Company, Yakutugol and Mechel Trading on allegations of abuse of their dominant position on the Russian market of coking coal concentrate.  As a result of the investigation, in August 2008 the FAS issued findings according to which these

- 64 -

subsidiaries were held to have violated Russian antimonopoly law by abusing their dominant position on the Russian market for certain grades of coking coal concentrate. The FAS issued a directive requiring these subsidiaries to cease the violations and to change the terms of supply of coking coal concentrate to customers in Russia by: (1) refraining from establishing monopolistically high or low prices; (2) providing, to the extent possible, equal supply terms to all customers without discrimination; (3) submitting to the FAS during the next 5 years economic justifications of each coking coal concentrate price increase of more than 5% as compared to the prices of previous quarter; (4) reducing sale prices by 15% for the period from September 2008 until December 2008; and (5) executing long-term supply contracts of at least three years' duration with effect from 2009. We fulfilled all terms set forth in the FAS directive and intend to further comply with them.

Furthermore, *as a result of the antimonopoly investigation FAS initiated administrative proceedings against Mechel Trading House, Southern Kuzbass Coal Company and Yakutugol which resulted in fines being imposed on these companies in the total amount of 797.7 million rubles, which equals nearly 5% of these subsidiaries' total sales of coking coal concentrate for 2007*. The companies were granted a deferral of the payment of the fines in accordance with the law. Currently all fines have been paid in full.

\*        \*        \*

TAXES OTHER THAN INCOME TAX

Taxes other than income tax included in the consolidated income statements of income and comprehensive income are comprised of the following . . . .

\*        \*        \*

*Included in fines and penalties related to taxes in 2008 are penalties to Federal Antimonopoly Service ("FAS") in the amount of $34,008[,000]* (refer to Note 26(g)).

\*        \*        \*

*Commitments*

In the course of carrying out its operations and other activities, the Group and its subsidiaries enter into various agreements, which would require the Group to invest in or provide financing to specific projects or undertakings. . . .

As of December 31, 2008, total Group's contract commitments amounted to . . . commitment for delivery of goods and services of $936,047[,000]. . . .

\*        \*        \*

- 65 -

Included in the commitments related to delivery of goods and services are amounts arising from long-term fixed-price sales contracts signed by the Group based on the demands of the FAS, which required the Group to sign long-term delivery contracts for coal supply.

*       *       *

*Government accusations and Federal Antimonopoly Service audits*

After the Prime Minister Putin's sharp criticism of the Group's monopoly prices, the FAS started an on-site audit of Mechel mining entities to determine the reasonableness of prices set by the Group for the Russian coal market. Based on the FAS statement of August 19, 2008, Mechel had created discriminatory terms for certain buyers, unjustifiably declined to sign supply contracts, and set and maintained monopoly prices. ***According to the FAS decision, the fine imposed on Mechel constituted 5 per cent of the Group's 2007 sales of certain types of coal and amounted to $34,008[,000]***. The amount was paid in full.

Management believes that the risk of recurring claims from the FAS or other regulatory bodies is remote due to the fact that the Group has fully met all previous requirements and paid the penalties implied by the FAS.

120.    Even after the Class Period, defendants failed to disclose that they faced and still face criminal liability for their competition and tax law violations. The criminal investigation of Mechel's anticompetitive practices by the Investigations Committee of the Prosecutor General's Office remains pending. They also failed to disclose that they face the prospect of being assessed additional back taxes as well as fines and penalties related to their tax violations.

121.    Further, defendants never disclosed their illegal business practices with Kompass, which involves Mechel "selling" coking coal to Kompass at artificially low prices and Kompass re-selling the coal at a higher price and kicking back directly or indirectly a portion of the increase to Mechel and/or its insiders.

**DEFENDANTS ENGAGED IN ILLEGAL ANTICOMPETITIVE
CONDUCT AND TAX EVASION**

122.    During the time period that defendants issued the false and misleading statements and omissions identified above, the Company under the direction of the Individual Defendants engaged

- 66 -

in anticompetitive conduct and transfer pricing schemes, substantially inflating the Company's revenues and earnings and putting the Company at substantial risk of up to $1.42 billion in tax claims for unpaid back taxes, criminal charges, and crippling civil penalties and fines. Russian law provides that companies acting in violation of Russian competition laws are to be fined 1% to 15% of the total revenue from the previous year's sales in the market where the laws were violated. In addition, the Russian Federation Tax Code permits the tax authorities to demand payment of all tax liabilities that are found to have been avoided through the use of transfer pricing.

123.    At all relevant times, Mechel, together with Russian coking coal producers Raspadskaya Coal and Evraz Holding, controlled over 50% of the coking coal market in Russia and with these companies, held at all relevant times a dominant position as that term is defined in the Russian Federal Act on Protecting Competition (the "Competition Law"). As alleged herein, FAS Russia determined and Mechel admitted holding a dominant position during the Class Period. The Competition Law provides a clear threshold of 50% for the creation of a dominant position in a particular market, or a collective dominant position held by up to three companies in a particular market. Russian law does not require the companies to have coordinated their actions or for a "connecting factor" to exist among the companies for such companies to be deemed to have a collective dominant position.

124.    Article 10 of the Competition Law, entitled "Prohibition of Abuse of Dominant Position by an Economic Entity," prohibits dominant companies from abusing their dominant position in a way that could result in the prevention, restriction or elimination of competition in the relevant market. Monopolistic and predatory pricing, restrictions in production, the imposition of unfair contractual terms, or the refusal to supply products without economic or technical justification

are activities that holders of a dominant position are clearly and unambiguously prohibited from engaging in under the Competition Law.  Article 10, Part 1 provides in relevant part:

> 1.    Actions (inaction) of an economic entity occupying a dominant position, which result or can result in prevention, restriction or elimination of competition and (or) infringement of the interests of other persons are prohibited, including the following actions (inaction):
>
> 1)    establishment and maintaining of monopolistically high or monopolistically low price for a commodity . . . .
>
> \*        \*        \*
>
> 5)    economically or technologically unjustified refusal or evasion from concluding a contract with individual purchasers (customers) in the case when there are possibilities for production or delivery of the relevant commodity as well as in the case if such refusal or evasion is not provided for directly by the federal laws, statutory legal acts of the President of the Russian Federation, the Government of the Russian Federation, authorized federal bodies of executive authority or judicial acts . . . .
>
> \*        \*        \*
>
> 8)    creation of discriminatory conditions . . . .

125.    According to an official report issued by the Russian Accounting Chamber, which is the financial controlling agency for the Russian Parliament, Mechel in 2007 and early 2008 (*i.e.*, during the Class Period) repeatedly abused its dominant position in the coking coal market by: (i) establishing and maintaining monopolistically high prices; (ii) refusing to enter into supply contracts with Russian customers without economic or technological grounds; and (iii) creating discriminatory conditions for certain consumers of Mechel's products.  In particular:

(a)    Mechel Trading (now known as Mechel International), Southern Kuzbass and/or Yakutagol wrongfully suspended the delivery of coking coal concentrate to one of Mechel's largest Russian customers, NLMK without economic or technological justification in violation of the Competition Law;

- 68 -

(b)    Mechel Trading, Southern Kuzbass and/or Yakutugol refused to supply coking coal concentrates to NLMK, and to another customer, OAO Altai-Koks, in breach of their contracts with both companies.  Mechel also unjustifiably refused to enter into a new contract with Altai-Koks.  Both activities were in violation of the Competition Law; and

(c)    Mechel Trading charged monopolistically high prices to its Russian customers, prices which were 75% higher than prices charged to customers outside of Russia, in violation of the Competition Law.

126.    The penalty for abuse of dominant position is set forth in Article 14.31 of the Code of Administrative Offenses of the Law of the Russian Federation, which provides for the imposition of an administrative fine of 1% to 15% of the total revenue of the offender from the sale of goods on the market where the violation was committed, for the year that preceded the year when the violation of the law was identified.

127.    The natural consequence for Mechel in terminating its illegal practice of charging monopolistically high prices to its Russian customer would be a need to cut coking coal and coking coal concentrate prices.  As set forth in FAS Russia's August 14, 2008 judgment, certain Russian consumers opined to FAS Russia that Mechel sold coking coal and/or coking coal concentrate to them at prices that were artificially inflated by as much as 20%.  Analysts and the media also reported that, as a result of Mechel's competition law violations, FAS Russia could mandate a 30% reduction in Mechel's coking coal and/or coking coal concentrate prices for the remainder of 2008.

128.    On August 19, 2008, following its investigation into Mechel's anticompetitive conduct, FAS Russia announced that Mechel would be fined 5% of its 2007 annual coking coal profit and would have to cut prices on coking coal, including coking coal concentrate, by 15%.  Earlier in the month, as reported by *Reuter News*, analysts had estimated that a 30% reduction in

- 69 -

coking coal prices could equate to $600 million in lost second-half 2008 revenues and $950 million in lost revenues for the whole of 2008.

129.    On August 20, 2008, following its investigation into Mechel's anticompetitive conduct, FAS Russia found Mechel guilty of violating Clauses 1, 5 and 8, Part 1, Article 10 of the Competition Law, imposed a fine of RUR 797,735,291 on Mechel (U.S. $34 million) equal to 5% of its total revenue from the sale of coking coal for 2007, which includes coking coal concentrate sales, and ordered Mechel to cut its coking coal, including coking coal concentrate, prices by 15%.

130.    Using analysts' calculations in ¶128 above, such a reduction in Mechel's coal prices would equate to hundreds of millions in lost revenues for Mechel in 2008.

131.    During the relevant time period, Mechel also engaged in illegal transfer pricing. Transfer pricing occurs when an entity (or its subsidiary) sells a product at below market prices to an affiliated entity either to avoid taxes or to strip profits from one entity to another.  According to an article published on August 18, 2008 by *Kommersant* entitled "Prime Minister of Russia Vladimir Putin Moves Attack on Mechel to National Level," Mechel engaged in transfer pricing by charging its Swiss offshore trading unit, Mechel International, prices that were three to four times less than prices on the domestic coal market.  Quoting Prime Minister Putin, the article states that Mechel sold coking coal for RUR 4,100 (U.S. $139.00) per ton domestically but for only RUR 1,100 (U.S. $37.50) per ton to Mechel International, a price variance of 75%.  Mechel International then sold the coking coal on the global market for RUR 9,473 (U.S. $323.00) per ton, thus avoiding Russian tax liability on the difference between the amount paid by Mechel International and the price Mechel International received from the global market.  Mechel's pricing practices were so egregious that Russia's Prosecutor General Yury Chaika called Mechel's conduct "scandalous," according to an article published on July 29, 2008 by *Russia & CIS Business Financial Daily*.

132.   Publicly available Russian customs data obtained in the course of plaintiffs' investigation confirms that Mechel, through its subsidiary Southern Kuzbass, was engaged in systematic transfer pricing for coking coal sales throughout the Class Period, a pattern which escalated in 2008 as Mechel's need for cash became more urgent as its debts skyrocketed as described in more detail below.

133.   The chart below is a sampling of egregious transfer pricing transactions by Southern Kuzbass between January 1, 2008 and July 25, 2008, and shows that Mechel International (formerly Mechel Trading) paid as much as 69.25% less to Southern Kuzbass than the prices paid by AzovStal (Azov Steel) and Arcelor Mittal Group ("Arcelor") on the same day:

| Southern Kuzbass – 2008 | | | | |
|---|---|---|---|---|
| **Buyer** | **Date** | **Volume (tons)** | **Total Price** | **Price per ton** |
| Mechel International | 02/14/2008 | 20,692.90 | $1,107,070 | $53.50 |
| AzovStal (Azov Steel) | 02/14/2008 | 10,573.20 | $1,141,906 | $108.00 |
| AzovStal (Azov Steel) | 02/14/2008 | 10,013.50 | $1,081,458 | $108.00 |
| | | | | |
| Mechel International | 06/24/2008 | 15,139.70 | $628,298 | $41.50 |
| Arcelor Mittal Group | 06/24/2008 | 20,442.40 | $2,759,724 | $135.00 |

134.   Also, unbeknownst to the tax authorities, according to an analyst with over ten years experience in analyzing sources in Latvia, the Latvian business community and its key players ("Latvia analysts"), Mechel was engaged in illegal tax evasion schemes through an unaffiliated company, Kompass, a Riga, Latvia-registered company, which describes itself as a provider of "transit services" in Latvia.  The unaffiliated company is a part of a larger group, Kompass Grupa, which includes, *inter alia*, Baltikums Banka ("Baltikums"), a Latvian bank.

135.   Kompass Grupa has been accused of illegal money laundering by the SEC.  In July 2007, it was widely reported in the Latvian media that American Express Bank closed its correspondent accounts with Baltikums.  *Business & Baltia*, one of Latvia's most respected Russian-language business daily newspapers, reported that the decision to close the Baltikums accounts was

- 71 -

made by American Express Bank under pressure from the SEC due to suspicions of money laundering.

136.     According to Latvia analysts, Baltikums (one of the twenty-four banks in Latvia) regularly assist customers from Russia and other countries of the former Soviet Union with what they describe as "tax optimization services."  Upon information and belief derived from Latvia analysts' investigation and Russian customs data described below, during the Class Period, Kompass arranged for "tax optimization services" to be provided to Mechel in violation of Russian tax laws. In essence, Mechel "sold" coking coal to Kompass at artificially low prices and Kompass re-sold the coal at a higher price and kicked back a portion of the increase directly or indirectly to Mechel and/or its insiders.

137.     The Russian customs data confirms that Mechel through its subsidiary Southern Kuzbass was selling coking coal to Kompass during the Class Period at prices that mirrored the prices charged to Mechel International, and in some instances, were even lower.  In 2007, for example, Kompass paid Southern Kuzbass an average price per ton of $52.10 while Mechel International paid $63.40.  Also, Kompass and Mechel International bought far more coking coal, 268,217 tons and 373,975 tons, respectively, than any other customer in 2007.  The highest volume any other customer bought was 161,931 tons by Dneprodzerzhinsk Coke Chemical Plant, at an average price of $81.50 per ton (*i.e.*, 36% and 22.2% price differential) as compared to Kompass & Mechel International, respectively.

138.     In 2008, Kompass paid Southern Kuzbass only $24.70 per ton on average, compared with $46.00 per ton on average paid by Mechel International and $138.00 per ton, $114.00 per ton, and $118.00 per ton paid on average by foreign customers Arcelor, Kharkov Coke Plant, and AzovStal (Azov Steel), respectively.

139.    Mechel's transfer pricing scheme was in clear violation of Article 40 of the Russian Federation Tax Code ("Tax Code"), which categorically prohibits transactions between related parties in which there is a 20% or greater price differential between the price charged to the related party and the market price for identical goods or goods of a similar kind.  The tax authorities are authorized by statute to assess additional taxes and a penalty for companies that are found to have violated Article 40.

140.    Mechel's unpaid tax liabilities arising from its illegal transfer pricing practices with respect to Mechel International, Mechel International Holdings, Mechel Energy and/or Eagle Energy, resulted in substantially inflated revenues and earnings, and exposed the Company to a substantial risk of claims for unpaid back taxes, criminal charges, and crippling civil penalties and fines.

141.    As detailed in ¶109 above, on July 31, 2008, *Russia & CIS Metals and Mining Weekly* published an article entitled "Mechel, Coking Coal Producers Under Investigation Over Prices" in which it stated that "Tax authorities could slap coal and steel producer Mechel with profit tax claims that are about four times what the company has paid."

142.    As described herein, during the Class Period, defendants made or caused to be made a series of materially false or misleading statements about Mechel's business, financial well-being and prospects.  Specifically, defendants' illegal anticompetitive pricing and contracting practices and tax avoidance scheme made defendants' Class Period statements false and misleading and rife with omissions concerning Mechel's margins, production costs, costs of goods, loss contingencies, income and revenue.  In addition, throughout the Class Period defendants falsely represented that Mechel was experiencing record financial results due to favorable pricing environments and Mechel's strategies to increase revenue and profitability.  These material misstatements and

omissions had the cause and effect of creating in the market an unrealistically positive assessment of Mechel and its business, financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and misleading statements during the Class Period resulted in plaintiffs and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

## MECHEL'S VIOLATION OF U.S. GAAP RULES IN ITS FINANCIAL STATEMENTS FILED WITH THE SEC

143.    The Company's financial statements and the statements about the Company's financial results were false and misleading, as such financial information was not prepared in conformity with U.S. GAAP, nor was the financial information a fair presentation of the Company's operations due to the Company's improper accounting for, and disclosure about its revenues and failure to accurately disclose loss contingencies, in violation of U.S. GAAP rules.

144.    In Mechel's 2008 Form 20-F, the Company represented that its financial statements were in accordance with U.S. GAAP:

> The financial data set forth below as of December 31, 2007, 2006, 2005, 2004 and 2003, and for the years then ended, have been derived from our consolidated financial statements. Our reporting currency is the U.S. dollar and we prepare our consolidated financial statements in accordance with accounting principles generally accepted in the United States ("U.S. GAAP").

145.    U.S. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4 01(a)(1)) states that financial statements filed with the SEC which are not prepared in compliance with U.S. GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with U.S.

- 74 -

GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements.  17 C.F.R. §210.10-01(a).

146.    GAAP, as set forth in FASB Statement of Financial Accounting Standard ("SFAS") No. 5, governs companies' accounting for contingencies.[3]  SFAS No. 5 requires contingent losses be accrued where certain conditions exist and where a loss is probable, but cannot be reasonably estimated, adequate disclosures must be made:

**Accrual of Loss Contingencies**

8.    An estimated loss from a loss contingency (as defined in paragraph 1) shall be accrued by a charge to income if *both* of the following conditions are met:

a.    Information available prior to issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements.  It is implicit in this condition that it must be probable that one or more future events will occur confirming the fact of the loss.

b.    The amount of loss can be reasonably estimated.

**Disclosure of Loss Contingencies**

9.    Disclosure of the nature of an accrual made pursuant to the provisions of paragraph 8, and in some circumstances the amount accrued, may be necessary for the financial statements not to be misleading.

10.    If no accrual is made for a loss contingency because one or both of the conditions in paragraph 8 are not met, or if an exposure to loss exists in excess of the amount accrued pursuant to the provisions of paragraph 8, disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or

---

[3]    On June 30, 2009, the Financial Accounting Standards Board ("FASB") issued SFAS No. 168, *The FASB Accounting Standards Codification™ and the Hierarchy of Generally Accepted Accounting Principles – a replacement of FASB Statement No. 162.*  FASB *Accounting Standards Codification™* ("ASC") will become the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC.  These allegations use the historical references to U.S. GAAP, as such references existed during the Class Period.

an additional loss may have been incurred.[4]  The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made.  Disclosure is not required of a loss contingency involving an unasserted claim or assessment when there has been no manifestation by a potential claimant of an awareness of a possible claim or assessment unless it is considered probable that a claim will be asserted and there is a reasonable possibility that the outcome will be unfavorable.

147.    Prior to and during the Class Period, three subsidiaries of Mechel were being investigated for violating Russia's competition laws and the Company had been engaging in anticompetitive conduct and failing to adequately accrue tax liabilities.  The combination of Mechel's illegal activities and the fact that it was being investigated for such activities meant that it was probable Mechel would incur a loss, in the form of fines or other penalties and increased taxes.  As a result, per SFAS No. 5, the Company was required to accrue a loss for such penalties if the loss could reasonably be estimated.  If not capable of being reasonably estimated, an adequate disclosure of the loss and the estimated range of loss was required to be included as a footnote to Mechel's financial statements.  The failure to do so caused Mechel's financial statements issued during 2008 and 2009 to be false and misleading and presented in violation of U.S. GAAP.

148.    As a result, the Company announced financial results that were in violation of U.S. GAAP and the following concepts:

---

[4]      For example, disclosure shall be made of any loss contingency that meets the condition in paragraph 8(a) but that is not accrued because the amount of loss cannot be reasonably estimated (paragraph 8(b)).  Disclosure is also required of some loss contingencies that do not meet the condition in paragraph 8(a) – namely, those contingencies for which there is a *reasonable possibility* that a loss may have been incurred even though information may not indicate that it is *probable* that an asset had been impaired or a liability had been incurred at the date of the financial statements.

- 76 -

(a)    The principle that "financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit, and similar decisions" was violated (FASB Statement of Concepts No. 1, ¶34);

(b)    The principle that "financial reporting should provide information about the economic resources of an enterprise, the claims to those resources . . . and effects of transactions, events, and circumstances that change resources and claims to those resources" was violated (FASB Statement of Concepts No. 1, ¶40);

(c)    The principle that "financial reporting should provide information about an enterprise's financial performance during a period" was violated (FASB Statement of Concepts No. 1, ¶42);

(d)    The principle that "financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it" was violated (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should be reliable in that "it represents what it purports to represent" was violated (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)    The principle that completeness, meaning that "nothing material is left out of the information that may be necessary to insure that it validly represents underlying events and conditions" was violated (FASB Statement of Concepts No. 2, ¶79); and

(g)    The principle that conservatism be used as a "prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered" was violated (FASB Statement of Concepts No. 2, ¶95).

506629_1

149.    The adverse information concealed by defendants during the Class Period and detailed above was in violation of Item 303 of Regulation S-K under the federal securities law (17 C.F.R. §229.303).

## LOSS CAUSATION

150.    During the Class Period, as detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of Mechel's securities and operated as a fraud or deceit on Class Period purchasers of Mechel's stock by failing to disclose to investors, *inter alia*:

(a)    that the Company had engaged in anticompetitive conduct by employing a discriminatory pricing policy for raw material sales between domestic and foreign steel firms;

(b)    that the Company had engaged in anticompetitive conduct by fixing and maintaining coking coal and/or coking coal concentrate prices at artificially high levels and unreasonably – without economic or technological grounds – refusing to enter into supply contracts or to perform on its existing contracts;

(c)    that the Company's anticompetitive practices in the coking coal market violated Russia's competition law, and as these violations were discovered the Company could incur a significant level of fines, be ordered to cut coking coal and/or coking coal concentrate prices and be forced to enter into long-term coking coal and/or coking coal concentrate supply contracts below market prices;

(d)    that a portion of the Company's income and revenue was derived from anticompetitive conduct, and if such actions were discovered, the Company's margins, income and revenue would significantly decline in future periods;

(e)    that the Company had artificially inflated its margins, income and revenue through a sophisticated sales and distribution scheme involving offshore trading companies, including Kompass and Mechel's subsidiaries (Mechel International, Mechel International Holdings, Mechel Energy and Eagle Energy), to avoid properly accounting for loss contingencies and evade paying taxes on a significant portion of its revenue;

(f)    that Mechel was violating the Russian Federation Tax Code's transfer pricing rules by selling coking coal and coking coal concentrate to its own offshore trading companies at prices that deviated by well more than an allowable 20% from the price declared for export at the Russian border;

(g)    that the Company's financial statements were not prepared in accordance with U.S. GAAP; and

(h)    that, as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

151.    On July 15, 2008, FAS Russia said in a press release for the Russian media that it had enough evidence to open a case against Mechel and charge three subsidiaries of Mechel – Mechel Trading (now Mechel International), Southern Kuzbass and Yakutugol with violating Russia's competition laws.  According to FAS Russia, the charges stemmed from evidence demonstrating that Mechel Trading may have unjustifiably suspended coking coal concentrate delivery to NLMK, and that Mechel Trading and Yakutugol may have refused to conclude coking coal concentrate delivery contracts with NLMK.  FAS Russia also had evidence demonstrating that Mechel Trading may have violated competition laws by establishing and maintaining monopolistic prices for coking coal and/or coking coal concentrate.

- 79 -

152.    On July 22, 2008, Mechel canceled its IPO for its preferred shares, originally set for July 23, 2008, in response to FAS Russia's mounting investigation.

153.    On these partial revelations of previously misrepresented or concealed information concerning Mechel's anticompetitive conduct, some of the artificial inflation came out of the price of Mechel's stock price.  As a result of their purchase of Mechel stock at artificially inflated prices during the Class Period, plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws as the truth began to emerge on and around July 15-22, 2008.  The stock price, however, continued to trade at artificially inflated prices due to defendants' continued misrepresentations and omissions.

154.    On this news, the Company's shares fell from $46.50 per share on July 14, 2008, to close on July 23, 2008 at $36.61 per share (a 22% decline), as information began leaking into the market that Mechel engaged in improper pricing and contracting practices and, as a result, defendants likely did not properly report the Company's margins, production costs, costs of goods, income and revenue.  The price decline on July 23, 2008 was statistically significant, *i.e.*, not explained by movements in the market as a whole, and the direct result of the leakage of information into the market that Mechel was significantly overvalued due to improper business practices.  However, due to defendants' lack of full and complete disclosure, and continuing misrepresentations and omissions – including concealment that Mechel had engaged in illegal tax evasion and anticompetitive behavior – Mechel's stock continued to trade at artificially inflated prices through the balance of the Class Period.

155.    On July 24, 2008, Russian Prime Minister Vladimir Putin declared that Mechel engaged in price fixing.  Putin also stated that Mechel's raw material pricing policy and profit margins were so abusive that they warranted an investigation by antitrust authorities and the General

Prosecutor in Russia.  Mechel had sold coking coal, including coking coal concentrate, to customers in Russia at twice the price that it had sold raw materials to non-Russian customers, which violated Russia's Competition Law.

156.    When the truth concerning Mechel's anticompetitive conduct entered the market and became apparent to investors, Mechel's shares fell precipitously as some of the prior artificial inflation came out of Mechel's stock price.  As a result of their purchase of Mechel stock at artificially inflated prices during the Class Period, plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws as the truth continued leaking into the market on and around July 24, 2008.  The stock price, however, continued to trade at artificially inflated prices due to defendants' continued misrepresentations and omissions.

157.    On July 24, 2008, Mechel's shares fell $13.77 per share, or over 37.6%, to close at $22.84 per share on unusually heavy trading volume of over 33 million shares as information continued leaking into the market that Mechel engaged in price fixing and maintained suspicious profit margins and, as a result, defendants likely did not properly report the Company's margins, production costs, costs of goods, income and revenue.  The price decline on July 24, 2008 was statistically significant, *i.e.*, not explained by movements in the market as a whole, and the direct result of the leakage of information into the market that Mechel was significantly overvalued due to improper business practices.  As explained by one analyst from International Investment Research, "[t]he significant single-day fall in the ADR price was mainly due to comments by Russian prime minister Vladimir Putin that the FAS should direct its attention to Mechel's pricing scheme, based on his claim that the company is charging domestic customers at twice the rate of its international clients."  However, due to defendants' lack of full and complete disclosure, and continuing misrepresentations and omissions – including concealment that Mechel had engaged in illegal tax

- 81 -

evasion and anticompetitive behavior – Mechel's stock continued to trade at artificially inflated prices through the balance of the Class Period.

158.    Then on July 28, 2008, Prime Minister Putin revealed that Mechel had also used offshore traders to minimize tax payments. Specifically, investors learned that Mechel evaded income taxes in Russia by selling coking coal and/or coking coal concentrate at a quarter of domestic prices to its offshore subsidiaries located in countries with lower income tax rates. Mechel would then sell the coking coal and/or coking coal concentrate at world prices, which constituted tax evasion, and contributed to a coal shortage and higher steel prices in Russia.

159.    When the truth concerning Mechel's tax evasion scheme entered the market and became apparent to investors, Mechel's shares fell precipitously as the prior artificial inflation came out of Mechel's stock price. As a result of their purchase of Mechel stock at artificially inflated prices during the Class Period, plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws, as the truth entered the market on and around July 28, 2008.

160.    On July 28, 2008, Mechel's shares fell $6.70 per share, or over 25.5% to close at $19.50 per share, on unusually heavy trading volume of over 33 million shares as information entered the market that Mechel engaged in illegal tax evasion and, as a result, defendants likely did not properly report the Company's tax liabilities, loss contingencies, income and profit margins. The price decline on July 28, 2008 was statistically significant, *i.e.*, not explained by movements in the market as a whole, and the direct result of the leakage of information into the market that Mechel was significantly overvalued due to improper business practices. As explained by one analyst from Independent International Investment:

> The Mechel OAO (Mechel) ADR price declined significantly on 28 July 2008, following tax evasion allegations from the Russian Prime Minister, which added to

- 82 -

the on going allegations of coal-price fixing. . . . The significant decline in the ADR price on 28 July 2008 was mainly due to allegations from the Russian Prime Minister Vladimir Putin that Mechel was evading taxes by selling its products cheaply in international markets through its offshore companies.

161.    By failing to disclose the above facts, defendants presented a misleading picture of the Company, its business, financial well-being and prospects.  The false and misleading statements and omissions caused and maintained the artificial inflation in Mechel's stock price throughout the Class Period, until the truth was revealed to the market.  Defendants' false and misleading statements and omissions had the intended effect and caused Mechel stock to trade at artificially inflated levels – reaching a high of $57.62 per share on May 30, 2008.

162.    As a direct result of public disclosures concerning the Company on July 15-22, 2008, July 24, 2008 and July 28, 2008, the price of Mechel's stock fell precipitously, falling more than 66% from its Class Period high on May 30, 2008.  These disclosures removed the artificial inflation from the price of Mechel's stock, causing real economic loss to investors who had purchased Mechel's stock during the Class Period.

163.    The more than 66% decline in the price of Mechel's stock after these disclosures came to light was a direct result of the nature and extent of defendants' fraud finally being revealed to the market.  The timing and magnitude of Mechel's stock price decline negates any inference that the loss suffered by plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiffs and other members of the Class was a direct result of defendants' fraudulent scheme to misrepresent the margins, production costs, costs of goods, tax liabilities, loss contingencies, income and revenues of the Company, artificially inflate Mechel's stock price and the subsequent significant decline in the value of Mechel's stock when the truth was revealed to the market.

506629_1

## ADDITIONAL SCIENTER ALLEGATIONS

164.    As alleged herein, defendants acted with scienter in that defendants knew that the public documents and statements issued by them or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding Mechel, their control over, and/or receipt and/or modification of Mechel's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Mechel, participated in the fraudulent scheme alleged herein.

165.    Defendants engaged in deliberately illegal behavior, knew facts or had access to information suggesting that Mechel's public statements were not accurate, and/or failed to check information that they had a duty to monitor.  Moreover, defendants knew that the illegal behavior described herein, if discovered, would result in a substantial adverse financial impact on the Company.

166.    Defendants knew that Mechel was engaging in illegal anticompetitive conduct and transfer pricing because (1) defendants disclosed the existence of relevant transfer pricing and competition laws in their public filings immediately preceding and during the Class Period; (2) news concerning amendments to, and strengthening of, both competition law and transfer pricing rules was widely publicized in the Russian media immediately prior to the Class Period; (3) the Yukos case was a highly publicized case that began with an investigation into that company's transfer pricing practices and ended in the dismantling of the company by the Russian government in 2007

- 84 -

(*i.e.*, prior to the Class Period), and thus would have been known to defendants as a prime example of the inherent and substantial risks involved in defendants' illegal conduct; (4) the laws in these areas are clear, specific and enforced aggressively by the Russian authorities, as demonstrated by the laws themselves as well as publicly reported proceedings for similar violations previously brought by FAS Russia and tax authorities against Mechel as well as companies in the same or related industries and thus would have been known to defendants; (5) under applicable Russian labor laws, defendants had certain enumerated duties as officers of Mechel that (i) would have exposed defendants to the Company's illegal activities by virtue of carrying out those duties and (ii) required defendants to have knowledge of applicable Russian competition and tax laws; (6) the Individual Defendants had extensive knowledge of the coal and steel industries and the economics underlying transactions in those sectors by virtue of their educational backgrounds and extensive work experience in those sectors; and (7) coking coal and coal concentrate were core products of Mechel during the Class Period and as such, defendants knew or recklessly disregarded facts concerning the Company's activities concerning its core products.  The totality of these facts supports a strong inference that defendants knew they were engaging in deliberately illegal and reckless behavior and/or failing to check information that they had a duty to monitor, and the Company's failing to disclose illegal activities and misrepresenting its financial affairs.

167.    Defendants knew that their activities were prohibited by transfer pricing regulations, that the Russian authorities had become more aggressive in investigating tax evasion schemes and in particular, transfer pricing schemes, and that such conduct could result in the imposition of severe fines, penalties and interest charges.

168.    Defendants in fact had previously defended lawsuits brought in 2006 against the Company by minority shareholders of Mechel coal subsidiaries claiming, *inter alia*, that Mechel

caused its coal subsidiaries, including Southern Kuzbass, to engage in transfer pricing which cost the subsidiaries $760 million in lost revenue, according to an article published on June 21, 2006 by *Russia & CIS Business & Financial Daily* entitled "Vostok Nafta to Take Mechel, Yuzhny Kuzbass to Court."

169.    In a Form 20-F filed on July 2, 2007, a filing which defendant Zyuzin signed, defendants disclosed that "[r]ecent events within the Russian Federation suggest that the tax authorities may be taking a more assertive position in their interpretations of the legislation and assessments. . . .  Tax declarations, together with related documentation such as customs declarations, are subject to review and investigation by a number of authorities, each of which may impose severe fines, penalties and interest charges."  Defendants made the same disclosure in a Form 20-F filed on June 19, 2008.

170.    In the July 2, 2007 Form 20-F, defendants also made the following disclosure, demonstrating their knowledge of applicable transfer pricing regulations:

> Transfer pricing
>
> Russian transfer pricing rules entered into force in 1999, giving Russian tax authorities the right to make transfer pricing adjustments and impose additional tax liabilities in respect of all controlled transactions, provided that the transaction price differs from the market price by more than 20%.  Controlled transactions include transaction between related entities and certain other types of transactions between independent parties, such as foreign trade transactions with significant (by more than 20%) price fluctuations.

171.    The 2006 amendments to the Tax Code's transfer pricing provisions were widely publicized prior to the Class Period.  These amendments were viewed by legislators, the industry and the media as a critical step in the Russian government's efforts to crack down on tax evasion.  A sampling of the press articles published on this topic in Russia's most circulated business news sources includes:

- 86 -

- A December 27, 2004 article entitled "Tax Code Amended to Facilitate End of Transfer Pricing" published in *SKRIN Market and Corporate News*, Russia's equivalent of the *Bloomberg* news service, described the practice of transfer pricing and quoted *Vedemosti*, Russia's largest business daily newspaper, as saying that the ***Tax Code amendments would require companies to*** "***submit detailed information on conditions of a given transaction for tax officials to determine its fairness; any company that fails to do so will be liable to a fine***."

- A February 22, 2005 article entitled "Business Taps Forward in the Tax Twilight Zone" published in the *Moscow Times* reported that "a barrage of back tax claims keeps raining down" on Russia's business community and quoting the head of PricewaterhouseCooper's tax and legal practice in Russia as saying that "People are looking at tax policies more closely" and that "overzealous authorities have shown a very black-and-white view of the tax code even though the law is replete with gray areas." The article noted, however, that "[s]ome schemes, like transfer pricing, are explicitly defined as tax evasion."

- A December 19, 2006 article entitled "Finance Ministry to Draft Transfer Pricing Bill By Next February" published by *Russia & CIS Business Law Weekly*, described amendments to the definition of "related persons" in Articles 20 and 40 of the Tax Code. The article reported that the amendment to Article 20 would create an "exhaustive" list of formal criteria by which the Tax Service could determine whether a party was a related person, thereby avoiding application to the courts for that determination.

172.    A March 9, 2007 article entitled "Resistance to Transfer Pricing Must Be Concentrated on Forex Deals – Expert" published by *Russia & CIS Business and Financial Newswire*, reporting that the head of the Expert Department of the Presidential Administration Arkady Dvorkovich had told the press that the tax authorities' focus on transfer pricing should be concentrated on foreign trade deals between affiliates, primarily in the raw materials sectors: "***At the present stage it is essential to concentrate all efforts on foreign economic deals with affiliated persons, primarily in commodities***." As Mechel is a primary producer of coking coal in Russia, these and the other statements described herein would have alerted defendants, unless they recklessly disregarded this information, to the fact that their transfer pricing schemes were illegal and would likely result in charges by the tax authorities against the Company.

- 87 -

173.    The text of the Tax Code's transfer pricing laws were also clear and unambiguous.

Article 40, which governs transfer pricing, provides in relevant part:

Article 40.  Principles for Determining the Price of Goods (Works, Services)

1.    Unless otherwise provided by the present Article, for the purposes of taxation of the prices of goods, works, services shall be those stated by parties to transactions. Until proven otherwise, it shall be assumed that these prices correspond to the level of market prices.

2.    Tax authorities, during the exercise of control over the calculation of taxes, shall be entitled to verify the correctness of the prices used in transactions only in the following cases: 1) between related persons . . . .

3.    In cases provided for by Item 2 of this Article, when the prices of goods, works or services applied by the parties to a transaction deviate upwards or downwards for more than 20 per cent from the market price of identical (homogenous) goods (works or services), the tax body shall have the right to pass a justified decision on the additional charge of tax and a penalty, calculated as if the results of this transaction would have been assessed on the basis of the application of market prices for relevant goods, works or services.

Article 20 defines "related persons" as, among other things, "one organisation [who] directly and/or indirectly participates in another organisation, and the summary share of such participation makes up over 20 percent."

174.    Under Article 20 of the Tax Code, Mechel, as the owner of more than 20% of Mechel International, Mechel Trading, Yakutugol, and Southern Kuzbass was clearly deemed a related person to these subsidiaries.

175.    The prices that Mechel was charging Mechel International, Mechel International Holdings, Mechel Energy and/or Eagle Energy for coking coal, which differed 75% from market prices, were clearly in violation of Article 40 of the Tax Code.

176.    Pursuant to Item 2 of Article 40 of the Tax Code, the Russian tax authorities are authorized to audit any transaction between related entities, as well as any transaction, whether among related entities or among independent entities, where the price of goods, works or services deviates by more than 20% from the market price within a short period of time.  Prior to the Class

- 88 -

506629_1

Period, the Russian courts consistently interpreted Article 40 as categorically prohibiting a price deviation of more than 20% from market prices both in transactions between related entities or among independent companies. The cases are published on online Russian legal databases widely available and utilized by Russian attorneys, similar to U.S legal databases such as Lexis.

177.    The chart below summarizes some of the cases decided by Russian courts against companies that violated Article 40's 20% rule:

| No. | Court | Date | Case No. | Plaintiff | Defendant | Case Summary |
|---|---|---|---|---|---|---|
| 1 | FAC of North-West District | 12/19/2001 | A56-21019/01 | OOO Riviera | IMTL of Frunzensky District of Saint Petersburg City | The court upheld a lower court's decision that OOO Riviera had violated Article 40's 20% rule in exporting lanthanum oxide to a related entity, a trading supplier, for prices deviating from market prices by 820,408%. |
| 2 | FAC of Volga-Vyatka District | 06/24/2002 | A29-10230/01A | OOO Komvest | IMTL of Syktyvkar City | The court upheld a lower court's decision that related companies had violated Article 40's 20% rule in selling shares of another related company to each other at prices more than 20% below the price charged to independent companies. |
| 3 | FAC of Volga-Vyatka District | 04/14/2003 | A38-17/325-02 | OOO BaLu | IMTL of Yoshkar-Ola City | Related parties were found to have violated Article 40's 20% rule in a commercial lease of property to each other. |
| 4 | FAC of Far-East District | 07/09/2003 | F03-A51/03-2/1438 | IMTL of Soviet District of Vladivo-stok City | ZAO "Sfera-Market" | Related parties were found to have violated Article 40's 20% rule in a commercial lease of property to each other, while charging market prices to independent parties. |

| No. | Court | Date | Case No. | Plaintiff | Defendant | Case Summary |
|---|---|---|---|---|---|---|
| 5 | FAC of East-Siberian District | 09/01/2004 | A78-5802/03-S2-17/381-F02-2869/04-S1 | IMTL of Central Administrative District of Chita City | Subsidiary company OOO "Chiman" of Manchurian Trade-Economic Company of International Civil Aviation (China) | The court upheld a lower court's decision that a timber company had violated Article 40's 20% rule by charging prices for exports of timber that were 148% and 144% lower than the market price, thus showing losses instead of profit and not paying taxes. Monetary penalties were imposed on the company for unpaid profit taxes in the amount of 770,523 rubles, penalties for untimely payment of tax in the amount of 434,513 rubles, tax liability in the form of a fine under item 1 of article 122 of the Tax Code of the Russian Federation in the amount of 154,105 rubles, and court fees in the amount of 2,000 rubles. |
| 6 | FAC of North-Caucasus District | 01/18/2005 | F08-6499/2004-2474A | OOO Yunigs | IMTL of Taganrog City | The court found that a petrol company had violated Article 40's 20% rule in selling petrol to a related person. |
| 7 | FAC of Ural District | 02/14/2005 | F09-232/05-AK | ZAO Concrete Products-36 | IMTL of Suburban District of Sverdlovsk Region | A company selling its concrete products to its related trading partner, OOO "Trade House Uralstroysnab," for prices which were more than 20% below the market price was found to have violated Article 40's 20% rule.

The court imposed monetary penalties on the company that included additional profit tax in the |

| No. | Court | Date | Case No. | Plaintiff | Defendant | Case Summary |
|-----|-------|------|----------|-----------|-----------|--------------|
|  |  |  |  |  |  | amount of 90,638 rubles, VAT taxes in the amount of 117,845 rubles, as well as penalties for unpaid VAT taxes in the amount of 20,051 rubles. |
| 8 | FAC of Volga-Vyatka District | 09/12/2005 | A79-9855/2004-SK1-9264 | JV ZAO Pronova | HO of MTL of Chuvash Republic | A company was found to have violated Article 40's 20% rule in supplying diphenylguanidine to a related entity for prices which were more than 20% lower than prices for which it supplied the product to other customers. The penalties imposed on the company included additional profit tax in the amount of 5,529,524 rubles, penalties in the amount of 3,059,567 rubles 31 kopeks, as well as court fees in the amount of 2,000 rubles. |
| 9 | FAC of North-West District | 10/06/2005 | A66-5524/2004 | IDI of FTS # 1 of Tver Region | OAO Afanasy-Pivo | Afanasy Pivo, a beverage company, entered into a sub-licensing agreement with a related entity, ZAO "Tver-Pivo" for the use of the "Afanasy" trademark. ZAO "Tver-Pivo" then used the trademark under its license agreement with a related Swiss company. License fees charged among the three companies were held to be lower than the market price by more than 20%. |
| 10 | FAC of Moscow Region | 10/26/2005 | KA-A40/10292-05 | OAO Samaran-eftegaz | FTS of Russia IDI of FTS # 1 for the largest | An oil company was found to have violated Article 40's 20% rule in selling oil to related companies for prices which were more |

| No. | Court | Date | Case No. | Plaintiff | Defendant | Case Summary |
|---|---|---|---|---|---|---|
| | | | | | taxpayers | than 20% below the market price. |
| 11 | FAC of Moscow Region | 11/21/2005 | KA-A40/11239-05 | OAO Toms-kneft of the Eastern Oil Company | IDI of MTL # 1 for the largest taxpayers | An oil company was found to have violated Article 40's 20% rule in selling oil to related entities for prices which were more than 20% below the market price. |
| 12 | FAC of Moscow Region | 12/08/2005 | KA-A40/11827-05 | OAO Toms-kneft of the Eastern Oil Company | FTS of Russia | An oil company was found to have violated Article 40's 20% rule in selling oil to related entities for prices which were more than 20% below the market price. |
| 13 | FAC of West-Siberian District | 08/21/2006 | F04-5023/2006 (25241-A46-33) | IDI of FTS for the largest taxpayers of Omsk Region, Omsk City | OAO Joint Stock Company of Energy and Electrifica-tion Oms-kenergo | An energy company was found to have violated Article 40's 20% rule in purchasing coal from a purportedly sham company, OOO "Rusinvestproyekt" for $12.6 USD per ton, while paying a legitimate coal supplier, ZAO $8.7-9.5 USD per ton at the same time. The defendant was exposed to monetary penalties in the form of payment of taxes of 20% on illegal taxable profits of 37,461,060 rubles, penalties in the form of a fine which would be at least 40% of the illegal taxable profits, and the payment of court fees of at least 2,000 rubles. |

Abbreviations:
AR – Autonomous Region
FAC – Federal Arbitrage Court
FTS – Federal Tax Service
HO of MTL – Head Office of the Ministry of Taxes and Levies

- 92 -

IDI of FTS – Inter-District Inspectorate of the Federal Tax Service
IDI of MTL – Inter-District Inspectorate of the Ministry of Taxes and Levies
IMTL – Inspectorate of Ministry of Taxes and Levies
ITS – Inspectorate of Tax Service
JV – Joint Venture
MTI – Main Tax Inspectorate

178.    Defendants recklessly disregarded these published decisions by Russian courts clearly establishing that their conduct was not only in violation of Article 40 of the Russian Tax Code, but that Russian courts and the tax authorities were routinely enforcing the statute against companies that engaged in illegal transfer pricing.

179.    Defendants recklessly disregarded the landmark Yukos Oil case which serves as an example of the catastrophic consequences of violating transfer pricing regulations and the fact that Russia's tax laws prohibiting transfer pricing were being enforced by the authorities.  Yukos went bankrupt following a 2003 investigation by the tax authorities into its transfer pricing practices which resulted in the assessment of $27 billion in back tax claims and the liquidation of the company by the Russian government in 2007.

180.    Defendants also knew that their activities were subject to FAS Russia regulations, that the Russian authorities were actively engaged in oversight of gas and coal companies, and that anticompetitive conduct arising from Mechel's dominant position on the coking coal market could be heavily penalized by FAS Russia if discovered.

181.    Defendants further knew that FAS Russia was closely monitoring Mechel as far back as 2004, when FAS Russia issued a recommendation to Mechel requiring its coal mining subsidiary Southern Kuzbass to act in a way that would ensure competition in the coal concentrate processing market, and directing it to conclude the purchase and sale contracts that it had with certain customers on fair price terms.

- 93 -

182.    In 2005, according to publicly available official FAS Russia documents, FAS Russia brought the following proceedings against companies in the commodities markets:

(a)    *FAS v. Eurocement Group* (Ruling No. 13-K-03-05) – On October 11, 2005, FAS Russia ruled that the cement company Eurocement Group had violated the law on competition and limitation of monopolistic activity in commodities markets by charging monopolistically high prices for cement, and ordered the company to pay a fine of RUR 267 million (U.S. $9.2 million) and to submit to additional oversight requirements;

(b)    *FAS v. Gazprom Group*, Case No. 1 05/15905 – On November 22, 2005, FAS Russia ruled that Gazprom had violated the law on competition and limitation of monopolistic activity in commodities markets by charging monopolistically high prices through its subsidiaries for the provision of liquefied hydrocarbon gas and ordered the payment of excess profits received as a result of the violations.

183.    In October 2006, the new Competition Law was enacted.  As detailed below, the legislation was widely publicized in the Russian media prior to and following its enactment.  The amendments to the Competition Law were specifically directed at further tightening abuse of dominant position laws as well as prohibiting cartel collusions by introducing the notion of a "collective dominant position" which would enable authorities to regulate and investigate facts concerning competition in commodity markets, according to articles published on December 8, 2004 and February 3, 2005 by *ITAR-TASS News Agency.*

184.    In a November 9, 2005 article entitled "Russia Anti-Monopolist Watchdog to Increase Fines" published by *ITAR-TASS News Agency* discussing the pending legislation, FAS Russia chief Igor Artemyev was quoted as saying that the new legislation "is going to significantly

tighten the fining of companies violating anti-monopolistic legislation," and increase the amount of the maximum fines from approximately U.S. $17,000 to fines in the tens of millions of dollars.

185.    In a July 25, 2006 article entitled "Competition Protection Law Meets EU Standards" published by *Russia & CIS Business Law Weekly*, Russia's Deputy Prime Minister Alexander Zhukov was reported as saying that one of the most important provisions of the law was reducing the threshold for dominant position from 63% to 50% as well as imposing uniform standards of competition protection in commodity markets.

186.    The enactment of the Competition Law resulted in a surge of enforcement actions by FAS Russia against companies in the coal and steel sectors, as well as related industries, that were deemed to have abused their dominant positions.  For example:

(a)    In a November 29, 2006 article entitled "Novolipetsk Steel's VIZ-Stal Found Violating Competition Law" published by *Russia & CIS Business and Financial Newswire*, it was reported that VIZ-Stal, a wholly owned subsidiary of NLMK, one of Mechel's largest customers, was charged by FAS Russia with abusing its dominant position in failing to conclude a supply contract;

(b)    In a December 20, 2006 article entitled "FAS Cracks Down on Kaustic" published by *SKRIN Market & Corporate News*, it was reported that FAS Russia had brought a proceeding against Kaustic OJSC, a company engaged in the supply of chloride brine, alleging that Kaustic had set monopolistic high prices and unjustifiably refused to supply goods.

187.    During the Class Period, defendants knew that they held a dominant position in the coking coal market and as such, were subject to laws governing abuse of dominant position as well as increased oversight by FAS Russia.  In the Company's Form 20-F filed on June 19, 2008, which was signed by defendant Zyuzin, defendants made the following statements indicating their

- 95 -

awareness that Mechel and its subsidiaries held a dominant position in the coking coal market and as such, were subject to heightened oversight by FAS Russia:

> Inclusion of our subsidiaries in the register of companies controlling more than 35% of a specific market, as well as the classification of us or any of our subsidiaries as monopolists or persons holding a dominant market position, does not by itself restrict our current activities or the activities of these subsidiaries. *However, these subsidiaries may be subject to additional FAS oversight by reason of their having been deemed to have a dominant market position*.

188.    Russian labor laws require the Individual Defendants to carry out certain enumerated duties and responsibilities and to have knowledge of applicable law in order to hold the positions and titles that they held at Mechel. Specifically, under the *Unified Qualification Guidebook for Managers, Specialists, and other Office Workers* approved by Resolution of the Ministry of Labor of Russian Federation from August 21, 1998, No. 37, in the subsequent amendments, and which was in effect at all relevant times:

(a)    Individuals such as defendant Zyuzin and defendant Polin who hold the title of General Director (CEO) of a Russian company are responsible for, among other things, managing the company in accordance with current laws governing the production, economic and financial activity of the enterprise, bearing the full weight of responsibility for the consequences of decisions made. The General Director is responsible for ensuring the fulfillment by the enterprise of all obligations before the federal, regional and local budgets and all obligations under economic contracts and ensures the legality of enterprise activity.

(b)    The General Director is required by law to know, among other things, the legislative and normative legal acts regulating the production, economic and financial activity of the enterprise, as well as applicable regulations of the federal, regional, and local state authorities, tax legislation, the procedure of concluding and executing economic and financial contracts, and the organization of production and labor in the enterprise.

- 96 -

(c)    Individuals, such as defendant Ploschenko, who hold the title of Chief Financial Officer, are responsible for, among other things, creating the company's tax policy, tax planning and optimization of taxation, preparing and conducting the issuance of securities, regulating the ratio between equity capital and borrowed capital, interfacing with credit organizations for receiving credit, participating in the development of production sales plans, organizing analysis and estimation of financial results of the enterprise, internal audits, and examining and resolving claims in accordance with current legislation arising from the enterprise's economic activity.

(d)    The CFO is required to know by law, among other things, the legislative and normative acts regulating the production, economic and financial activity of the enterprise, normative and methodical documents on the matters of accounting organization and financial management, civil law, financial, tax and corporate legislation, the procedure for concluding and executing economic and financial contracts, accounting, tax, statistical and administrative rules, and economics and organization of production, labor and management.

189.    Applicable Russian labor laws create a strong inference that the Individual Defendants knew the Company was engaged in illegal activities, because the Individual Defendants' duties by law required them to have knowledge of Mechel's contractual, pricing, and export activities and of the laws applicable to such economic activities.

190.    Also, the Individual Defendants' respective educational backgrounds and extensive experience in the coal industry gives rise to a strong inference that they had the requisite knowledge of the industry and applicable law to understand that they were engaging in, or causing the Company to engage in, illegal conduct that could seriously harm the Company and that resulted in the Company misstating its financial position:

- 97 -

(a)    Defendant Zyuzin has a doctorate in coal mining and is a certified coal mining engineering economist.  Zyuzin also has 10 years of experience serving as a member of the boards of various coal companies, including Southern Kuzbass;

(b)    Defendant Ploschenko has a Master's Degree in International Securities Investment & Banking, a BA in International Finance & Trade and a Specialist Diploma in International Economics.  Ploschenko previously served as Mechel's Deputy CFO and Deputy Treasurer for Corporate Lending and held the position of Head of Metal and Mining Industries Group for the Corporate Clients Department at Commerzbank (Eurasija).  Ploschenko also has worked as an auditor.[5]

(c)    Defendant Polin has a degree in metallurgy from Chelyabinsk Polytechnic University and has over 20 years of floor and management experience in the manufacture and marketing of steel products, and previously served as the Senior Vice President of Production at Mechel as well as Executive Director-First Deputy General Director of Beloretsk Metallurgical Plant, a Mechel subsidiary.

191.    Coking coal and coal concentrate are two of Mechel's core products, representing a significant portion of the Company's revenues – as reported for 2008, coking coal concentrate sales alone constituted over 55% of Mechel's revenues.  The Individual Defendants' statements described herein concerning coking coal and coal concentrate, including statements concerning the pricing and sales of those products, give rise to a strong inference that the Individual Defendants knew about

---

[5]    Further, defendant Ploschenko was, according to a statement made by Zyuzin in a July 3, 2007 press release announcing Ploschenko's appointment, "a key member of the finance team and has been deeply involved in setting and executing on our financial strategy" and contributed toward the Company's "growth and progress" in working "to improve reporting, to successfully implement [Mechel's] strategy of financial development, and further strengthen [Mechel's] market position."

Mechel's illegal anticompetitive conduct and transfer pricing concerning its core products, that such conduct was approved by the Individual Defendants, and that the Individual Defendants were sufficiently knowledgeable about the Company to know that their statements concerning the Company's core products were false.

192.    Defendant Zyuzin had a concrete and personal motive for the misrepresentations or omissions concerning Mechel's illegal conduct and financial results and for artificially inflating Mechel's stock price during the Class Period.  As the CEO and General Director of Mechel, Zyuzin had the opportunity to engage in, or cause the Company to engage in the misrepresentations and omissions complained of herein as well as the illegal conduct in order to ensure that the stock price remained elevated.  Zyuzin faced substantial personal financial exposure if the Company's stock price dropped as a consequence of his large stake in Mechel during the Class Period.  Zyuzin had a 71.62% stake in Mechel in 2007 and a 73% stake in 2008.  Zyuzin, who was No. 77 on Forbes Magazine's Ranking of the World's Billionaires in 2008, was estimated to have a net worth of $10 billion.  Based on his 73% stake in the Company in 2008, approximately 69% of Zyuzin's personal net worth was invested in Mechel.

193.    The impact of the Company's performance on Zyuzin's personal fortune was significant.  On July 31, 2008, *The Financial Times* published an article entitled "Medvedev adviser in attack on Putin over market fall," reporting that Zyuzin's personal fortune was halved from $11 billion to $5.5 billion following Putin's statements to the Russian press regarding Mechel's illegal conduct.

194.    Zyuzin also faced significant personal financial exposure because he had pledged a substantial percentage of his Mechel stockholdings as collateral for loans to Mechel.  Mechel needed these loans to finance the acquisitions described below and the buyout of Zyuzin's former partner,

- 99 -

Vladimir F. Iorich.  In a Schedule 13D filed on July 21, 2008, Zyuzin disclosed that he had pledged a total of 76.3 million of his 290.8 million Mechel shares – *approximately 26% of his personal holdings in the Company* – to lenders in connection with certain financings obtained for the benefit of Zyuzin personally and/or Mechel, although the material terms of those financings have not been disclosed by the Company.  *By the end of 2008, Zyuzin's pledges of his personal holdings in Mechel had almost tripled to approximately 67% of his holdings*.  According to a Schedule 13D filed on June 19, 2009, Zyuzin had pledged 186.6 million of his 277.9 million Mechel shares to lenders.

195.    As described below, during the Class Period, Mechel was in a precarious financial position as a consequence of massive debts taken on by the Company for several large cash acquisitions that Mechel completed in 2007 and 2008.  The Company planned to complete two stock offerings in 2008 and sought billions of dollars in financing from lenders, the proceeds of which would be used to pay down Mechel's debts.  To successfully accomplish these transactions, Mechel's stock price needed to be priced at levels that would attract potential investors and lenders and assure them of the Company's profitability.

196.    Analysts reported that in 2007 and early 2008, Mechel was aggressively seeking to raise capital to pay down the massive $5 billion debt the Company had accumulated as a consequence of the acquisition of a number of coal and mining assets.  These included two large coal mines, Yakutugol and Elgaugol, which were acquired by the Company on October 5, 2007 for a total price of RUR 58.2 million (U.S. $2.3 billion), according to the Company's Form 6-K dated October 17, 2007.

197.    Also, Mechel needed equity capital and financing to complete three additional acquisitions planned for 2008.  In 2008, Mechel paid $1.5 billion for Oriel Resources, a London

- 100 -

based chrome and nickel mining company, and $221 million for Ductil Steel, a Romanian company. In early 2008, Mechel also was negotiating the purchase of Bluestone Coal, a U.S. company, for $436.4 million plus 83.3 million preferred shares in a deal that analysts valued at $1.1 billion. Although the deal did not close until May 2009, by December 18, 2008, Mechel had paid the entire cash amount – $436.4 million – for the acquisition, according to the Company's Form 20-F dated December 31, 2008.  The increase in Mechel's debt as a result of its acquisition activity was significant.  According to analysts, Mechel's active debt-to-share ratio jumped to 98.6% in 2007 from 17.1% in 2006.

198.    Analysts reported in July 2008, that to pay down Mechel's debt, defendants planned to conduct an offering of up to 55 million of Mechel's preferred shares, or 11.7% of its enlarged capital, at a target price of $29.70 per share seeking to raise $1.6 billion, an amount almost equal to the price the Company paid for Oriel Resources.  According to an August 13, 2008 article in *Russian Business Monitor*, defendants planned to raise additional cash through an initial public offering of its mining subsidiary, Mechel Mining, to be conducted by the end of 2008.  However, as a consequence of the charges brought against the Company by FAS Russia in July 2008, both of these offerings were delayed indefinitely.

199.    During the Class Period, Mechel also sought billions of dollars in financing from lenders.  In a November 6, 2007 Mechel press release, defendants announced that the Company had finalized a $2 billion syndicated loan arrangement in connection with a refinancing of short term loans taken for the purpose of acquiring Yakutugol and Elgaugol, among other assets.  Defendant Ploschenko commented that "[g]aining this credit significantly improves Mechel's credit portfolio structure, increasing its long term component and lowering our cost of capital."  In March 2008, Mechel obtained additional loans totaling $1.5 billion from German bank West LB.  To avoid

- 101 -

defaulting on these loans, Mechel was obligated to, among other things, maintain certain financial ratios relating to the Company's level of debt.

200.    According to the Form 20-F filed on June 23, 2009, Mechel entered into loan agreements containing "covenants and restrictions, which include, but are not limited to financial ratios, maximum amount of debt, and cross-default provisions." Certain of those covenants required Mechel to maintain financial ratios such as: consolidated net borrowing to earnings before interest, taxes, depreciation and amortization ("EBITDA"); EBITDA to consolidated interest payments; and consolidated net borrowing to shareholder's equity. The threat of breaching these and other loan covenants motivated defendants to promulgate materially false and/or misleading statements in order to avoid triggering loan defaults. Ultimately, loan defaults would have led to Zyuzin losing his pledged shares in the Company and would have substantially adversely impacted his personal wealth.

201.    Mechel ultimately was not able to satisfy its loan obligations and was in danger of default. In a Form 20-F filed June 24, 2009, the Company reported that "we have been in breach of certain covenants of certain of our loan agreements representing 78.9% of our indebtedness outstanding as of December 31, 2008. Certain of these breaches have been remedied and certain others, particularly relating to maintenance of financial ratios, are continuing. These agreements entitle our lenders to demand accelerated partial or full repayment of outstanding interest and principal. Certain of our loan agreements of which we are in breach contain cross-default provisions."

202.    In light of the extent to which defendant Zyuzin's personal wealth was intertwined with the stock price of Mechel and the financial ratios provided in Mechel's loan documents, Zyuzin had a strong personal motive both to inflate the Company's stock price, to misrepresent Mechel's

financial condition, and to engage in, or cause the Company to engage in, the illegal conduct alleged herein. The income obtained illegally from Mechel's anticompetitive conduct and transfer pricing significantly inflated the Company's revenues and earnings. The income derived from Mechel's illegal activities also ensured Mechel's viability at a time when the Company's crippling debt threatened to destabilize and potentially bankrupt Mechel.

203.    The defendants' machinations, and particularly Zyuzin's, ultimately could not rescue the Company, and in August 2009, Mechel was forced to seek a massive bailout from the Russian government. According to a report published by Deutsche Bank on September 3, 2009, in a meeting held on August 21, 2009, Prime Minister Putin instructed certain government ministries to provide Mechel with state guarantees for no less than approximately $1 billion, as well as purchase of approximately $320 million of Mechel bonds. The government also considered providing significant tax breaks which could be extended up to ten years.

## APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

204.    Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's ADRs traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's ADRs; and

- 103 -

(e)  Plaintiffs and other members of the Class purchased Mechel ADRs between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

205.  At all relevant times, the market for Mechel's securities was an open, well-developed and efficient market for the following reasons, among others:

(a)  Mechel's securities met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)  As a regulated issuer, Mechel filed periodic public reports with the SEC and the NYSE;

(c)  Mechel regularly communicated with public investors *via* established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)  Mechel was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

206.  As a result of the foregoing, the market for Mechel's securities promptly digested current information regarding Mechel from all publicly-available sources and reflected such information in the price of Mechel's securities.  Under these circumstances, all purchasers of Mechel's securities during the Class Period suffered similar injury through their purchase of Mechel's securities at artificially inflated prices and a presumption of reliance applies.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

207.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased Mechel's securities traded on the NYSE between October 3, 2007 and July 25, 2008, inclusive and who were damaged thereby.   Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

208.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Mechel's securities were actively traded on the NYSE. While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, plaintiffs believe that there are hundreds, if not thousands, of members in the proposed Class.  During the Class Period, Mechel had more than 100 million ADRs outstanding that were owned by hundreds or thousands of persons.  Record owners and other members of the Class may be identified from records maintained by Mechel, or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

209.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law as complained of herein.

210.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the other Class members.

211.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented or omitted material facts about Mechel;

(c)    whether defendants knew or recklessly disregarded that their statements and omissions were false and misleading;

(d)    whether the price of Mechel's securities during the Class Period was artificially inflated due to non-disclosures and/or misrepresentations complained of herein; and

(e)    to what extent the members of the Class have sustained damages and the proper measure of damages.

212.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## NO SAFE HARBOR

213.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful

- 106 -

cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false or misleading, and/or the forward-looking statement was authorized and/or approved by an executive officer of Mechel who knew that those statements were false when made.

### COUNT I

**Violation of §10(b) of the Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

214.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

215.    During the Class Period, defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including plaintiffs and other Class members, as alleged herein; and (ii) cause plaintiffs and other members of the Class to purchase Mechel's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

216.    Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Mechel's securities in violation of §10(b) of the Exchange Act and Rule 10b-5.

- 107 -

506629_1

All defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

217.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Mechel's business, financial well-being and prospects, as specified herein.

218.    These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Mechel's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Mechel and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Mechel's securities during the Class Period.

219.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management

- 108 -

team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

220.    The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.    Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Mechel's business, financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.    As demonstrated by defendants' overstatements and misstatements of the Company's business, financial well-being and prospects throughout the Class Period, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

221.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Mechel's securities was artificially inflated during the Class Period.    In ignorance of the fact that market prices of Mechel's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by defendants, but not disclosed in public statements by defendants during the Class Period, plaintiffs

and the other members of the Class acquired Mechel's securities during the Class Period at artificially high prices and were damaged thereby.

222.    At the time of said misrepresentations and omissions, plaintiffs and other members of the Class were ignorant of their falsity, and believed them to be true.  Had plaintiffs and the other members of the Class and the marketplace known the truth regarding the problems that Mechel was experiencing, which were not disclosed by defendants, plaintiffs and other members of the Class would not have purchased or otherwise acquired their Mechel securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

223.    By virtue of the foregoing, defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

224.    As a direct and proximate result of defendants' wrongful conduct, plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

225.    The market for Mechel securities was open, well-developed and efficient at all relevant times.  Defendants' misrepresentations and misleading omissions were the reason for the loss suffered by Lead Plaintiffs and other Class members.

### COUNT II

### Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

226.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

227.    The Individual Defendants acted as controlling persons of Mechel within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their

506629_1

ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which plaintiffs contend are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

228.     In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

229.     As set forth above, Mechel and the Individual Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiffs pray for relief and judgment, as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.    Awarding compensatory damages in favor of plaintiffs and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury.

DATED: February 19, 2010                 ABRAHAM, FRUCHTER & TWERSKY, LLP
                                                          MITCHELL M.Z. TWERSKY (MT-6739)
                                                          XIMENA R. SKOVRON (XS-3397)


                                                          _____
                                                          MITCHELL M.Z. TWERSKY

                                                          One Pennsylvania Plaza, Suite 2805
                                                          New York, NY  10119
                                                          Telephone:  212/279-5050
                                                          212/279-3655 (fax)

                                                          COUGHLIN STOIA GELLER
                                                             RUDMAN & ROBBINS LLP
                                                          JOHN J. RICE
                                                          SHANNON M. MATERA
                                                          655 West Broadway, Suite 1900
                                                          San Diego, CA  92101
                                                          Telephone:  619/231-1058
                                                          619/231-7423 (fax)

- 112 -

506629_1

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARIO ALBA JR.
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)

Co-Lead Counsel for Plaintiffs

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI  48201
Telephone:  313/578-1200
313/578-1201 (fax)

Additional Counsel for Lead Plaintiff City of
Westland Police and Fire Retirement System

- 113 -