UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————— x

BOARD OF TRUSTEES OF THE CITY OF
FORT LAUDERDALE GENERAL
EMPLOYEES' RETIREMENT SYSTEM, et
al.,

                          Plaintiffs,

          vs.

MECHEL OAO, et al.,

                          Defendants.

—————————————————— x

:   Civil Action No. 09-cv-03617 (RJS)
:
:   ECF CASE
:
:   CLASS ACTION
:
:   PLAINTIFFS' OPPOSITION TO MECHEL
:   OAO'S MOTION TO DISMISS THE
:   CONSOLIDATED SECOND AMENDED
:   CLASS ACTION COMPLAINT
:
:   [REVISED PURSUANT TO COURT'S
:   MAY 24, 2010 ORDER]

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ......................................................................................................1

II.     STATEMENT OF FACTS .......................................................................................3

        A.      Mechel's Undisclosed Conduct Violated Russia's Anticompetition Laws ............4

        B.      Mechel's Undisclosed Conduct Violated Russia's Tax Laws ................................8

        C.      Post-Class Period Events Confirm Plaintiffs' Allegations of Fraud.....................10

III.    PUBLICATIONS AND EXHIBITS IMPROPERLY RELIED UPON BY
        DEFENDANT SHOULD BE STRICKEN.........................................................................12

IV.     APPLICABLE STANDARDS ...............................................................................14

V.      THE SAC STATES A CLAIM FOR SECURITIES FRAUD ...........................................14

        A.      Defendants Had a Duty to Disclose Their Improper Pricing Practices and
                the True Status of Their Long-Term Contracts.....................................................14

                1.      Defendants' Incomplete Statements Were Both Material and
                        Misleading.................................................................................................15

                2.      Defendants Knew that They Were Engaging in Fraudulent
                        Anticompetitive Conduct .........................................................................17

        B.      Defendants Had a Duty to Disclose Material Facts About Their Tax
                Evasion Schemes .................................................................................................20

                1.      The Open Investigation into Defendants' Tax Evasion Scheme ..............23

                2.      *Yukos* and *VimpelCom* Are Distinguishable ...........................................24

        C.      Defendants' Risk Disclosures Were Inadequate...................................................26

        D.      The SAC Properly Alleges Scienter ....................................................................27

                1.      The SAC Properly Alleges Defendants' Conscious Misbehavior
                        and Recklessness......................................................................................27

                2.      The SAC Properly Alleges that Defendant Zyuzin Had a Motive
                        and Opportunity to Commit Fraud............................................................29

                3.      Mechel Had a Motive to Commit Fraud ...................................................31

**Page**

VI.    THE SAC ADEQUATELY ALLEGES LOSS CAUSATION .........................................32

    A.    The SAC Alleges Plaintiffs Suffered Losses as a Result of the False and
         Misleading Statements and Omissions ...................................................................33

    B.    Defendant's Conjecture Cannot Defeat Plaintiffs' Allegations as a Matter
         of Law ....................................................................................................................33

VII.   LEAVE TO AMEND SHOULD BE GRANTED IF NECESSARY ...............................39

VIII.  CONCLUSION ..............................................................................................................40

525553_1

# TABLE OF AUTHORITIES

Page

## CASES

Ashcroft v. Iqbal,
___ U.S. ___, 129 S. Ct. 1937 (2009)...................................................................34

Atlas v. Accredited Home Lenders Holding Co.,
556 F. Supp. 2d 1142 (S.D. Cal. 2008).............................................................13

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007).........................................................................................14

Berson v. Applied Signal Tech., Inc.,
527 F.3d 982 (9th Cir. 2008) ..........................................................................26

Chambers v. Time Warner, Inc.,
282 F.3d 147 (2d Cir. 2002).............................................................................13

City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.,
No. 08-969, 2009 WL 3837659
(D. Del. Nov. 13, 2009) ............................................................................17, 24

City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC,
423 F. Supp. 2d 348 (S.D.N.Y. 2006)...............................................................35

Cortec Indus., Inc. v. Sum Holding L.P.,
949 F.2d 42 (2d Cir. 1991)...............................................................................39

Cosmas v. Hassett,
886 F.2d 8 (2d Cir. 1989)..................................................................................28

Dura Pharms., Inc. v. Broudo,
544 U.S. 336 (2005).....................................................................................32, 34

FAS v. Eurocement Group
(Ruling No. 13-K-03-05) ..................................................................................19

FAS v. Gazprom
(Case No. 1 05/15905) .....................................................................................19

First Virginia Bankshares v. Benson,
559 F.2d 1307 (5th Cir. 1977) .......................................................................5, 14

Ganino v. Citizens Utils. Co.,
228 F.3d 154 (2d Cir. 2000)..................................................................... passim

**Page**

*Guerra v. Teradyne Inc.*,
No. Civ.A. 01-11789-NG, 2004 WL 1467065
(D. Mass. Jan. 16, 2004) ........................................................................................31

*In re Ambac Fin. Group, Inc. Sec. Litig.*,
No. 08 Civ. 411(NRB), 2010 WL 727227
(S.D.N.Y. Feb. 22, 2010) ........................................................................................32

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)..............................................................27, 28

*In re Bristol Myers Squibb Co. Sec. Litig.*,
586 F. Supp. 2d 148 (S.D.N.Y. 2008)..............................................................32, 38

*In re Check Point Software Techs. Ltd. Sec. Litig.*,
No. 03 Civ. 6594(RMB), 2006 WL 1116699
(S.D.N.Y. Apr. 26, 2006) ........................................................................................28

*In re China Life Sec. Litig.*,
No. 04 Civ. 2112(TPG), 2008 WL 4066919
(S.D.N.Y. Sept. 3, 2008) .........................................................................................38

*In re Countrywide Fin. Corp. Sec. Litig.*,
588 F. Supp. 2d 1132 (C.D. Cal. 2008) ..................................................................35

*In re Credit Suisse First Boston Corp. Sec. Litig.*,
No. 97 Civ. 4760(JGK), 1998 WL 734365
(S.D.N.Y. Oct. 20, 1998) ........................................................................................14

*In re Forest Labs. Sec. Litig.*,
No. 05 Civ. 2827(RMB), 2006 WL 5616712
(S.D.N.Y. July 21, 2006) ........................................................................................28

*In re IMAX Sec. Litig.*,
587 F. Supp. 2d 471 (S.D.N.Y. 2008)......................................................................35

*In re Initial Pub. Offering Sec. Litig.*,
544 F. Supp. 2d 277 (S.D.N.Y. 2008)......................................................................33

*In re MBIA, Inc. Sec. Litig.*,
No. 08-CV-264 (KMK), 2010 WL 1253925
(S.D.N.Y. Mar. 31, 2010) ........................................................................................29

- iv -

**Page**

*In re Moody's Corp. Sec. Litig.*,
   612 F. Supp. 2d 397 (S.D.N.Y. 2009)................................................................32

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010)..........................................................................15

*In re Omnicom Group, Inc. Sec. Litig.*,
   597 F.3d 501 (2d Cir. 2010)......................................................................37, 38

*In re Open Joint Stock Co.Vimpel-Commc'ns*,
   No. 04 Civ. 9742(NRB), 2006 WL 647981
   (S.D.N.Y. Mar. 14, 2006) ...............................................24, 25, 38, 39

*In re Par Pharm., Sec. Litig.*,
   733 F. Supp. 668 (S.D.N.Y. 1990) ................................................................21

*In re PXRE Group, Ltd. Sec. Litig.*,
   600 F. Supp. 2d 510 (S.D.N.Y. 2009)
   *aff'd*, 357 F. App'x 393 (2d Cir. 2009)..................................................22, 23

*In re Reserve Fund Sec. & Derivative Litig.*,
   No. 09 MD. 2011(PGG), 2010 WL 685013
   (S.D.N.Y. Feb. 24, 2010) ............................................................................28

*In re S. African Apartheid Litig.*,
   643 F. Supp. 2d 423 (S.D.N.Y. 2009)..............................................................3

*In re Scholastic Corp. Sec. Litig.*,
   252 F.3d 63 (2d Cir. 2001)...........................................................................32

*In re Scottish Re Group Sec. Litig.*,
   524 F. Supp. 2d 370 (S.D.N.Y. 2007)..............................................................32

*In re Take-Two Interactive Sec. Litig.*,
   551 F. Supp. 2d 247 (S.D.N.Y. 2008)........................................................20, 38

*In re Time Warner Sec. Litig.*,
   9 F.3d 259 (2d Cir. 1993).............................................................................14

*In re Tommy Hilfiger, Sec. Litig.*,
   No. 04-civ-7678, 2007 WL 5581705
   (S.D.N.Y. July 20, 2007) ......................................................13, 21, 22

- v -

**Page**

*In re Tower Auto. Sec. Litig.*,
   483 F. Supp. 2d 327 (S.D.N.Y. 2007)...................................................................32

*In re Van Der Moolen Holding N.V. Sec. Litig.*,
   405 F. Supp. 2d 388 (S.D.N.Y. 2005).................................................................17

*In re Wash. Mut.*,
   259 F.R.D. 490 (W.D. Wash. 2009) .....................................................................13

*In re Yukos Oil Co. Sec. Litig.*,
   No. 04 Civ. 5243(WHP), 2006 WL 3026024
   (S.D.N.Y. Oct. 25, 2006) ........................................................................... *passim*

*Janel World Trade, Ltd. v. World Logistics Servs., Inc.*,
   No. 08 Civ. 1327(RJS), 2009 WL 735072
   (S.D.N.Y. Mar. 20, 2009) .......................................................................29, 30, 31

*Kaster v. Modification Sys., Inc.*,
   731 F.2d 1014 (2d Cir. 1984)................................................................................39

*Kramer v. Time Warner, Inc.*,
   937 F.2d 767 (2d Cir. 1991).................................................................................13

*Lentell v. Merrill Lynch & Co.*,
   396 F.3d 161 (2d Cir. 2005).............................................................................35, 38

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
   513 F.3d 702 (7th Cir. 2008) ............................................................................24, 28

*Montoya v. Mamma.Com Inc.*,
   No. 05 Civ. 2313(HB), 2006 WL 770573
   (S.D.N.Y. Mar. 28, 2006) ....................................................................................24

*Nathel v. Siegal*,
   592 F. Supp. 2d 452 (S.D.N.Y. 2008)...................................................................35

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)............................................................................23, 27

*Ofori-Tenkorang v. Am. Int'l Group, Inc.*,
   460 F.3d 296 (2d Cir. 2006).................................................................................14

*Police & Fire Ret. Sys. v. SafeNet, Inc.*,
   645 F. Supp. 2d 210 (S.D.N.Y. 2009)...................................................................38

525553_1

**Page**

*Reina v. Tropical Sportswear Int'l,*
No. 8:03-CV-1958-T-23TGW, 2005 WL 846170
(M.D. Fla. Apr. 4, 2005) ...................................................................31

*Rombach v. Chang,*
355 F.3d 164 (2d Cir. 2004)...........................................................26

*Rothman v. Gregor,*
220 F.3d 81 (2d Cir. 2000)..............................................................31

*SEC v. O'Meally,*
No. 06 Civ. 6483(LTS) (RLE), 2008 WL 4090461
(S.D.N.Y. Sept. 3, 2008) ..................................................................14

*Silverman v. Motorola, Inc.,*
No. 07 C 4507, 2008 WL 4360648
(N.D. Ill. Sept. 23, 2008) .................................................................35

*Slayton v. Am. Express Co.,*
460 F.3d 215 (2d Cir. 2006)...........................................................39

*Sokolski v. Trans Union Corp.,*
178 F.R.D. 393 (E.D.N.Y. 1998).....................................................39

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.,*
552 U.S. 148 (2008)........................................................................14

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank,*
250 F.3d 87 (2d Cir. 2001).......................................................29, 30

*Tellabs, Inc. Makor Issues & Rights, Ltd.*
551 U.S. 308, 324 (2007)...................................................12, 27, 29

*United States v. Diallo,*
476 F. Supp. 2d 497 (W.D. Pa. 2007),
*aff'd,* 575 F.3d 252 (3d Cir. 2009) .................................................18

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
§78j(b).............................................................................................14
§78t(a) ...............................................................................................3

**Page**

Federal Rules of Civil Procedure
Rule 4(m) ..................................................................................................................3
Rule 8 .....................................................................................................................32
Rule 8(a) .....................................................................................................32, 33, 38
Rule 9 .....................................................................................................................32
Rule 9(b) .................................................................................................................32
Rule 12(b)(6) .....................................................................................................14, 35
Rule 15(a)(2) ...........................................................................................................39

Federal Rules of Evidence
Rule 201 ..................................................................................................................13

17 C.F.R.
§240.10b-5 ..............................................................................................................14
§240.10b-5(b) ..........................................................................................................14

**SECONDARY AUTHORITIES**

3 James Wm. Moore, *et al.*,
*Moore's Federal Practice* (3d ed. 2008)
§15.14[1] ................................................................................................................39

## I.    INTRODUCTION

On August 14, 2008, Mechel OAO ("Mechel" or the "Company"), the largest producer of coking coal products in Russia, ***admitted*** to violating Russia's anticompetition laws. Specifically, defendants admitted to discriminatory pricing and contracting in Mechel's coking coal business, thus impacting industry capacity and pricing.[1]  In earlier statements to investors, defendants had falsely attributed their record financial results and the strong pricing of, and demand for, Mechel's coking coal products to market forces.  During the Class Period,[2] however, defendants failed to disclose Mechel's anticompetitive behavior and tax avoidance schemes.  As investors learned of this fraudulent conduct, the price of Mechel's shares fell precipitously.[3]

Mechel was at all relevant times 73% owned by defendant Zyuzin, a Russian oligarch with almost 70% of his personal wealth tied-up in Mechel stock.  Throughout the Class Period, defendants were intimately aware of Mechel's business practices as coking coal was Mechel's core product.[4]  Defendants also knew that Russia's antitrust authority ("FAS")[5] had been closely monitoring Mechel since 2004 and consistently prosecuting anticompetition law violations in the

---

[1]    The defendants are Mechel and several of its top insiders: Igor V. Zyuzin (Chief Executive Officer), Stanislav A. Ploschenko (Chief Financial Officer) and Vladimir A. Polin (Chief Executive Officer of Mechel's subsidiary in charge of operations) (collectively, "defendants").

[2]    The Class Period in this action is from October 3, 2007 through July 25, 2008.

[3]    *See* Declaration of Ximena R. Skovron in Support of Plaintiffs' Opposition to Mechel OAO's Motion to Dismiss the Consolidated Second Amended Complaint ("Skovron Decl."), Ex. A.

[4]    Consistent with defendants' Class Period SEC filings, the terms "coking coal," "coking coal products" and "coking coal concentrate," which is processed coking coal, are used interchangeably.

[5]    FAS is the Federal Antimonopoly Service.

commodities markets since 2005 – facts missing in the 2003 prosecution of the Russian-based Yukos Oil Company.

In fact, during the Class Period, FAS found Mechel to have a dominant position in the Russian coking coal market. Mechel ***admitted*** after the Class Period that it had abused its dominant position by engaging in anticompetitive pricing and proscribed contracting practices with its biggest customers, violating Russia's anticompetition laws. Defendants knew that disclosure of this conduct would have been material to Mechel investors. This information would have been especially important to investors by May 15, 2008, the date by which defendants knew that FAS intended to impose "harsh sanctions" on antimonopoly law violators, like Mechel – because FAS said as much in a press release. Nevertheless, defendants continued to make statements about Mechel's coking coal pricing and contracts, but chose to say nothing about Mechel's anticompetitive conduct or the real risks related thereto.

In touting the Company's profitability, defendants also never disclosed Mechel's transfer pricing scheme that generated record-breaking profits by avoiding Russian taxes during the Class Period. Mechel improperly (and illegally) avoided Russia's income taxes by selling Mechel's coking coal products at a quarter of domestic prices to Mechel's own offshore subsidiary, Mechel International, and an offshore trading company known as Kompass Tranzits SIA ("Kompass"), which were located in countries with lower income tax rates. This scheme, coupled with Mechel's admitted anticompetitive conduct, rendered Mechel's reported financial results, including income and revenue, materially false and misleading at all relevant times.

Russian Prime Minister Vladimir Putin and FAS officials publicly revealed key facts underlying defendants' anticompetition and tax schemes. Russia's Prosecutor General described defendants' tax scheme as "scandalous," and criminal and tax investigations ensued. As investors

- 2 -

learned of this conduct over time, the Company's shares fell sharply and their price has never recovered to its Class Period high of $57.62 per share.

Mechel contends that plaintiffs' SAC should be dismissed without leave to amend (Def. Mot. at 38) (Dkt. No. 30) for failure to allege: (a) that Mechel knowingly or recklessly made a material misstatement or omission (*id.* at 18-26); (b) a strong inference of individual scienter (*id.* at 27-31); and (c) loss causation (*id*. at 32-37). By its silence, Mechel concedes that the SAC is sufficient in all other respects. As demonstrated herein, Mechel's arguments fail and the Court should deny defendant's motion in its entirety.[6]

## II.    STATEMENT OF FACTS

During the Class Period, Mechel completed several large acquisitions, including the large coal mines of Yakutugol and Elgaugol, resulting in approximately $5 billion in corporate debt and an increase in Mechel's active debt-to-share ratio from 17.1% in 2006 to 98.6% in 2007.[7] ¶¶6, 195-200.[8] Faced with such a high ratio in 2007, defendants continued to artificially inflate Mechel's financial statements as the Company needed to demonstrate liquidity in order to maintain its current

---

[6]     Defendant's contention that plaintiffs' §20(a) claim must be dismissed lacks merit. The individual defendants have not appeared despite personal service having been effectuated on December 18, 2009. Skovron Decl., Ex. B. Additionally, Requests for International Judicial Assistance were executed by this Court on October 20, 2009, and submitted to the U.S. Department of State on November 6, 2009. Skovron Decl., Ex. C. The estimated time for service pursuant to such Requests to Russia is 6-12 months, a period which has not yet expired. *Id*. (Ingalls Aff., ¶6). In any event, the 120-day time limit for effectuating service does not apply to service abroad, particularly where, as here, plaintiffs have made good faith attempts at service. *See* Fed. R. Civ. P. 4(m); *In re S. African Apartheid Litig*., 643 F. Supp. 2d 423, 432-33 (S.D.N.Y. 2009).

[7]     Not surprisingly, Mechel reported on its 2007 acquisitions, but chose not to disclose its required and actual financial ratios for the related debt covenants or the consequences of non-compliance.

[8]     Unless otherwise noted, all "¶" or "¶¶__" references are to the Consolidated Second Amended Class Action Complaint (the "SAC").

debt load and secure financing for further acquisitions in 2008. ¶¶6, 197. Defendant Zyuzin also faced significant personal financial exposure because 70% of his personal net worth came from his Mechel stock and almost 67% of that was pledged as collateral for loans to Mechel. ¶194.

In order to pay down Mechel's massive debt, defendants planned to complete two stock offerings in 2008 and secure billions of dollars in financing from lenders. ¶195. However, to successfully accomplish these transactions and protect Zyuzin's considerable personal financial exposure, Mechel needed its stock priced at levels that would attract potential investors and lenders and assure them of the Company's profitability. *Id.*

### A.    Mechel's Undisclosed Conduct Violated Russia's Anticompetition Laws

During the Class Period, at the same time Mechel's domestic competitors in Russia were experiencing coking coal shortages, Mechel was enjoying tremendous growth in its supply of coking coal products.[9] Unbeknownst to investors, however, defendants used Mechel's dominant position to force domestic coking coal customers to accede to Mechel's monopolistically high prices by, for example, "threatening to recall trainloads of coal in order to win a doubling of the price."[10] ¶¶10, 40, 100, 105, 158. When at least two of Mechel's top five customers refused to accede to Mechel's monopolistic prices, Mechel ***unjustifiably*** refused to perform under the contracts. ¶¶43, 112, 119, 125. After the Class Period, defendants ***admitted*** that these refusals violated Russia's antimonopoly laws. ¶¶9, 43, 112.

---

[9]    Through its purchases of Yakutugol, ***Russia's largest coking coal producer***, and Elgaugol, Mechel increased coal production by 25% in 2007 and touted that Mechel had "significant growth potential" over and above the growth achieved in 2007. ¶¶63, 65. Thus, Mechel's ***ability*** to supply customers with coking coal products was not a concern for defendants during the Class Period.

[10]    At all relevant times, Mechel held a dominant position in the coking coal market, as clearly defined by the Russian Federal Act on Protecting Competition (the "FLC"). ¶¶123, 185.

Defendant improperly asserts *as fact* that Mechel's conduct was justified due to its purported coking coal shortage, and blames long-term contracts at the newly acquired Yakutugol and two accidents at Mechel's Lenin mine for the shortage. Def. Mot. at 7. These factual assertions must fail for several reasons. *First*, after a thorough investigation, these same arguments were already rejected by FAS. *See* Shvets Decl., Ex. D. *Second*, defendants admitted in 2008 that 75% of Yakutugol's coking coal output was *not* subject to long-term contract. ¶65. *Third*, defendants have no basis to attribute the Lenin mine's reported annual loss of coking coal to the Class Period when only one (much less severe) of the two mining accidents asserted happened during the Class Period. *See* Shvets Decl., Ex. B at 18-19, 63. *Fourth*, of the complaining customers listed in FAS's judgment against Mechel, only one was denied deliveries of the brand of coking coals produced by the Lenin mine. *See* Shvets Decl., Ex. D at 3. *Finally*, defendant Mechel's claims ring hollow because Mechel experienced a massive increase in mining output throughout 2007 and 2008. *See* ¶65; Shvets Decl., Ex. D at 8 (Mechel's export sales of coking coal concentrate grew "more than 300%").

Mechel's *unjustified* refusal to perform under its contracts and enter into new contracts created pricing pressure domestically by escalating the shortage of coking coal in Russia and contributed to Mechel's ample supply of coking coal for export. ¶¶10, 40, 100, 158. This conduct allowed defendants to illegally implement monopolistically high prices domestically and execute a profitable tax avoidance scheme abroad. ¶¶3, 53-55, 57-59, 63-65, 67-68, 78-79, 81-83. Thus, defendants' statements during the Class Period about "market forces" as the source of their record-breaking income and revenues were false.

In truth, at least as early as March 2008 FAS was investigating whether Mechel's subsidiaries violated the antimonopoly laws, specifically the FLC, through anticompetitive pricing and

contracting practices.  ¶¶7, 73-74.  Mechel received directives from FAS in March, April and May, but chose not to disclose that Mechel's continuing conduct was proscribed in the directives.  ¶73. Specifically, these directives stated that Mechel held "a dominant position on the market for coking coal . . . and . . . coal concentrate" and ordered Mechel, *inter alia*, "to provide, to the extent possible, equal supply terms to all customers without discrimination against companies not forming part of the Mechel-Invest group of companies" and to provide "the financial and economic reasoning for" "any increase in domestic prices of coking coal, steam coal and coking coal concentrate, if such increase amounts to more than 10% of the relevant price used 180 days before the date such increase is planned to take place."  ¶¶73-74; *see also* Shvets Decl., Ex. O.  Defendants downplayed these directives during the Class Period as routine examples of "FAS [Russia] oversight by reason of their having been deemed to have a dominant market position" on the Russian coking coal market.[11] ¶¶73, 75.  The false and misleading nature of this description is confirmed by FAS's May 15, 2008 press release explaining that inquiries were sent to major producers of coking coal ***due to*** "***concern over potential price increases for coking coal and coal concentrate in the Russian market***," which FAS was reviewing "with the utmost seriousness, and "***if any violations of antimonopoly laws are found, harsh sanctions will be imposed***."[12]  ¶85 and n.2.

On July 15, 2008, FAS announced that "***following an investigation***" into whether Mechel fixed coking coal prices, it had enough evidence to open a case and charge its three subsidiaries –

---

[11]    Defendant challenges whether FAS conducted a non-routine investigation of Mechel.  *See* Def. Mot. at 23.  The SAC establishes that it did.  *See, e.g.*, ¶¶85 n.2.  *See also* Skovron Decl., Ex. D (Federal Law No. 134-FZ (setting forth the reasons for and length of non-routine FAS investigations)).

[12]    *Cf.* Def. Mot. at 12 (falsely characterizing FAS's investigation as starting "just four weeks" prior to August 14).

- 6 -

Mechel Trading (now Mechel International), Southern Kuzbass, and Yakutugol – with violating the FLC. ¶¶8, 32, 91, 100, 151. According to FAS, the charges stemmed from evidence demonstrating that one of Mechel's subsidiaries may have unjustifiably suspended coking coal concentrate delivery to at least one of Mechel's largest customers, Novolipetsk ("NLMK"), and that one or more of Mechel's subsidiaries may have refused to conclude coking coal concentrate delivery contracts with at least NLMK. ¶¶91, 151; Skovron Decl., Ex. E at 46, 64. FAS also had evidence demonstrating that one of Mechel's subsidiaries may have violated the FLC by establishing and maintaining monopolistically high prices for its coking coal products. ¶¶32, 91, 151.[13] One week later, on July 22, Mechel canceled its July 23 IPO for its preferred shares, as investor confidence declined in response to FAS's investigation. ¶¶8, 32, 92, 97, 152, 198.

On this news, the Company's shares fell from $46.50 per share on July 14, 2008, to close on July 23, 2008 at $36.61 per share (a 22% decline), as information leaked into the market regarding Mechel's improper pricing and contracting practices and, as a result, defendants likely did not properly report the Company's margins, income and revenue, among other things. ¶¶93, 153-154. However, due to defendants' lack of full and complete disclosure, and continuing misrepresentations and omissions – including concealment of Mechel's conduct that could (and did) constitute illegal tax evasion and anticompetitive behavior in violation of the FLC – Mechel's stock continued to trade at artificially inflated prices through the balance of the Class Period. ¶154.

On July 24, 2008, investors learned from the Prime Minister that Mechel had engaged in price fixing when it sold coking coal to customers in Russia at monopolistically high prices,

---

[13]    Ultimately, the FAS Judgment issued after the Class Period found Mechel guilty of all charges. *See* ¶¶110-112; Shvets Decl., Ex. D.

violating the FLC.  ¶¶94, 155.  The Prime Minister, having evaluated evidence against Mechel,

publicly declared that Mechel's domestic coking coal pricing policy and profit margins were so

abusive that they warranted an investigation by antitrust and criminal authorities, FAS and the

General Prosecutor in Russia, respectively.[14]  *Id*.  The media reported that, ***unlike the situation with***

***Yukos***, the Prime Minister's statements about Mechel were not politically motivated.  ¶¶94, 99.  The

Prime Minister had reacted to evidence that demonstrated that Mechel had "fall[en] out of mutually

accepted norms of behavior in the market."  ¶¶94, 99.  On this news, Mechel's shares fell $13.77 per

share, or over 37.6%, to close at $22.84 per share.  ¶¶156-157.

Mechel did not challenge the Prime Minister's statements about its pricing policies.  Rather,

consistent with Mechel's later ***admission*** to violating the FLC, on Friday, July 25, 2008, the media

reported that Mechel promised to cooperate with the government and pledged "it would never ***again***

charge a different price for coking coal on the domestic market than it did abroad."  ¶¶34, 96-98.

### B.    Mechel's Undisclosed Conduct Violated Russia's Tax Laws

Mechel contributed to the shortage of coking coal in Russia by diverting its ample coking

coal product supply to the export market, while at the same time implementing a scheme to avoid

paying Russian income tax.  Specifically, throughout the Class Period, ***Mechel sold its coking coal***

***products at a quarter of Russian domestic prices to its offshore subsidiary***, Mechel International

and an offshore trading company, Kompass, which were located in countries with lower income tax

rates than Russia.  ¶¶100-104, 158.  By doing this, only a quarter of the sales price was taxed at

Russia's income tax rate.  Mechel reaped substantial profits through its subsidiaries when they

---

[14]    Defendants purport to re-translate *Bloomberg's* report of the Prime Minister's July 24, 2008
statements without providing a copy of the transcript to which they cite.  *See* Def. Mot at 9 and
Shvets Decl., ¶3.  This is improper and should be stricken as requested in §III., *infra*.

subsequently sold the coking coal products to the export market at world prices.  ¶103.  In discounting coking coal "sold" to Kompass, Mechel and/or its insiders would realize profits in the form of a kickback associated with the subsequent sales price.  ¶¶136-138.

Defendants failed to disclose this conduct – conduct that was illegal tax evasion.[15]  The Russian Federation Tax Code categorically prohibited transactions between related parties in which there is a 20% or greater price differential between the price charged to the related party and the market price for identical goods or goods of a similar kind.  ¶¶70, 109, 139.  Yet, Mechel discounted its prices to related parties by up to 75% throughout the Class Period.[16]  ¶¶104, 125, 131, 136, 138, 175.  Investors were unaware that Mechel was generating income and failing to report loss contingencies by engaging in this conduct, which was described by Russia's Prosecutor General as "scandalous."  ¶¶52, 107, 131, 143, 146-147.

On Monday, July 28, 2008, investors learned for the first time of Mechel's tax scheme.  ¶¶10, 40, 100, 158.  Specifically, the Prime Minister publicly stated that Mechel evaded income taxes in Russia by selling coking coal products at a quarter of domestic prices to its offshore subsidiaries located in countries with lower income tax rates.[17]  ¶¶100-104, 158.  The Prime Minister explained

---

[15]    Prior to the Class Period the relevant authorities in Russia were routinely and increasingly enforcing the antimonopoly and tax laws.  *See* ¶¶169, 171-172, 177-179, 181-186.

[16]    Defendants argue in the abstract that a tax violation determination is complicated because the tax authority must use official sources of price information.  Def. Mot. at 16.  However, the severity of Mechel's violations (75% difference in price) simplifies this analysis.  *Compare* ¶¶104, 125, 131, 175 (prices charged by Mechel to related parties differed 75% from market prices) *with* ¶109 (tax experts at the time explained, "If the price difference had been 20-30%, the company would have nothing to fear.").

[17]    Defendant argues *as fact* that when the Prime Minister revealed this tax avoidance scheme, he was somehow referring to Mechel's conduct during the 2003-2005 time period.  *Compare* Def.

that Mechel would then sell the coking coal at world prices, a practice which he declared constituted tax evasion, as well as contributing to a coal shortage and higher steel prices in Russia.[18] ¶¶101, 158.

That same day, FAS also issued a statement that there was "enough evidence" to fine Mechel for FLC violations in the coking coal market, which included price fixing at monopolistically high prices, the unjustified refusal to supply under existing contracts, and the unjustified refusal to enter into new supply contracts. ¶¶100, 105. FAS's chief also revealed details previously not disclosed about the evidence against Mechel for its FLC violations. The chief revealed that *FAS's investigation had "gathered enough evidence. One mustn't blackmail steel plants, threatening to recall trainloads of coal in order to win a doubling of the price*." ¶105. On this news, Mechel's shares fell $6.70 per share, or over 25.5%, to close at $19.50. ¶¶159-160.

### C.    Post-Class Period Events Confirm Plaintiffs' Allegations of Fraud

After the Class Period, government officials and the media confirmed the validity of the claims against Mechel. The Investigations Committee of the Prosecutor General's Office initiated a criminal investigation and that investigation is still pending. ¶¶52, 107. Further, in July 2009, the Audit Chamber announced that it had investigated Mechel's use of offshore entities to carry out coal

---

Mot. at 16 *with, e.g.*, Shvets Decl., Ex. V at 1 (evaluating Mechel's 2003-2005 audit). This assertion does not make sense. *See also* §III., *infra* (moving to strike Shvets Decl., Exs. V, W).

[18]    Ultimately, Mechel's intentional contribution to the shortage was one reason provided by FAS for finding Mechel did not have sufficient justification under the FLC for its monopolistic coking coal prices. *See* Shvets Decl., Ex. D.

exports and planned on submitting the results of its investigation to the Ministry of the Interior, Federal Customs Service, and Federal Tax Service. ¶50; Skovron Decl., Ex. F.[19]

In awaiting a guilty judgment from FAS in August 2008, the media also confirmed the seriousness of the charges against Mechel. It was reported that Russian tax authorities could force Mechel could have to pay the profit taxes that it had illegally avoided, which were estimated to be about four times what the Company had paid in 2007.[20] ¶109. Moreover, analysts reported that FAS could force Mechel to cut coking coal prices by 30%, which would cause a loss of $600 million in second-half revenues and $950 million for the whole of 2008. ¶116. Analysts also reported that such a price cut would result in a 2% and 8% reduction of Mechel's profit in 2008 and 2009, respectively. ¶117.

Ultimately, FAS issued a press release announcing that ***Mechel admitted to, and FAS found Mechel guilty of, breaking the FLC***. ¶¶43, 112. On August 14, 2008, FAS stated in a judgment that Mechel violated the FLC by discriminating against Russian consumers, unreasonably refusing to enter into new contracts and honor existing contracts, and maintaining monopolistically high prices in the coking coal market. ¶¶43, 110-112. Defendants did not then (as they do now), contend that they merely elected "not to contest" FAS's finding of guilt. *See* Def. Mot. at 13.

Citing Mechel's cooperation, FAS imposed a fine of RUR 797,735,291 (U.S. $34 million) on Mechel equal to 5% of its 2007 coking coal concentrate revenue, and ordered Mechel to cut its coking coal, including coking coal product, prices by 15%. ¶¶44, 118-119. Analysts reported relief

---

[19]    *Cf.* Def. Mot. at 16 n.13 (incorrectly citing Shvets Decl., Ex. EE as the report cited in ¶50). The Audit Chamber is an oversight body that reports to the Russian Parliament on the various activities of Russia's various federal agencies.

[20]    In 2007 Mechel paid profit tax of $356.32 million on a net profit of $913.05 million. ¶109.

as the fine was far lower than the $150-$200 million that investors expected. ¶115. However, Mechel's stock price did not fully recover to its pre-July 24 trading price as analysts explained that investors were waiting to see the impact of the price cut, the result of the tax evasion investigation, and what the new price benchmark would be for new contracts for coking coal. *Id.*

## III.    PUBLICATIONS AND EXHIBITS IMPROPERLY RELIED UPON BY DEFENDANT SHOULD BE STRICKEN

The Supreme Court directs courts to "draw from the facts alleged" in considering a motion to dismiss a complaint under the securities laws. *Tellabs, Inc. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007) ("*Tellabs I*"). Thus, plaintiffs request that the Court strike eleven newspaper articles, two PwC reports (that pre-date the Class Period) and a translation of the Prime Minister's July 24, 2008 statements (collectively, the "Publications"),[21] which defendant uses to inject factual assertions about the causes of Mechel's stock price decline and reasons for defendants' July 22, 2008 cancellation of its IPO.[22] *See also* §VI.B., *infra*. Plaintiffs also request that the Court strike Exhibits M and P-S, which defendant uses to make unsubstantiated factual assertions about the FLC and FAS requirements. *See also* §V.A.2., *infra*. In addition, plaintiffs request that the Court strike Exhibits V

---

[21]    (1) Shvets Decl., ¶3 (citing *Wash. Post*, June 23, 2004); (2) Shvets Decl., ¶56 and Def. Mot. at 34 (citing Shvets Decl., Ex. WW); (3) Def. Mot. at 9, 34, 35 (citing *N.Y. Times*, July 26, 2008); (4) Def. Mot. at 34 (citing *Forbes*, July 25, 2008); (5) Def. Mot. at 34 (citing *N.Y. Times*, July 28, 2008); (6) Def. Mot. at 34 n.24 (citing PricewaterhouseCoopers, IPO Watch Europe); (7) Def. Mot. at 34 n.24 (citing PricewaterhouseCoopers, 2008 US IPO Watch); (8) Def. Mot. at 35 (citing *N.Y. Times*, Feb. 25, 2010); (9) Def. Mot. at 35 (citing *Fortune Mag.*, Sept. 10, 2008); (10) Def. Mot. at 36 (citing *Time*, Aug. 21, 2008); (11) Def. Mot. at 36 (citing *Reuters*, July 28, 2008); (12) Def. Mot. at 36 (citing *Forbes*, Aug. 13, 2008); (13) Def. Mot. at 36 (citing *Reuters*, Sept. 22, 2008); and (14) Shvets Decl., ¶3, Def. Mot. at 9 (*Bloomberg*'s translation).

[22]    *See, e.g.*, Def. Mot. at 34 (contending that a *New York Times* article demonstrated that the stock drop was caused by political concerns); *id*. at 35 (same); *id*. at 34 & n.24 (improperly cited for characterization that IPO's were "scarce" and capital markets were in turmoil); Def. Mot. at 9 and Shvets Decl., ¶3 (translating statements without authenticating or providing the transcript).

and W, which defendant uses to inject facts about tax audits in the 2003-2005 time period, and

Exhibits AA-DD, which defendant uses to assert facts about customer complaints post-Class Period

(collectively, the "Exhibits").  *See also* §II.B., *supra*.

The disputed materials are not integral to, relied upon, attached to, or referenced in the SAC.

*Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (plaintiff's reliance on a document

in drafting the complaint is "a necessary prerequisite to the court's consideration of the document on

a dismissal motion; mere notice or possession is not enough").  In addition, they should be stricken

as they are both asserted for their truth and "subject to reasonable dispute."[23]  *See* Fed. R. Evid. 201

(judicial notice is only proper where the fact for which judicial notice is sought is "not subject to

reasonable dispute"); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) (judicial notice

is not properly taken with respect to the truth of the content).  Further, even if defendant is merely

seeking judicial notice of the fact that the information exists or was published – which defendant is

not – the Publications still should not be considered by the Court, as the mere existence of them is

not relevant to this litigation.  *See In re Tommy Hilfiger, Sec. Litig.*, No. 04-civ-7678, 2007 WL

5581705, at *5 (S.D.N.Y. July 20, 2007) (granting plaintiffs' motion to exclude extraneous articles

because "[t]he fact of their publication alone is irrelevant").  Thus, because the Publications and

Exhibits cited by defendant are extraneous to the SAC and are not subject to judicial notice, they

should be stricken.

---

[23]    Indeed, numerous courts have rejected similar attempts by defendants to obtain judicial notice of such articles and reports.  *See, e.g.*, *In re Wash. Mut.*, 259 F.R.D. 490, 495 (W.D. Wash. 2009) (refusing to take judicial notice of the recent economic downturn); *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1161 (S.D. Cal. 2008) (refusing to consider newspaper articles discussing the subprime mortgage market).

525553_1

## IV.    APPLICABLE STANDARDS

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the court must "accept all factual allegations as true" contained in the complaint and "draw all reasonable inferences in [the] plaintiff[s'] favor." *Ofori-Tenkorang v. Am. Int'l Group, Inc.*, 460 F.3d 296, 298 (2d Cir. 2006); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007).[24]

## V.    THE SAC STATES A CLAIM FOR SECURITIES FRAUD

### A.    Defendants Had a Duty to Disclose Their Improper Pricing Practices and the True Status of Their Long-Term Contracts

An affirmative duty to disclose arises under §10(b) when: (1) the parties share a fiduciary or similar relationship of trust and confidence; or (2) where a previous disclosure is or becomes inaccurate, incomplete or misleading. *In re Time Warner Sec. Litig.*, 9 F.3d 259, 268 (2d Cir. 1993) ("A duty to disclose arises whenever secret information renders prior public statements materially misleading, not merely when that information completely negates the public statements."); *see also SEC v. O'Meally*, No. 06 Civ. 6483(LTS) (RLE), 2008 WL 4090461, at *2 (S.D.N.Y. Sept. 3, 2008); *accord First Virginia Bankshares v. Benson*, 559 F.2d 1307, 1314 (5th Cir. 1977) ("a defendant may not deal in half-truths"); *In re Credit Suisse First Boston Corp. Sec. Litig.*, No. 97 Civ. 4760(JGK),

---

[24]    Section 10(b) makes it unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may proscribe." 15 U.S.C. §78j(b).  Rule 10b-5, in turn, prohibits "mak[ing] any untrue statement of a material fact or [omitting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. §240.10b-5(b).  To state a claim under §10(b) and Rule 10b-5 promulgated thereunder, plaintiffs must plead: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

- 14 -

1998 WL 734365, at *6 (S.D.N.Y. Oct. 20, 1998) ("'Rule 10b-5 creates a statutory duty to speak the full truth when a defendant undertakes to say anything.'").[25]

### 1.    Defendants' Incomplete Statements Were Both Material and Misleading

"At the pleading stage, a plaintiff satisfies the materiality requirement . . . by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). "[B]ecause the materiality element presents 'a mixed question of law and fact,' it will rarely be dispositive in a motion to dismiss." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) (a complaint may not properly be dismissed unless statements "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance").

During the Class Period, defendants claimed that Mechel was experiencing the best year for financial performance in its history. ¶57.  In particular, defendants touted Mechel's mining segment results, stating that it had "experienced a breakthrough year in 2007." ¶63.  Defendants attributed the Company's "record financial results" to coking coal's "positive pricing trends" and "price increases [that] occurred on both export and domestic markets." ¶¶57, 58, 67.  According to defendants, Mechel's coking coal price increases were the result of market factors. ¶¶67, 65. Defendants' Class Period statements include, *inter alia*:

- "***The main factors contributing to our growth were pricing***, adding $823 million." ¶55 [Zyuzin, Earnings call held 10/03/07]

- "Today we are witnessing ***further price increases for coal products on the back of rising demand in Asian markets and infrastructural challenges faced by major***

---

[25]    Citations are omitted and emphasis is added, unless otherwise noted.

*coal exporting count[r]ies*. We expect to capitalize on the existing favorable market conditions." ¶57 [quoting Zyuzin, 12/11/07 Press Release]

- "*The price factor was, by far, dominating in the mining segment*, pushing the revenue up 33%, to $1.266 billion." ¶58 [Ploschenko, Earnings call held 12/11/07]

- [Polin:] . . . "*As the commodities pricing environment continued to improve significantly during the year*, we increased coal production by 25% supported by the Yakutugol acquisition at the year end among others.

  Globally, coal prices have been driven by great demand among the steel producers and the limited supply generated by seaport infrastructure problems experienced in key exporting countries. Currently retail prices remain at the current level for foreseeable future and even grow." ¶65 [Earnings call held 05/29/08]

- "*The price increases occurred on both export and domestic markets, resulting from increasing coking coal demand and tight supply both in domestic and export markets due to accidents in several Russian coal mines which caused mine closures and cargo seaport capacity problems in Australia*. . . . Coking coal concentrate supplied to the steel segment increased by $220.3 million, or 117.5% . . . where $123.7 million of the increase was due to an increase in sales prices . . . ." ¶67 [Form 20-F filed 06/19/08]

- "*We also benefited from a favorable price environment for coal products due to the fact that significant demand and supply imbalance appeared in consequence of environmental and infrastructural problems*. The mining segment saw coal pricing growth over the past six months, *and looking forward we anticipate the existing price environment to continue given infrastructural restraints in the market*." ¶78 [quoting Polin, 07/07/08 Press Release]

- [Polin:] . . . "*The mining segments was a clear out performer as its revenue from sales to front markets is doubled* and the steel segment also performed well with revenue increasing by one-third. *The pricing effects contributed $255 million in the steel segment and $182 million in the mining segment*." ¶83 [Polin, Earnings call held 07/14/08]

- [Zyuzin:] . . . "So, we hope that even in the fourth quarter, we have already witnessed it *has a increase in sales prices for Yakutugol's operations, for which we have their both spot and long-term contracts, and while we'll have to finish the long-term contracts as of the end of the year*, we will be able to increase prices on the spot basis." ¶58 [Earnings call held 12/11/07]

Defendants' statements were misleadingly incomplete, however, because as revealed by the subsequent FAS Judgment against Mechel, the true source of Mechel's mining segment revenues was its abuse of its dominant position through illegal price-gouging schemes, in which it charged

525553_1

domestic customers discriminatory and monopolistically high prices and groundlessly refused to deliver on, *inter alia*, Yakutugol's long-term contracts. Shvets Decl., Ex. D (FAS Judgment, ¶5); ¶¶43, 110.

Defendants put the source of such revenues and Mechel's long-term contract practices at issue. In doing so, defendants had a duty to disclose the whole truth. *See In re Van Der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005) (denying motion to dismiss where company failed to disclose illegal trading practices when it had "put the sources of . . . revenue at issue"); *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, No. 08-969, 2009 WL 3837659, at *9 (D. Del. Nov. 13, 2009) (where illegal anticompetitive conduct was a source of revenue, stating that "[e]ven though the statements may have accurately depicted [the company's] financial performance, attributing such performance to only lawful conduct falls below the level of honesty required by the securities laws").

Defendants' omissions of fact concerning the true source of their revenues are indisputably material. *See, e.g.*, *Van Der Moolen*, 405 F. Supp. 2d at 401 ("if [a company] puts the topic of the cause of its financial success at issue, then it is 'obligated to disclose information concerning the source of its success, since reasonable investors would find that such information would significantly alter the mix of available information'"); *Horizon Lines*, 2009 WL 3837659, at *30 ("In our view, facts regarding an anticompetitive rate-fixing scheme 'would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'").

### 2. Defendants Knew that They Were Engaging in Fraudulent Anticompetitive Conduct

Mechel dedicates its entire argument section concerning materiality to arguing that it did not know it was violating the FLC and therefore, did not have a duty to disclose that fact. Defendants' scienter is addressed in §V.D., *infra*. This argument misses the point because defendants' omissions

- 17 -

concern Mechel's true source of income and revenue – its undisclosed pricing and contracting practices, not its failure to disclose the possibility of enforcement action.  Further, Mechel's assertion is disingenuous given that defendants disclosed that Mechel was prohibited from engaging in discriminatory pricing (as it was ultimately found to have done), among other enumerated abusive practices, as a result of its dominant position.   ¶73.   Also, widely disseminated press articles announcing pertinent amendments to the FLC and the FAS's crackdown on anticompetitive conduct in the commodities markets belies defendant's position.  ¶¶180-186.

Nonetheless, Mechel argues that defendants could not have anticipated that their conduct was improper.   Mechel reasons that, while defendants knew the FLC's restrictions applied to their conduct in the coking coal market as defined in March 2008, the FAS Judgment changed the definition to only include specific grades of coking coal concentrate.  This argument lacks merit, for FAS consistently identified the relevant market as including ***both*** coking coal ***and*** its derivative, coking coal concentrate.  Specifically, the FAS determined that Mechel held:

> a dominant position on the market for ***coking coal*** (anthracite used as raw material in the metallurgical industry, ***and*** its processed product, coal concentrate, used both for coking and as raw material in the metallurgical industry).

Shvets Decl., Ex. O (March 2008 Orders at 1); ¶74.

Thus, in its Orders, FAS did not limit its determination of Mechel's dominant position to specific grades of coking coal concentrate, and therefore there is no basis to contend anything other than that Mechel held a dominant position in ***all*** grades of coking coal concentrate which it produced.  *See, e.g.*, *United States v. Diallo*, 476 F. Supp. 2d 497, 507 (W.D. Pa. 2007) ("on the logic that the general includes the specific, it seems clear that the general term 'use' of 'goods'

would be at least as broad as – and would include – the specific example that Congress identified for packaging and other paraphernalia"), *aff'd*, 575 F.3d 252 (3d Cir. 2009).[26]

Defendant seeks an unsubstantiated inference from an FAS press release issued after the Class Period, which generally states that businesses were often not able to "develop a clear understanding of possible restrictions resulting from the amendments to antimonopoly law." Def. Mot. at 13 (citing Shvets Decl., Ex. P).[27]  However, the amendments to the FLC did not make changes to the relevant coking coal market definition (nor does defendant assert to the contrary), which is the purported reason defendants could not "predict" FAS enforcement action.  Moreover, this argument is belied by the fact that defendants disclosed that FAS found Mechel to be in a dominant position and prohibited it from engaging in specified discriminatory pricing and contracting practices.  ¶¶73, 187.

Defendant's attempt to argue that it was unaware that its conduct was in violation of the law based upon *FAS v. Eurocement Group* (Ruling No. 13-K-03-05) is without merit.  Def. Mot. at 21-22 (citing Shvets Decl., Ex. X).  The case of *Eurocement* and *FAS v. Gazprom* (Case No. 1 05/15905), along with other FAS actions and articles in the press, demonstrate that FAS vigorously enforced Russia's anticompetition laws against those found to be in a dominant position.  *See* ¶¶182-186.  On the facts of that case, ultimately, FAS was unable to demonstrate the existence of a violation.  However, here there has been no reversal of FAS's determination concerning Mechel.

---

[26]    Further, it makes no difference whether the FAS Judgment was independent of and did not rely upon the March 2008 Orders.  *See* Def. Mot. at 23.  The critical fact is that in 2004, and no later than Mechel's October 2007 acquisition of two of Russia's largest coking coal production sources (Yakutugol and the license to the Elga deposit), defendants were on notice of Mechel's dominant position.  ¶¶63, 65, 181.  The March 2008 Orders reaffirmed these facts.

[27]    *See* §III. (moving to strike Shvets Decl., Ex. P).

Similarly, *Sibuglemet* does not support defendant's position. *See* Shvets Decl., Exs. Q-S.[28] There, the Moscow Arbitration Court held that FAS had not proven that the company held a dominant position in the market for "sintering coal concentrates," as (**unlike Mechel**) the company had not previously been included by FAS in the register of businesses holding a dominant position. Shvets Decl., Ex. R at 6 (FAS "did not provide statistics or sufficient evidence to justify that conclusion . . . . The case files contain no information that the petitioner is listed in the register of businesses."). Thus, the court found that there had been no abuse of Sibuglemet's dominant position with respect to its sale of sintering coal concentrate because it ***had not been proven to have a dominant position***. *Id*. at 6-7. By contrast, Mechel conceded that the FAS had included it in the register of businesses holding a dominant position in the larger coking coal product market. ¶187.[29]

### B. Defendants Had a Duty to Disclose Material Facts About Their Tax Evasion Schemes

During the Class Period, defendants repeatedly boasted of their "record profitability," and that it was "compelling proof of the success of the growth strategy we have chosen and continue to follow." ¶83. Defendant Polin asserted that "[t]he mining segment demonstrated by far the most significant increase in revenue and profitability during the reported period." *Id*.; *see also* ¶53 (attributing "increasing profitability" to "enhanced cost control efforts" and "efficiency of the Company's mining operations"). In addition, the Company's Form 20-F, signed by defendants

---

[28]     *See also* §III. (moving to strike Shvets Decl., Exs. Q-S).

[29]     *In re Take-Two Interactive Sec. Litig*., 551 F. Supp. 2d 247 (S.D.N.Y. 2008), also does not support defendant's position on materiality. Def. Mot. at 18-19. There, the court held that the plaintiff ***had properly pled a material omission concerning the defendants' failure to comply with applicable regulations***. *Take-Two*, 551 F. Supp. 2d at 263. Further, defendant's position is not supported by the portion of FAS's annual report to which it cites. *See* Def. Mot. at 12 (citing Shvets Decl., Ex. M); *see also* §III. (moving to strike Shvets Decl., Ex. M).

- 20 -

Zyuzin and Ploschenko, discussed Mechel's income tax expenses in detail, but did not reveal the Company's actual tax liabilities.  ¶¶67, 76.

In making such statements, defendants failed to disclose that their reported profits did not take into account massive unpaid tax liabilities resulting from defendants' transfer pricing scheme, in which defendants sold coking coal products to Mechel International at nominal prices and paid Russian taxes on those prices while Mechel International resold the same products at much higher export prices, for which it paid minimal Swiss taxes.  These statements are actionable.  *See Tommy Hilfiger*, 2007 WL 5581705, at *1, *4-*5 (denying motion to dismiss §10(b) claim based upon company's failure to disclose illegal transfer pricing scheme involving foreign subsidiaries).[30]  The SAC describes this scheme based upon official customs data, the November 2009 Audit Chamber Report, and the Prime Minister's statements to the press concerning Mechel's tax evasion.  Thus, the SAC establishes that Mechel was charging its subsidiary prices that deviated downwards from market prices by 69.25% to as much as 150%.  ¶¶131-133; 102-04 (quoting the Prime Minister as stating that Mechel was charging "75% below the domestic market price").

As the Audit Chamber Report, which is relied upon in the SAC, states: ***Mechel and others charged "$47.36 and $51.46 USD per ton for coal products*** exported out of Russia, depending on the cost of shipping and expenses at ports. . . . At the same time, according to information in the

---

[30]    *In re Par Pharm., Sec. Litig.*, 733 F. Supp. 668 (S.D.N.Y. 1990), cited in *In re Yukos Oil Co. Sec. Litig.*, No. 04 Civ. 5243(WHP), 2006 WL 3026024, at *14, *16 (S.D.N.Y. Oct. 25, 2006), is not to the contrary.  *Par Pharm.* held that the defendants were not obligated to speculate in their disclosures on the outcome of any investigation into the bribery scheme in which they allegedly were engaging.  The court, however, found that the plaintiffs had stated a cause of action with respect to the company's failure to disclose that "the sales, earnings and product approvals which the company mentioned in its various statements were the result of the bribes paid to FDA officials, and that the defendants knew this to be true at the time they issued the statements.  Plaintiffs are entitled to attempt to prove those contentions to the jury."  733 F. Supp. at 678-79.

- 21 -

handbook for prices on the world market issued by the All-Russian Market Research Institute (Moscow-2008), *the price of coal during the same period and in the same area fluctuated between $97 and $175 USD per ton*." Skovron Decl., Ex. F; *see also* ¶50. As alleged, these practices are in clear violation of Article 40 of the Russian Tax Code, which categorically prohibits price deviations of more than 20% from market prices in transactions between related parties. *See* ¶173.

Defendants' failure to accurately disclose the Company's unpaid tax liabilities, which were reportedly four times greater than the taxes the Company had actually paid in 2007, was material. ¶¶42, 109. Mechel's unpaid tax liabilities amounted to *$1.42 billion, plus penalties and interest, an amount that was substantially higher than the Company's entire net profit of $913.05 million in 2007*. ¶42. Certainly, a reasonable investor would have viewed the Company's tax schemes and their potential liabilities as significant. *See Ganino*, 228 F.3d at 161.

A second tax evasion scheme described in the SAC concerns transfer pricing through Kompass which, after Mechel International, was Southern Kuzbass's biggest coking coal customer in 2007. ¶¶134-138. The scheme involved the sale of coking coal by Southern Kuzbass to Kompass at prices that were even lower than prices charged to Mechel International, and at volumes far in excess of amounts sold to the next highest external customer. *Id*. Kompass would sell the same products on the export market at prices that were *450%* higher and kick back to Mechel a portion of the profit. ¶¶136, 138. The heavily discounted, high volume Kompass transactions were material and their omission is actionable as alleged. *See Tommy Hilfiger*, 2007 WL 5581705, at *1, *4-*5.

Defendant's sole argument concerning the Kompass scheme is whether the confidential source is described "with sufficient particularity." Def. Mot. at 26. However, this Court has previously held that information provided by confidential witnesses will not be discounted solely on the basis of their anonymity. *In re PXRE Group, Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 526 n.18

- 22 -

(S.D.N.Y. 2009) (the Court will "consider allegations based on information provided by confidential sources without discounting those allegations due solely to the anonymity of the information's source") (citing cases), *aff'd*, 357 F. App'x 393 (2d Cir. 2009). Moreover, *Novak* held that "where plaintiffs rely on confidential personal sources but also on other facts, **they need not name their sources as long as the latter facts provide an adequate basis for believing that the defendants' statements were false**." *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000). Here, the SAC alleges the confidential witness's position as an analyst in Latvia as the basis for his knowledge, as well as independent facts corroborating his knowledge, including customs data. Nothing more is required.

### 1.    The Open Investigation into Defendants' Tax Evasion Scheme

Defendant's assertion that it was never investigated for transfer pricing is flatly wrong and directly contradicted by: (1) international press and analyst reports discussing Mechel's transfer pricing practices, the ongoing tax investigation, and the potential tax liability faced by the Company; and (2) the Report issued by the Audit Chamber in November 2009 describing the investigation into Mechel's transfer pricing practices. *See* Skovron Decl., Ex. F;[31] ¶¶10, 50, 40 (*Associated Press* quoting the Prime Minister: "it's a reduction of the tax base within the country, **it's tax evasion**"); ¶41 (article stating that "Tax authorities could slap coal and steel producer Mechel with profit tax claims that are about four times what the company has paid."); ¶49 (analyst reported that investors' "**main [remaining] concern regarding Mechel is the tax authorities' investigation of alleged transfer pricing and tax evasion, which could have more far-reaching consequences and remains unresolved**"); *see also* ¶131. Thus, the SAC's detailed factual allegations based upon official

---

[31]    The Audit Chamber, an oversight body that reports to the Russian Parliament on the various activities of Russia's various federal agencies, also issued a Report in July 2009 discussing the FAS investigation into Mechel's anticompetitive practices. Shvets Decl., Ex. EE.

525553_1

government documents, press articles, and analyst's reports are well-pled. *See, e.g.*, *Montoya v. Mamma.Com Inc.*, No. 05 Civ. 2313(HB), 2006 WL 770573, at *4 (S.D.N.Y. Mar. 28, 2006).[32]

Tellingly, defendant Mechel does not point to *any* evidence whatsoever that Mechel was cleared of these charges. *See* Def. Mot. at 25-26. The fact that the Tax Ministry has not yet made a final determination does not in any way suggest that defendants are innocent of tax evasion. Courts routinely adjudicate cases brought under the federal securities laws concurrently with ongoing government investigations into the same conduct. *See, e.g.*, *Horizon Lines*, 2009 WL 3837659, at *2 (adjudicating §10(b) claim concurrently with DOJ investigation of anticompetitive conduct).

### 2.    *Yukos* and *VimpelCom* Are Distinguishable

*Yukos* is not on point. In *Yukos*, the court found that the Tax Ministry did *not* find a violation of Article 40's 20% rule as the plaintiffs had alleged and, in fact, "made no reference" to Article 40. 2006 WL 3026024, at *14. Thus, the plaintiffs in *Yukos* sought to impose a duty on the defendants to disclose conduct that was not at issue in the Tax Ministry's investigation of Yukos. Further, the *Yukos* court reasoned that defendants did not act with scienter since the plaintiffs had failed to plead a "single instance" in which the Tax Ministry had previously challenged related-party transactions. *Id*.

By contrast, here FAS *did* find the defendants' anticompetitive conduct to be illegal, the Company *admitted* to engaging in the illegal conduct, and the SAC alleges with great specificity the defendants' failure to disclose that conduct. *See* §V.A.-C. Unlike in *Yukos*, the SAC alleges the failure to disclose improper conduct that had been determined by a fact finder as ***occurring at the***

---

[32]    In light of these facts, Mechel's claim that it was never investigated for tax evasion is not only implausible, it is an improper denial of the SAC's allegations. *Cf. Tellabs*, 551 U.S. at 323.

- 24 -

*time defendants spoke*.  With respect to the allegations of tax evasion, the SAC alleges conduct that does constitute a violation of Article 40 and is currently the subject of investigation by Russian authorities, unlike in *Yukos*.  No factfinder has found Mechel innocent of such violations.

Furthermore, in contrast to the complaint in *Yukos* which described "not a single instance" in which the Russian authorities had previously cracked down on similar schemes, the SAC contains particularized allegations concerning the defendants' pre-Class Period disclosures of the applicability of Article 40's 20% rule.  ¶170.  Also, the SAC describes the plethora of information and precedents available to defendants prior to the Class Period with respect to the application of Article 40 of the Tax Code *and* Article 10 of the FLC to similar conduct. ¶¶171, 172, 176, 177, 180-186.  Finally, these laws are clearly written. ¶¶173, 174, 123, 124, 126.

*VimpelCom* is also inapplicable.  In *VimpelCom*, the court held that the company was not required to disclose the commencement of a tax inspection regarding unpaid VAT taxes; the mere existence of a tax inspection was not material. *In re Open Joint Stock Co.Vimpel-Commc'ns*, No. 04 Civ. 9742(NRB), 2006 WL 647981, at *5 (S.D.N.Y. Mar. 14, 2006) ("*VimpelCom*").  Here, the SAC does not allege that Mechel merely failed to disclose investigations by FAS or Tax Ministry, but that certain conduct which violated the law was not disclosed.  *VimpelCom* nonetheless is instructive because the court found it significant that the company *had specifically disclosed the conduct at issue in the tax inspection*, noting that "VimpelCom's Form 20-F disclosed the fact that VimpelCom's practice was to pay VAT on the goods it imported and to reduce taxes paid to Russian authorities by an equivalent amount." *Id.* at *6.  The court also noted that the company "additionally disclosed the fact that Russian laws related to VAT were uncertain *and that it was possible that tax authorities could disagree with the company's [disclosed] position concerning VAT offsets*." *Id.*

Here, in contrast, defendants did not disclose their practice of paying taxes to Russian authorities on the below-market, bottom-dollar prices charged to Mechel International and Kompass, rather than on the higher export price ultimately charged for the same products. Defendants did not disclose the strong possibility that the tax authorities could disagree with their position on the taxes owed on transactions with Mechel International and Kompass.

### C.    Defendants' Risk Disclosures Were Inadequate

In its statement of facts, defendant points to risk disclosures – concerning the possibility of "arbitrary government action" through "selective implementation of regulations and legislation" thus "creat[ing] an uncertain investment climate" – as sufficient as a matter of law to warn investors of the specific conduct in which the Company was engaged. Def. Mot. at 14-15. Defendants made similar general statements with respect to the enforcement of transfer pricing regulations, attributing the possibility of enforcement action to "uncertainties in interpretation of transfer pricing legislation." ¶70. Thus, instead of truthfully disclosing the conduct and attributing the possibility of an enforcement action with respect to such conduct, defendants conveyed the false impression to investors that the possibility of an enforcement action was strictly the result of an arbitrary legal system in Russia and not associated with any specific present conduct.

Under even the most permissive standard for disclosing risk, defendants' statements fall far short of the mark. "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004); *see also Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 986 (9th Cir. 2008) ("[n]othing alerts the reader that some of these risks may already have come to fruition"); *id*. at 987. Thus, defendants' risk disclosures were grossly inadequate because they failed to disclose the conduct necessary to weigh the risks – that Mechel was ***currently*** engaging in improper tax and anticompetition conduct.

- 26 -

### D.    The SAC Properly Alleges Scienter

A complaint raises a strong inference of scienter "'(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Ganino*, 228 F.3d at 168-69.  Importantly, the inquiry is "whether *all* of the facts alleged, taken *collectively*, give rise to a strong inference of scienter." *Tellabs I*, 551 U.S. at 323.  The inference that defendants acted with scienter "need not be irrefutable" (*i.e.*, of the "'smoking-gun' genre"), nor even the "'most plausible of competing inferences.'" *Id.* at 324.  A complaint will survive "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

### 1.    The SAC Properly Alleges Defendants' Conscious Misbehavior and Recklessness

Conscious misbehavior "encompasses deliberate illegal behavior." *Novak*, 216 F.3d at 308.  Reckless conduct is conduct "'which is "highly unreasonable" and which represents "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."'" *Id.*  One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate.  *See id.* at 311.

Here, defendants demonstrated their knowledge of the Company's pricing, long-term contracts and profitability when they chose to speak about these topics in detail.  *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004) ("Indeed, if facts that contradict a high-level officer's public statements were available when the statements were made, it is reasonable to conclude that the speaker had intimate knowledge of those facts or should

- 27 -

have known of them."). Additionally, the fact that the alleged misstatements and omissions concerned the Company's core products – coking coal and coking coal concentrate – gives rise to a strong inference of scienter. *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989). *See In re Check Point Software Techs. Ltd. Sec. Litig.*, No. 03 Civ. 6594(RMB), 2006 WL 1116699, at *4 (S.D.N.Y. Apr. 26, 2006) (scienter found where statements concerning illegal anticompetitive conduct related to core business operations).[33] As Judge Posner put it, "[t]hat no member of the company's senior management who was involved in authorizing or making public statements about the demand for the [company's flagship products] knew that they were false is very hard to credit." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) ("*Tellabs II*").

Here, coking coal and coking coal concentrate are indisputably core products of Mechel. ¶191. In 2008, coking coal concentrate sales alone constituted 55% of Mechel's revenues. *Id*. During the Class Period, defendants ascribed their record-breaking income and revenues to the high pricing and volume of sales of coking coal, and made statements about the status of the Company's long-term contracts for coking coal products, but omitted material facts concerning the Company's anticompetitive and tax avoidance schemes. *See* §§V.A.1., V.B., *supra*. All three of the individual defendants made such statements. *Id*. In sum, the Court may find a strong inference of scienter as to defendants' undisclosed activities concerning its coking coal products.[34] *See Atlas Air*, 324 F. Supp. 2d at 489.

---

[33]    *In re Reserve Fund Sec. & Derivative Litig.*, No. 09 MD. 2011(PGG), 2010 WL 685013, at *9-*10 (S.D.N.Y. Feb. 24, 2010); *In re Forest Labs. Sec. Litig.*, No. 05 Civ. 2827(RMB), 2006 WL 5616712, at *10-*11 (S.D.N.Y. July 21, 2006); *Atlas Air*, 324 F. Supp. 2d at 489.

[34]    Knowledge of the Company's fraudulent activities can also be imputed to individual defendants by virtue of Russian labor law requirements, which obligates defendants in their

Ordinarily, where the scienter of a corporation's officers is satisfactorily alleged, it may be imputed to the corporation. *See In re MBIA, Inc. Sec. Litig.*, No. 08-CV-264 (KMK), 2010 WL 1253925, at *19 (S.D.N.Y. Mar. 31, 2010) ("All that is required is that 'the pleaded facts [] create a strong inference that someone whose intent could be imputed to the corporation acted with the requisite scienter.'") (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital, Inc.*, 531 F.3d 190, 195 (2d Cir. 2008)). Accordingly, scienter has been adequately pled as to both Mechel and the individual defendants.

### 2. The SAC Properly Alleges that Defendant Zyuzin Had a Motive and Opportunity to Commit Fraud

"To show motive and opportunity, plaintiffs must allege a likelihood that [a] defendant[] could realize 'concrete benefits' through [his] deception." *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100 (2d Cir. 2001).[35] The courts must consider the totality of the facts alleged to determine whether they give rise to "an inference of scienter ***at least as likely*** as any plausible opposing inference." *Tellabs I*, 551 U.S. at 322.

The SAC alleges that Mechel's CEO, Zyuzin, had a concrete and personal motive to deceive investors because he had significant amounts of his personal fortune invested in Mechel, both through his 73% ownership stake in Mechel which constituted 69% of his personal net worth in

___

capacities as principal corporate officers to be aware of and adhere to applicable laws concerning Mechel's production, economic and financial activities. ¶188.

[35] Defendant Zyuzin's opportunity to commit fraud by virtue of his position as CEO of Mechel is indisputable. *See Janel World Trade, Ltd. v. World Logistics Servs., Inc.*, No. 08 Civ. 1327(RJS), 2009 WL 735072, at *6 (S.D.N.Y. Mar. 20, 2009) ("With respect to opportunity, Plaintiff has adequately pleaded that Francis, as an officer of World Logistics, had an opportunity to commit securities fraud.") (citing *PXRE Group*, 600 F. Supp. 2d at 528).

2008, and through his personal guarantee of millions of dollars in Company loans. ¶192.[36] During the Class Period, Zyuzin had pledged 76.3 million of his 290.8 million Mechel shares to lenders in connection with certain financings obtained for the benefit of Zyuzin personally and/or Mechel. ¶194. By the end of 2008, Zyuzin's pledges had almost tripled to approximately 67% of his holdings. *Id*. Thus, between his 73% stake in Mechel and his pledges of 67% of that stake as collateral for Company loans, Zyuzin's personal wealth would be significantly impacted if the Company's stock price dropped significantly. Indeed, ***Zyuzin's personal fortune was halved*** from $11 billion to $5.5 billion following the drop in Mechel's stock price when defendants' fraud was revealed. ¶193.

The Second Circuit has held that a large financial stake in a corporation, standing alone, can establish the requisite motive. *See Suez Equity*, 250 F.3d at 100. In *Janel*, this Court held that the existence of personal liability for a portion of a company's debt constitutes a concrete and personal motive for committing fraud. *See Janel*, 2009 WL 735072, at *6. Accordingly, Zyuzin's personal guarantee of a portion of the Company's debt, coupled with his majority ownership of Mechel, establishes his motive to commit fraud.

Defendant argues that the absence of allegations about personal benefits from Zyuzin's stock pledges is dispositive. Def. Mot. at 29-31. Defendant cites to *Yukos* and other cases holding that "passive" benefits such as dividends and executive compensation are not sufficiently personal and concrete to establish motive. *See id*. However, the SAC alleges that Zyuzin's motive arose as a result of his looming personal liabilities rather than any "passive" benefits he received from the

---

[36]    In 2008, Zyuzin was ranked No. 77 on *Forbes* Magazine's Ranking of the World's Billionaires, with an estimated net worth of $10 billion. ¶192.

Company. Thus, the cases cited by defendants are not analogous, nor do they suggest that the uniquely personal liability of Zyuzin here cannot establish motive to inflate the stock price. *See Janel*, 2009 WL 735072, at *6.

Defendant also asserts that plaintiffs' failure to allege the sale of Mechel stock by Zyuzin or the other defendants on a Russian exchange – information unavailable to plaintiffs – demonstrates that he did not have a motive to commit fraud. However, the "'sale of stock by an insider is not required to establish motive.'" *Guerra v. Teradyne Inc.*, No. Civ.A. 01-11789-NG, 2004 WL 1467065, at *28 (D. Mass. Jan. 16, 2004) (emphasis in original) (citing *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 84 (1st Cir. 2002)).

### 3.    Mechel Had a Motive to Commit Fraud

During the Class Period, Mechel was seeking billions of dollars in financing in order to finance certain acquisitions, including Yakutugol. The SAC details Mechel's acquisition activities and the amount and nature of the enormous debt that Mechel took on during the Class Period in order to finance these activities. ¶¶195-203. To avoid defaulting on its loans, Mechel was required to maintain certain financial ratios which were dependent on earnings and maintaining a high stock price. ¶¶200, 201.

The Second Circuit has held that stock price manipulation in the context of corporate acquisition activity can create a strong inference of scienter. *Rothman v. Gregor*, 220 F.3d 81, 93-94 (2d Cir. 2000) (ruling that stock price manipulation in the acquisition context may be sufficient to establish scienter and rejecting the proposition that "the desire to consummate any corporate transaction cannot ever be a motive for securities fraud"). In addition, the desire to avoid the company's default on loan covenants has been held to support a finding of motive and opportunity to inflate the company's stock price. *See Reina v. Tropical Sportswear Int'l*, No. 8:03-CV-1958-T-

- 31 -

23TGW, 2005 WL 846170, at *6 (M.D. Fla. Apr. 4, 2005). Thus, Mechel had a concrete motive during the Class Period to maintain its artificially inflated earnings and stock price.[37]

## VI.    THE SAC ADEQUATELY ALLEGES LOSS CAUSATION

Unlike allegations regarding the "circumstances constituting fraud," it is well-established that "[a]llegations of loss causation . . . are **not** subject to the heightened pleading requirements of Rule 9(b) and the PSLRA." *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 163 (S.D.N.Y. 2008). As such, plaintiffs' loss causation allegations need only satisfy the notice pleading standards of Rule 8(a). *See Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346-47 (2005) (indicating that a plaintiff need only "provide a defendant with some indication of the loss").[38] Further, in order to adequately plead loss causation, the complaint "'"must allege . . . that the **subject** of the fraudulent statement or omission was the cause of the actual loss suffered," *i.e.*, **that the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value**

---

[37]    Further, Generally Accepted Accounting Principles ("GAAP") violations may themselves give rise to a strong inference of scienter. *See, e.g.*, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 77 (2d Cir. 2001) (size of $24 million in special charges undermines defendants' argument that they were unaware of events affecting results); *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 393-94 & n.174 (S.D.N.Y. 2007). Under SFAS 5, ¶10, regardless of whether the exact amount is certain, defendants were required to disclose the risk of a loss to investors "when there is at least a reasonable possibility that a loss or an additional loss may have been incurred." ¶146. Defendants violated GAAP rules and accounting principles in failing to disclose the loss contingencies associated with the possibility of FAS penalties and tax liabilities resulting from Mechel's illegal conduct. ¶¶143-149. Accordingly, the SAC's undisputed allegations concerning defendants' GAAP violations provide additional support for the existence of scienter. Any assertion to the contrary is premature. *See, e.g.*, *Ganino*, 228 F.3d at 165; *In re Ambac Fin. Group, Inc. Sec. Litig.*, No. 08 Civ. 411(NRB), 2010 WL 727227, at *25 & n.38 (S.D.N.Y. Feb. 22, 2010) ("disagreements over GAAP compliance also raise issues of fact that cannot be resolved on a motion to dismiss").

[38]    *See also In re Moody's Corp. Sec. Litig.*, 612 F. Supp. 2d 397, 399 (S.D.N.Y. 2009) (examining plaintiffs' loss causation allegations "under the pleading standards of Federal Rule of Civil Procedure 8"); *In re Tower Auto. Sec. Litig.*, 483 F. Supp. 2d 327, 348 (S.D.N.Y. 2007) ("[N]early all courts addressing the [loss causation] issue since [*Dura*] have also applied Rule 8, rather than the heightened pleading standard of Rule 9.").

*of the security*.'"  *In re Initial Pub. Offering Sec. Litig.*, 544 F. Supp. 2d 277, 289 (S.D.N.Y. 2008)

(quoting *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 173 (2d Cir. 2005)) (first emphasis in

original).  Here, the SAC's detailed allegations unquestionably satisfy this requirement under Rule

8(a)'s notice pleading standards.

> ### A.     The SAC Alleges Plaintiffs Suffered Losses as a Result of the False and Misleading Statements and Omissions

As alleged in the SAC, the false and misleading statements and omissions were understood

by investors, and by the market generally, to represent that Mechel's income and revenue resulted

from market forces and cost control and production efficiencies.  ¶¶53-83, 85-90; *see also* ¶¶3-13,

204-206.  The misstatements and omissions had the corresponding effect of inflating Mechel's stock

price.

The SAC further alleges that a portion of the improper behavior was first revealed to the

market on July 15, 2008, when FAS announced escalation of their antimonopoly investigation of

Mechel.  Additional facts were revealed when the Prime Minister discussed Mechel's misconduct on

July 24 and 28.  *See, e.g.*, ¶¶9-10, 33, 40, 94, 100-104, 157-158; *see also Initial Pub. Offering*, 544

F. Supp. 2d at 289 ("'a plaintiff may identify particular "disclosing event[s]" that reveal the false

information, and tie dissipation of artificial price inflation to those events'").  These events revealed

to the market the severity of Mechel's conduct and its falsehoods.  *See, e.g.*, ¶¶94, 100-105.  As a

result, Mechel's stock price plummeted, and plaintiffs suffered massive damages.  ¶¶12, 33, 40, 95,

100, 106, 156-157, 159-160, 162-163.

> ### B.     Defendant's Conjecture Cannot Defeat Plaintiffs' Allegations as a Matter of Law

Defendant's entire loss causation argument is premised on an impermissible attempt to

cobble together various newspaper articles and rely on them for the truth of the matters they assert,

in order to persuade the Court that the "real" cause of plaintiffs' losses was not defendants' fraud, but general market decline and panic caused by the fact that the Prime Minister had discussed Mechel's transgressions.[39]  *See* Def. Mot. at 33-37.  Such tactics, however, are clearly improper at the motion to dismiss stage, where the Court must accept "all of the factual allegations in the [C]omplaint as true," and limit its review to those materials attached, or incorporated by reference, to the SAC and matters of public record subject to judicial notice.  *See Ashcroft v. Iqbal*, ___ U.S. ___, 129 S. Ct. 1937, 1949 (2009).  Because defendant's argument finds no support in the four corners of the SAC, it must be rejected at this stage.

Moreover, even setting aside the impermissibility of the extraneous materials relied on by defendant, its argument nonetheless fails.  The Supreme Court in *Dura* held that all that is required at the ***pleadings stage*** is that a plaintiff provide "***some*** indication of the loss and the causal connection that the plaintiff has in mind."  *See Dura*, 544 U.S. at 343-47.  Specifically, the *Dura* Court held that allegations of an artificially inflated purchase price, alone, are not sufficient to allege loss causation, and thus dismissal was warranted in that case because "the complaint nowhere else provide[d] the defendants with notice of what the relevant economic loss might be or of what the causal connection might be between that loss and the misrepresentation."  *Id*. at 347.  By contrast, as set forth above, the SAC clearly ***does*** provide defendants with "notice of what the relevant economic loss might be [and] what the causal connection might be between that loss and the misrepresentation."  *Id*.

Indeed, the Second Circuit has explicitly recognized that the standard defendant seeks to hold plaintiffs to here is simply not appropriate at the pleading stage, holding "'[i]f the loss was caused by an intervening event, like a general fall in the price of Internet stocks, the chain of causation . . . is a

---

[39]      *See* §III. (moving to strike the Publications).

525553_1

matter of proof *at trial* and not to be decided on a Rule 12(b)(6) motion to dismiss.'" *Lentell*, 396

F.3d at 174. Accordingly, numerous courts have found "[t]here is no requirement at the pleading

stage that a plaintiff 'affirmatively rule out those other factors in its complaint; rather that burden

arises *at trial*.'" *Silverman v. Motorola, Inc.*, No. 07 C 4507, 2008 WL 4360648, at *15 (N.D. Ill.

Sept. 23, 2008).[40] Hence, "it will be the *fact-finder's job* to determine which losses were

proximately caused by [defendants'] misrepresentations and which are due to extrinsic or

insufficiently linked forces";[41] such as investors' concerns about a "Yukos-like scenario." Def. Mot.

at 36.

Defendant contends that plaintiffs have not adequately pled loss causation in regard to the

initial stock drop between July 16, 2008 and July 23, 2008 because, they claim, contrary to the well-

pled assertions in the SAC, the drop was unrelated to the announcement of the escalating FAS

action. *See* Def. Mot. at 32.

First, defendant notes that the market did not react immediately to the news of the July 15th

FAS announcement and summarily conclude that the drop was therefore related to other market

forces. *See id.*[42] In support of this factual claim, defendant asserts that the decline in Mechel's stock

---

[40]    *See also Nathel v. Siegal*, 592 F. Supp. 2d 452, 467 (S.D.N.Y. 2008) ("The existence of intervening events that break the chain of causation, such as a general fall in the price of stocks in a certain sector, is a 'matter of proof *at trial* and not to be decided on a Rule 12(b)(6) motion to dismiss.'"); *City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 362-63 (S.D.N.Y. 2006) ("While defendants may ultimately show that some intervening event caused plaintiff's loss, 'such is a matter of proof *at trial* and not to be decided on a Rule 12(b)(6) motion.'"); *In re IMAX Sec. Litig.*, 587 F. Supp. 2d 471, 486 (S.D.N.Y. 2008) ("defendants will be entitled to interpose their defense of intervening facts . . . *at trial*").

[41]    *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1174 (C.D. Cal. 2008).

[42]    The timing of market's reaction to the revelation of the fraud and what effect, if any, intervening factors may have played in the drop, is a factual issue for trial. *Lentell*, 396 F.3d at 174.

was mirrored by the Russian exchange in general and the Russian mining and mineral sector in particular. *See* Def. Mot. at 33. However, contrary to defendant's claims, the precipitous decline of Mechel's stock price in reaction to news of government investigations of their activities in July 2008, was dramatically greater than the respective declines of the overall Russian market, the metals and mining sector and one of their chief competitors. *See* Skovron Decl., Ex. A.[43]

Next, defendant attempts to contest the well-pled allegation in the SAC that the decline in Mechel stock on July 23, 2008, resulted from a planned IPO being cancelled due to the effects of the pending FAS investigation. *See* Def. Mot. at 33-34; ¶¶8, 32, 92, 97, 152, 198. Defendant's alternative explanation for the IPO cancellation is that Mechel felt "investors were not then willing to pay the price Mechel believed the shares were worth." Def. Mot. at 34. Rather than properly cite to documents in the SAC or the public record, defendant relies upon a newspaper article which states that "Mechel's spokesperson declined comment." *See* Shvets Decl., Ex. WW; §III. (moving to strike Shvets Decl., Ex. WW). This provides scant support for defendant's factual assertion and no contradiction to the evidence cited in the SAC. Hence, even if it were proper for the court to make a factual determination on this issue, plaintiff would prevail.

As to the later, more-dramatic drops on July 24 and July 28, 2008, defendant argues that the stock dropped primarily because the Prime Minister was speaking about the Company. *See* Def. Mot. at 34. This argument, which relies exclusively on the injection and mischaracterization of

---

[43]    Ex. A to the Skovron Decl., comparative stock price charts generated from *Bloomberg* data for July 15, 2008 through July 28, 2008, is subject to judicial notice. *See Ganino*, 228 F.3d at 167 n.8 (stock price data judicially noticed even though "not attached to the Complaint as an exhibit or incorporated by reference into the Complaint").

extraneous materials impermissibly offered at the motion to dismiss stage, fails to refute the facts alleged in the SAC.

Defendant contends that the market could not have been concerned that the Prime Minister of Russia was making serious factual allegations about Mechel violating Russian law because "the FAS investigation already [had] been disclosed." Def. Mot. at 34. Citing *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501, 512 (2d Cir. 2010), defendant asserts that plaintiffs may not rely upon the Prime Minister's statements to prove loss causation because he was simply putting a "negative gloss on facts already disclosed." Def. Mot. at 34.

First, defendants are incorrect when they say the Prime Minister revealed no new information; in fact, he explained new facts about the antimonopoly investigation and also told the market that Mechel was involved in a tax avoidance scheme. *See* ¶¶10, 40, 100-103. Moreover, if defendant is correct in its contention, Mechel's stock price would not have dropped dramatically, as it did, in response to the Prime Minister's second statement concerning the tax scheme, as the market was already aware of the Prime Minister's interest in Mechel.

Second, this is wholly different from the situation in *Omnicom*, where the court unsurprisingly found that where a ***journalist*** discussed previously disclosed facts it did not constitute a corrective disclosure.[44] Certainly, when the powerful prime minister of a country addresses a government investigation it carries a significance and materiality for investors wholly unlike that of

---

[44]    Through some creatively selective quoting whereby they removed the words "journalistic" and "journalist's" from the quote they cite, defendant attempts to hide what clearly distinguishes the situation in *Omnicom* from the instant case. As the actual quote demonstrates, the *Omnicom* court held that a "negative ***journalistic*** characterization of previously disclosed facts does not constitute a corrective disclosure of anything but the ***journalists'*** opinions." 597 F.3d at 512.

a journalist.[45]  The situation here would be akin to the difference between a local federal prosecutor initially discussing an investigation of a company and subsequently the Attorney General of the United States addressing that same matter in detail.  Investors would be interested in the fact of the original investigation, but would treat it wholly differently when they learned of the details of the investigation that had come to the attention of those at the highest rungs of government.

In sum, notwithstanding defendant's efforts to confuse the facts and impermissibly rely on extraneous materials from outside the SAC, plaintiffs have clearly and directly alleged the precise false and misleading statements which "***concealed something from the market that, when disclosed, negatively affected the value of the security***."  *Lentell*, 396 F.3d at 173.  Accordingly, plaintiffs have adequately pled the element of loss causation, and nothing more is required at this stage.  *See Bristol Myers*, 586 F. Supp. 2d at 163 ("if the complaint connects the Defendants' fraud with Plaintiffs' purported loss within the 'short and plain statement' standard of Rule 8(a), then '[t]hat is all that is necessary at this stage of the litigation'").

---

[45]    The Prime Minister, who obviously had access to the investigative materials of the FAS and the tax authorities, stated that Mechel had violated Russian law and revealed specific details about the way in which Mechel was violating the law.  *See, e.g.*, ¶94 (the Prime Minister stating that Mechel sold raw materials in Russia at twice the price of exports).  This was just the kind of "hard fact" that was missing from the journalist's comment in *Omnicom*.  597 F.3d at 512.  Defendant's reliance on *In re China Life Sec. Litig.*, No. 04 Civ. 2112(TPG), 2008 WL 4066919 (S.D.N.Y. Sept. 3, 2008), is also misplaced.  The court in *China Life* held that there was no valid claim of loss causation because the misstatements alleged in the complaint were based upon the erroneous belief that China Life had run afoul of government regulations.  In stark contrast, Mechel has already ***admitted*** to the antimonopoly violations and there has been no exoneration in regard to the tax violations.  The situation in *VimpelCom*, as explained *supra* at §V.B.2. is also inapposite.  Further, the fact that Mechel's stock rose upon the ultimate announcement of the FAS fine simply reflects that the market had already taken account of the fraud underlying the investigation based upon prior disclosures.  *See Police & Fire Ret. Sys. v. SafeNet, Inc.*, 645 F. Supp. 2d 210, 231-32 (S.D.N.Y. 2009); *Take-Two*, 551 F. Supp. 2d at 288-90.

- 38 -

525553_1

## VII.    LEAVE TO AMEND SHOULD BE GRANTED IF NECESSARY

In the event the Court dismisses any allegations, plaintiffs seek leave to amend the SAC. "The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2); *see also Slayton v. Am. Express Co.*, 460 F.3d 215, 226 n.10 (2d Cir. 2006). "It is the usual practice upon granting a motion to dismiss to allow leave to replead." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991). Granting leave to amend if necessary would allow plaintiffs to provide additional responsive information and would avoid a premature determination of an intricate sequence of events.[46]

Despite the liberal repleading practice and policy, Mechel asks this Court to dismiss the SAC without leave to amend. Defendant's purported basis for asking the Court to take this unusual measure is that it allegedly provided plaintiffs with all documents upon which Mechel intended to rely in its motion to dismiss ***prior*** to plaintiffs filing the SAC. This is not correct; many of the documents cited in defendant's motion were not provided to plaintiffs prior to the filing of the SAC despite plaintiffs' request for the documents.[47] In light of the complexity of the allegations involved in this matter combined with the fact that plaintiffs' fact-finding is hampered because Mechel is a

---

[46]    "A liberal, pro-amendment ethos dominates the intent and judicial construction of Rule 15(a)(2)." 3 James Wm. Moore, *et al.*, *Moore's Federal Practice* §15.14[1], at 15-24 (3d ed. 2008). "Denial of leave to amend is disfavored." *Id.* at 15-23. "As long as appellants have 'at least colorable grounds for relief justice does . . . require' leave to amend." *Kaster v. Modification Sys., Inc.*, 731 F.2d 1014, 1018 (2d Cir. 1984) (quoting *S.S. Silberblatt, Inc. v. E. Harlem Pilot Block-Building 1 Housing Dev.*, 608 F.2d 28, 42 (2d Cir. 1979)); *see generally Sokolski v. Trans Union Corp.*, 178 F.R.D. 393, 396 (E.D.N.Y. 1998).

[47]    Defendant also contends that this SAC suffers from the same defects found in the *Yukos* and *VimpelCom* cases and the Court should follow the lead of those cases and dismiss without leave to amend. As discussed *supra* at §V.B.2., the facts in this case are dramatically different from *Yukos* and *VimpelCom*.

- 39 -

foreign company trading on the NYSE, the Court should allow plaintiffs leave to amend in the event the Court dismisses any of the allegations.

## VIII.  CONCLUSION

For the foregoing reasons, defendant's motion to dismiss the SAC should be denied in its entirety.

DATED:  May 28, 2010                   Respectfully submitted,

                                       ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                       JOHN J. RICE (admitted *pro hac vice*)
                                       SHANNON M. MATERA (SM-0426)


                                              s/ JOHN J. RICE
                                       ──────────────────────────
                                              JOHN J. RICE

                                       655 West Broadway, Suite 1900
                                       San Diego, CA  92101
                                       Telephone:  619/231-1058
                                       619/231-7423 (fax)

                                       ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                       SAMUEL H. RUDMAN
                                       DAVID A. ROSENFELD
                                       MARIO ALBA JR.
                                       58 South Service Road, Suite 200
                                       Melville, NY  11747
                                       Telephone:  631/367-7100
                                       631/367-1173 (fax)

                                       ABRAHAM, FRUCHTER & TWERSKY, LLP
                                       MITCHELL M.Z. TWERSKY (MT-6739)
                                       XIMENA R. SKOVRON (XS-3397)
                                       One Pennsylvania Plaza, Suite 2805
                                       New York, NY  10119
                                       Telephone:  212/279-5050
                                       212/279-3655 (fax)

                                       Co-Lead Counsel for Plaintiffs

VANOVERBEKE MICHAUD & TIMMONY, P.C.
MICHAEL J. VANOVERBEKE
THOMAS C. MICHAUD
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
313/578-1201 (fax)

Additional Counsel for Lead Plaintiff City of
Westland Police and Fire Retirement System

- 41 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 28, 2010, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I have mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 28, 2010.

s/ JOHN J. RICE
JOHN J. RICE

ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101-3301
Telephone: 619/231-1058
619/231-7423 (fax)

E-mail: jrice@rgrdlaw.com

# Mailing Information for a Case 1:09-cv-03617-RJS

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Jeffrey Simon Abraham**
  jabraham@aftlaw.com

- **Board of Trustees of the City of Fort Lauderdale General Employees' Retirement System**
  xskovron@aftlaw.com

- **Jeffrey S. Jacobson**
  jsjacobs@debevoise.com,mao-ecf@debevoise.com

- **Shannon McKenna Matera**
  smatera@csgrr.com

- **John J. Rice**
  jrice@rgrdlaw.com,karenc@rgrdlaw.com,tholindrake@rgrdlaw.com

- **David Avi Rosenfeld**
  drosenfeld@rgrdlaw.com,e_file_ny@rgrdlaw.com

- **Samuel Howard Rudman**
  srudman@rgrdlaw.com,e_file_ny@rgrdlaw.com

- **Ximena R. Skovron**
  xskovron@aftlaw.com

- **Aaron Michael Tidman**
  atidman@debevoise.com

- **Mitchell M.Z. Twersky**
  mtwersky@aftlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

```
Marc A. Topaz
Barroway Topaz Kessler Meltzer & Check, LLP
280 King of Prussia Road
Radnor, PA 19087
```