UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

────────────────────────────────x
BOARD OF TRUSTEES OF THE            )   09-cv-03617 (RJS)
CITY OF FT. LAUDERDALE, et al.,     )
                                    )   (Consolidated Action)
                Plaintiffs,         )
                                    )   ECF Case
        vs.                         )
                                    )
MECHEL OAO, et al.,                 )
                                    )
                Defendants.         )
────────────────────────────────x


# MECHEL OAO'S REPLY MEMORANDUM OF LAW
# IN SUPPORT OF ITS MOTION TO DISMISS
# THE CONSOLIDATED SECOND AMENDED CLASS ACTION COMPLAINT

Jeffrey S. Jacobson
Yeugenia Shvets
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000 (phone)
(212) 909-6386 (fax)

Colby A. Smith
Aaron M. Tidman
DEBEVOISE & PLIMPTON LLP
555 13th Street, N.W.
Washington, DC 20004
(202) 383-8000 (phone)
(202) 383-8118 (fax)

*Attorneys for Defendant
Mechel OAO*

June 21, 2010

# TABLE OF CONTENTS

Page

INTRODUCTION ...........................................................................................................................1

ARGUMENT .................................................................................................................................1

I.  Mechel Did Not Fail To Disclose A Material Risk Under Russia's Antitrust Laws ...........1

    A.  FAS's March 2008 Directive Did Not Presage Its August 2008 Decision ..............2

    B.  A Subsequent FAS Pronouncement And Russian Court Rulings Against FAS's Market Redefinition Further Undermine Plaintiffs' Securities Claims ......................................................................................................................5

II.  Mechel Had (And Has) No Reason To Disclose That It Violated Russian Tax Laws .....................................................................................................................................7

III.  Plaintiffs' Allegations Of Scienter Also Are Inadequate ....................................................9

IV.  Plaintiffs Have Failed To Adequately Plead Loss Causation ...........................................12

V.  Plaintiffs' Antitrust Claims Also Fail For Lack Of Materiality ........................................14

CONCLUSION ............................................................................................................................16

# TABLE OF AUTHORITIES

**CASES**

*Acito v. IMCERA Group, Inc.*,
    47 F.3d 47 (2d Cir. 1995) ............................................................................................... 9, 14

*Campo v. Sears Holdings Corp.*,
    No. 09-3589-cv, 2010 WL 1292329 (2d Cir. Apr. 6, 2010) .................................................. 9

*City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*,
    686 F. Supp. 2d 404 (D. Del. 2009) ............................................................................... 9, 15

*Curley v. AMR Corp.*,
    153 F.3d 5 (2d Cir. 1998) ...................................................................................................... 6

*Dura Pharmaceuticals, Inc. v. Broudo*,
    544 U.S. 336 (2005) ............................................................................................................ 12

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co*,
    553 F.3d 187 (2d Cir. 2009) ......................................................................................... 10, 14

*Funke v. Life Fin. Corp.*,
    237 F. Supp. 2d 458 (S.D.N.Y. 2002) ................................................................................... 6

*In re Bristol Myers Squibb Sec. Litig.*,
    312 F. Supp. 2d 549 (S.D.N.Y. 2004) ................................................................................... 7

*In re China Life Sec. Litig.*,
    No. 04 Civ. 2112 (TPG), 2008 WL 4066919 (S.D.N.Y. Sept. 3, 2008) .............................. 14

*In re Noah Educational Holdings, Ltd. Sec. Litig.*,
    No. 08 Civ. 9203 (RJS), 2010 WL 1372709 (S.D.N.Y. Mar. 31, 2010) .............................. 15

*In re Omnicom Group, Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010) ................................................................................................ 13

*In re Open Joint Stock Co. "Vimpel-Communications" Sec. Litig.*,
    No. 04 Civ. 9742 (NRB), 2006 WL 647981 (S.D.N.Y. Mar. 14, 2006) ....................... passim

*In re PXRE Group, Ltd. Sec. Litig.*,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009) ...................................................................... 9, 10, 11

*In re Tommy Hilfiger Sec. Litig.*,
    No. 04-civ-7678, 2007 WL 5581705 (S.D.N.Y. July 20, 2007) ............................................ 7

*In re Van Der Moolen*,
    405 F. Supp. 2d 388 (S.D.N.Y. 2005) ................................................................................. 15

*In re Yukos Oil Co. Sec. Litig.*,
   No. 04 Civ. 5243 (WHP), 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) ........................ passim

*Janel World Trade, Ltd. v. World Logistics Servs., Inc.*,
   No. 08 Civ. 1237 (RJS), 2009 WL 735072 (S.D.N.Y. Mar. 20, 2009) ....................................11

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001) ........................................................................................9, 10, 11

*Landmen Partners Inc. v. Blackstone Group L.P.*,
   659 F. Supp. 2d 532 (S.D.N.Y. 2009) ......................................................................................14

*Rothman v. Gregor*,
   220 F.3d 81 (2d Cir. 2000) .......................................................................................................10

*Suez Equity Investors, L.P. v. Toronto-Dominion Bank*,
   250 F.3d 87 (2d Cir. 2001) .......................................................................................................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) ......................................................................................................2, 9, 11

**OTHER AUTHORITIES**

Fed. R. Civ. P. 4(f) ...........................................................................................................................11

Fed. R. Civ. P. 44.1 ...........................................................................................................................6

# INTRODUCTION

Plaintiffs' opposition brief ("Opp. Br.") tries, but fails, to distinguish their claims from those dismissed in *In re Yukos Oil Co. Sec. Litig.*, No. 04 Civ. 5243 (WHP), 2006 WL 3026024 (S.D.N.Y. Oct. 25, 2006) and *In re Open Joint Stock Co. "Vimpel-Communications" Sec. Litig.*, No. 04 Civ. 9742 (NRB), 2006 WL 647981 (S.D.N.Y. Mar. 14, 2006) ("*VimpelCom*").

As in *Yukos* and *VimpelCom*, Plaintiffs have not alleged facts sufficient to show that Mechel concealed any known risk of foreseeable adverse action by Russian authorities. The record of Russia's actions demonstrates that Mechel, like Yukos and VimpelCom, could not have predicted it would be fined for alleged anticompetitive conduct in a newly defined market for certain grades of coking coal concentrates. In any event, the immateriality to Mechel of the $34 million fine confirms that the risk, even had it been known, did not require disclosure. Similarly, Plaintiffs' assertion that Mechel violated Article 40 of the Russian Tax Code fails for the same reason that claim failed in *Yukos*: Russia itself has not charged Mechel with violating Article 40. Because any risk of a tax charge thus remains theoretical and unquantifiable, Plaintiffs cannot allege any inadequacy in Mechel's disclosures of that risk.

Because Plaintiffs have failed to differentiate this case from *Yukos* and *VimpelCom*, and for the reasons further explained below and in Mechel's opening brief ("Opening Br."), the Court should dismiss Plaintiffs' Second Amended Complaint ("SAC") with prejudice.

# ARGUMENT

**I. Mechel Did Not Fail To Disclose A Material Risk Under Russia's Antitrust Laws.**

When the *Yukos* and *VimpelCom* plaintiffs sued for securities fraud after Russia levied fines against those companies, courts set a pleading standard that Plaintiffs here fail to meet: To avoid dismissal, Plaintiffs must plead facts sufficient to support an inference that Mechel failed

to disclose conduct it knew, or was reckless in not knowing, created a material risk of being found to have violated Russian law. *See Yukos*, 2006 WL 3026024, at *14-*16. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007), then raised the bar well out of Plaintiffs' reach, holding that the inference must be "more than merely plausible or reasonable — it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."

> A. **FAS's March 2008 Directive Did Not Presage Its August 2008 Decision.**

Plaintiffs contend they have satisfied *Tellabs* (and distinguished *Yukos* and *VimpelCom*) by citing directives that Russia's Federal Antimonopoly Service ("FAS") sent to Mechel during the three months between March and May 2008. FAS therein advised Mechel that, by virtue of the company's acquisition of two new coal mining subsidiaries, it now had "a dominant position on the market for coking coal," and had to obey certain conditions. Shvets Decl. Ex. O at 1.[1] Those conditions, however — which included that Mechel must "notify the FAS within 10 days of a price increase exceeding 15% as compared to the prices used a year prior," and which Mechel disclosed (*see* SAC ¶ 73; Shvets Decl. Ex. A at 19-20) — are not at issue here.

When FAS announced its $34 million fine against Mechel in August 2008, had FAS believed that Mechel violated the March-May directives, it would have been a simple matter for FAS to have said so. Indeed, those directives specified harsh built-in penalties for violations, including divesting Mechel of its newly-acquired subsidiaries. *See* Shvets Decl. Ex. O. Instead, however, FAS's August 2008 decision did not even mention the March-May directives, and it found that Mechel had acted inappropriately in a *differently defined market*.

---

[1] Plaintiffs also point to a May 15, 2008 press release announcing FAS had "sent enquiries to all major producers of coking coal and its concentrate" regarding price and supply trends, and that "should antimonopoly violations be revealed, tough sanctions in form of turnover fines would be applied to the violators." Opp. Br. at 2, citing Shvets Decl. Ex. Z. This release, however, did not say FAS believed Mechel or any firm had committed violations.

FAS's March-May 2008 directives defined, and warned Mechel not to abuse a dominant position in, a market comprising all "coal concentrate used as raw material in the metallurgical industry and the produce derived from it — coal concentrate used both for coking and as raw material in the metallurgical industry." *Id.* This market definition dated to February 2006, when FAS issued a detailed report on the coking coal market. *See id.* Ex. M.[2] The February 2006 report had a table listing the grades of coking coal concentrate sold in Russia, all of which, it said, were part of the *same* market. *See id.* at 2.

FAS's August 2008 decision took a different tack. After one of Mechel's customers, NLMK, complained that Mechel refused to deliver *three specific grades* of coking coal concentrate to it in June 2008 "due to an accident at [Mechel's] Lenin mine," Ex. M at 2, 6, and another customer, MMK, complained that Mechel had increased the price for those same three grades during the first half of 2008, *see id.* at 2, FAS defined a new market comprised of those three grades only.[3] Its decision divided nine grades of coking coal concentrate "into [three] groups," each comprising a new market. Shvets Decl. Ex. D at 4. One comprised grades K (K9), KO, and OS — the three grades NLMK and MMK sought to purchase from Mechel. FAS found that Mechel had a much higher share of this new market than it had of the previously defined market comprising raw coking coal and all concentrates. It then used this redefined

---

[2] Plaintiffs ask the Court not to consider FAS's February 2006 report (*see* Opp. Br. at 12), but it is a publicly-available regulatory document, as integral to Plaintiffs' SAC as the 2008 FAS directives on which the Complaint explicitly relies, representing FAS's official position regarding coking coal market boundaries.

[3] Plaintiffs claim Mechel "blackmail[ed]" steel plants by threatening to recall trainloads of coal in order to win higher prices," Opp. Br. at 10, but do not allege these charges with the particularity required for allegations of securities fraud. Plaintiffs cite a news report quoting FAS's chief as having made this remark, but FAS included no such allegations in the detailed order it issued two weeks after the quote appeared. Nor does the quote say where or when the "blackmail" allegedly occurred or that it involved K (K9), KO or OS concentrates.

market to justify a $34 million fine against Mechel for its dealings with NLMK and MMK (which, with their subsidiaries, were the only customers the August 2008 decision mentioned).

Plaintiffs, in defending their claim that Mechel should have anticipated this change, follow a failed strategy borrowed from *Yukos*. The plaintiffs in *Yukos* cited two Russian court cases they argued put Yukos on notice of the enforcement strategy ultimately used against it, but the court examined both and found them inapposite. *See Yukos*, 2006 WL 3026024, at *15. The same is true here with respect to the two cases Plaintiffs cite, neither of which involved FAS's retroactively redefining a "relevant market" and then imposing sanctions based on the new definition. In the first, *Eurocement*, FAS defined the market as comprising all types of cement, *see* Shvets Decl. Ex. X at 4-5, and in determining whether Eurocement charged too-high prices, examined average price increases for all those types, not any one, *see id.* at 12-13. In the second, *Gazprom*, FAS defined the relevant market as comprising all liquefied petroleum gases (LPG), including propane, butane, and others, again with no subdivisions, *id.* Ex. Y at 11, and FAS's decision to fine Gazprom referred to the "weighted average wholesale LPG price," *id.* at 22. In both cases, moreover, FAS focused on the prices those companies charged across-the-board, not to one or two individual customers. *See id*. Ex. X at 11-13; Ex. Y at 18-19.

After discarding the *Yukos* plaintiffs' citations to inapposite Russian cases, the court held that their "fail[ure] to allege the existence of any precedent" for Russia's actions meant Yukos could "hardly have been expected to disclose the speculative possibility" of a change in the law. *Yukos*, 2006 WL 3026024, at *16. That Russian laws "present an uncertain terrain for individuals and companies doing business there," as Mechel, Yukos and VimpelCom all disclosed, does not mean any of these companies "knew (or should have known)" that a Russian governmental inquiry "would result in adverse consequences" or that its "interpretation [of

4

relevant laws] was highly unreasonable." *VimpelCom*, 2006 WL 647981, at *8. Plaintiffs' SAC thus fails for the same reasons courts dismissed the *Yukos* and *VimpelCom* complaints.[4]

### B. A Subsequent FAS Pronouncement And Russian Court Rulings Against FAS's Market Redefinition Further Undermine Plaintiffs' Securities Claims.

The only distinguishing facts between Mechel's case and those of *Yukos* and *VimpelCom* favor Mechel's position, not Plaintiffs'. FAS itself has suggested that Mechel could not have anticipated its enforcement strategy. Even more powerful proof of this comes from the Russian courts, which recently have held that FAS had no legitimate basis to subdivide the coking coal market into particular grades of coking coal concentrates.

Mechel's opening brief cited an August 2009 FAS press release, "Clarification of Matters of the Application of Antimonopoly Law" (Shvets Decl. Ex. P), in which FAS said that "in 2007-2008 the new practice of enforcing antimonopoly law in the Russian Federation was just beginning to develop," and that businesses trying to determine "how a dominant position is established . . . [and] how a business abuses its dominant position . . . were not always able to adapt quickly to the new systems for regulation of economic relationships or develop a clear understanding of possible restrictions from the amendments to antimonopoly law."[5] Plaintiffs dispute this statement's importance, writing that because no "amendments" to Russian antitrust

---

[4] Contrary to Plaintiffs' arguments, Mechel has never "admitted" a knowing violation. *See* Opp. Br. at 1, 2, 4, 8, 11, 24. Plaintiffs do not and could not contend that Mechel acknowledged foreseeing either FAS's enforcement action or legal conclusions. Plaintiffs' reliance on a press article, which purports to quote Mechel as saying that it would "never *again* charge a different price for coking coal on the domestic market than it did abroad" (*id.* at 8; SAC ¶ 97) is misplaced and inappropriate because the article explicitly notes that "Mechel said it had not released the statement" and that the story "appeared on RIA's wire due to a technical error." *See* http://uk.reuters.com/assets/print?aid=UKL532058020080725.

[5] Plaintiffs ask the Court not to consider this press release, even though it is a publicly available pronouncement from the same regulatory body whose actions undergird Plaintiffs' claims. There is no more reason to ignore this release than there would be to ignore an SEC release interpreting U.S. securities laws. *See infra* at 14-15 (discussing court acceptance of SEC's announced interpretation of materiality).

law "ma[de] changes to the relevant coking coal market definition," FAS's belief that businesses could not have had a prior "clear understanding" of legal changes did not apply to Mechel. Opp. Br. at 19. Plaintiffs' argument, however, makes Mechel's point: Because the new definition arose unexpectedly by FAS fiat, not by statute, Mechel could not have predicted it. *Cf. Funke v. Life Fin. Corp.*, 237 F. Supp. 2d 458, 468 (S.D.N.Y. 2002) (taking public statement of SEC official into account in determining that rule was too ambiguous to support scienter claim).

After FAS pursued Mechel for allegedly abusing a dominant position in one newly defined market, Mechel complained to FAS about another mining firm, Sibuglemet, which had breached contracts with Mechel to deliver grades of concentrate that Mechel did not itself produce. *See* Shvets Decl. Ex. Q. FAS agreed with Mechel and, explicitly relying on the same rationale it used to charge Mechel, deemed Sibuglemet to have abused a dominant position in the newly-defined market for two other grades of coking coal concentrate — GZh and Zh. *See id*.

Sibuglemet challenged these findings in Russian court, and as Mechel's opening brief explained (at 13-14), two Russian courts now have held that FAS acted unlawfully.[6] *See* Shvets

---

[6] Plaintiffs have asked the Court not to consider these publicly-available *Sibuglemet* decisions. In so doing, they ignore the incongruity of urging the Court to consider *Gazprom* and *Eurocement*, but to disregard all other Russian court cases. They also ignore both *Yukos*, where the court considered Russian court decisions urged by Yukos as well as ones cited by plaintiffs, and Fed. R. Civ. P. 44.1, which allows courts to "consider any relevant material or source" concerning an issue of foreign law. *See Curley v. AMR Corp*., 153 F.3d 5, 13 (2d Cir. 1998) ("We urge district courts to invoke the flexible provisions of Rule 44.1 to determine issues relating to the law of foreign nations.").

Plaintiffs also contend that the courts held for Sibuglemet only because that company, supposedly unlike Mechel, "had not previously been included by FAS in the register of businesses holding a dominant position." Opp. Br. at 20 This is not a distinguishing fact, however, because none of the Mechel subsidiaries FAS charged had been listed, either. (Yakutugol was listed as having a dominant position in one region of Russia, but not country-wide, and the others were not listed at all.) *See* Declaration of Aaron Tidman ("Tidman Decl.") Ex. A at 18-19. Moreover, the *Sibuglemet* decisions explicitly were *not* based on Sibuglemet's absence from the register. *See* Shvets Decl. Ex. R at 5, 6 (explaining that Sibuglemet's absence from the register does not exempt it from scrutiny).

Decl. R-S. Both courts found FAS's enforcement action flawed for several reasons, *including that FAS had no basis on which to consider Zh and GZh coking coal grades to constitute an independent "relevant market." See id*. Ex. S at 4.

These decisions came too late to help Mechel, which acceded to FAS's judgment rather than fighting it. They confirm, however, that FAS's sub-division of the coking coal market was at least unexpected and unprecedented, and quite possibly improper. This aligns Mechel's case perfectly with *Yukos* and *VimpelCom*, in which courts held those companies' disclosures about their legal compliance to have been accurate when made. *See VimpelCom*, 2006 WL 647981, at *6 (defendant "cannot be held liable for failing to disclose facts that did not exist yet"); *Yukos*, 2006 WL 3026024, at *16 (same). *See also In re Bristol Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 567 (S.D.N.Y. 2004) (no misstatement where accounting issue had not been the subject of "prior accounting rules or literature").

## II. Mechel Had (And Has) No Reason To Disclose That It Violated Russian Tax Laws.

Plaintiffs also contend that Mechel should have anticipated and disclosed the risk of a tax sanction under Article 40 of the Russian Tax Code, even though Russia itself has not brought any such claim against the Company. In fact, Mechel never had, and still does not have, any reason to believe its tax treatment was improper. If anything, based upon two prior Russian court rulings rejecting Article 40 challenges against Mechel (Shvets Decl. Exs. V, W), the company has every reason to believe its strategies were and are perfectly legal. Plaintiffs therefore cannot reasonably contend that Mechel misrepresented its tax liability or risks.[7]

---

[7] Plaintiffs rely on *In re Tommy Hilfiger Sec. Litig.*, No. 04-civ-7678, 2007 WL 5581705 (S.D.N.Y. July 20, 2007) for the proposition that Mechel had a duty to disclose its allegedly "illegal" transfer pricing practices (Opp. Br. at 21). This case is inapposite because Hilfiger had admitted the illegality of its transfer pricing practices. It had entered into a non-prosecution agreement with federal prosecutors, amended its tax returns, and restated its financials — none of which is true of Mechel's tax payments to Russia.

7

Plaintiffs also ignore Mechel's disclosures of the uncertainty of Russian transfer pricing laws. Mechel's 2007 Form 20-F disclosed its recently won Article 40 cases, but cautioned that "[i]f similar such assessments are upheld in the future, our financial condition and results of operations could be materially adversely affected [and] we could face significant losses associated with the assessed amount of underpaid prior tax and related interest and penalties." Tidman Decl. Ex. A at 33-34. These statements fully disclosed the facts as Mechel knew them and remain accurate today. *See also id.* Ex. B at 23; Ex. C at 37 (repeating same disclosures).

Here again, Plaintiffs cannot evade the parallels between their claims and those that failed in *Yukos*. As Plaintiffs acknowledge, in *Yukos* "the court found that the [Russian] Tax Ministry *did **not*** find a violation of Article 40's 20% rule as the [Yukos] plaintiffs had alleged and, in fact, 'made no reference' to Article 40." Opp. Br. at 24, *citing Yukos*, 2006 WL 3026024, at *14. The same is true here. Indeed, the only distinction between the cases is that, in *Yukos*, the Russian government actually brought massive back-tax claims against the company, though not under Article 40. *See* 2006 WL 3026024, at *3, *5, *14-*16. Here, although Russia's Prime Minister, Vladimir Putin, accused Mechel of "tax evasion" at two July 2008 political events, Russia has not since brought relevant tax claims against Mechel under Article 40 or otherwise.

Plaintiffs seek to press their claim by contending the Russian Tax Ministry still may have an "open investigation" into whether Mechel violated Article 40. Opp. Br. at 23. Their citation for that claim is a July 2009 report by the Audit Chamber of Russia, but nowhere in the excerpts that Plaintiffs provided to the Court, or anywhere else in the report, does the Audit Chamber accuse Mechel of violating Article 40 (or any other law) or suggest that the government should

investigate Mechel.[8] Moreover, "the mere existence of a governmental inspection, unaccompanied by a clear indication of an adverse business consequence, is not material information." *VimpelCom*, 2006 WL 647981, at *6, *citing Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir. 1995). *See also Yukos*, 2006 WL 3026024, at *14 (dismissing claims because plaintiffs did not "adequately allege that it was probable that the Tax Ministry would assert its authority under Article 40 to challenge the prices Yukos implemented").

Plaintiffs' citation to *City of Roseville Employees' Ret. Sys. v. Horizon Lines, Inc.*, 686 F. Supp. 2d 404 (D. Del. 2009) is not to the contrary. *See* Opp. Br. at 24. In contrast to this case, where Russia has not charged Mechel with tax evasion, in *Horizon Lines*, investors sued after the U.S. Department of Justice charged the company with antitrust violations and after three of its executives "pleaded guilty . . . and [were] in prison." *Horizon Lines*, 686 F. Supp. 2d at 408.[9]

## III. Plaintiffs' Allegations Of Scienter Also Are Inadequate.

In order to establish scienter, Plaintiffs must (1) allege that defendants had both a motive and opportunity to commit fraud or (2) allege facts constituting strong circumstantial evidence of

---

[8] The report merely says that a Mechel subsidiary, Yuzhny Kuzbass, exported coal from the Kemerov region of Russia, then states that "individual exporters" (without naming Mechel) exported coal at prices lower than those on the world market. Skovron Decl. Ex. F at 3.

[9] Mechel's opening brief discussed other reasons why Plaintiffs' tax-related claims fail, including that (1) their chart of allegedly improper transactions omits key information, and (2) they support their charge of "illegal tax evasion schemes" in Latvia, which no Russian official ever has credited, only with vague statements by unnamed "Latvia analysts." *See* Opening Br. at 25-27. Plaintiffs' opposition ignored the first point and, with regard to the second, only cites this Court's decision in *In re PXRE Group, Ltd. Sec. Litig.*, 600 F. Supp. 2d 510, 526 n.18 (S.D.N.Y. 2009), as holding that "information provided by confidential witnesses will not be discounted solely on the basis of their anonymity." Opp. Br. at 22. The *PXRE* plaintiffs, however, identified their sources by titles and duties and explained the basis of their alleged knowledge. *See id.* at 526. *See also Campo v. Sears Holdings Corp.*, No. 09-3589-cv, 2010 WL 1292329, at *3 n.4 (2d Cir. Apr. 6, 2010) (anonymity of sources in securities complaints "frustrates" the *Tellabs* requirement). Plaintiffs here do not cite any precedent for crediting supposed facts alleged by witnesses described only as "analysts."

9

conscious misbehavior or recklessness. *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001). Their SAC and opposition brief satisfy neither standard.

Plaintiffs' allegations that Mechel and its chief executive officer, Igor Zyuzin, had a motive and opportunity to commit fraud cannot survive close scrutiny. With respect to Mechel itself, Plaintiffs argue that, because the company "was seeking billions of dollars of financing in order to finance certain acquisitions," it sought to maintain a strong stock price. In *PXRE*, however, 600 F. Supp. 2d at 533, this Court followed a long line of precedent in finding a "corporate finance" motive insufficient: "Such a motive is too generalized, and if scienter could be pleaded on that basis alone, virtually any company that attempted to raise capital, especially in a woeful economic climate, would face specious securities fraud allegations." *Yukos* also rejected the same type of allegation, finding that because a stock-based acquisition "benefits all holders of Yukos stock," it "did not create a 'concrete and personal' motive for Defendants to commit securities fraud." *Yukos*, 2006 WL 3026024, at *18.

Plaintiffs respond with *Rothman v. Gregor*, 220 F.3d 81, 93-94 (2d Cir. 2000), which they cite for the proposition that "stock price manipulation in the acquisition context may be sufficient to establish scienter." Opp. Br. at 31. But, in *Rothman*, the Second Circuit carefully limited its holding to situations in which companies use stock as acquisition currency, as Mechel did not. *Id.* at 93-94. The Second Circuit, moreover, has sharply constrained *Rothman*, finding most recently in *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co*, 553 F.3d 187, 201 & n.6 (2d Cir. 2009), that although "the artificial inflation of stock prices in order to acquire another company may, in some circumstances, be sufficient for scienter," a plaintiff making that claim must "allege a unique connection between the fraud and the

acquisition." Here, no such connection exists between Mechel's *cash* purchase of Yakutugol in October 2007 and its non-delivery of coking coal to customers *afterwards*.

With respect to Mr. Zyuzin, Plaintiffs allege that he "had a concrete and personal motive to deceive investors because he had significant amounts of his personal fortune invested in Mechel." Opp. Br. at 29.[10] *Yukos* rejected an identical claim, even though that company's CEO held a percentage of his company's stock at least as large as Mr. Zyuzin's in Mechel and had received $1.2 billion in dividends from the company during the putative class period in that case. *See Yukos*, 2006 WL 3026024, at *19; *see generally* Opening Br. at 30. Plaintiffs respond to this argument by citing *Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100 (2d Cir. 2001), and contending the case holds that "a large financial stake in a corporation, standing alone, can establish the requisite motive." Opp. Br. at 30. This statement and concept, however, appear nowhere in *Suez Equity*, and this Court has elsewhere said that a motive allegation no more substantive than that a wealthy man wishes to stay that way satisfies neither the *Tellabs* "cogent and compelling" standard nor the Second Circuit's command that a motive must be "concrete and personal." *PXRE*, 600 F. Supp. 2d at 530, *quoting Kalnit*, 264 F.3d at 139.[11]

---

[10] Contrary to Plaintiffs' claim (Opp. Br. at 3 n.6), they have not served Mr. Zyuzin or the two other individual defendants. As Plaintiffs acknowledge (*id.*), Russia has not acted on the Requests for Judicial Assistance that the Plaintiffs submitted to the State Department last November 6. Plaintiffs' attempt to hand papers to an employee at the defendants' Moscow workplace does not suffice. Even were the Hague Convention not in force between Russia and the United States, service of foreign court papers in Russia can only be done as directed by a competent Russian court. *See* Fed. R. Civ. P. 4(f); Tidman Decl. Ex. D.

[11] Plaintiffs also cite this Court's decision in *Janel World Trade, Ltd. v. World Logistics Servs., Inc.*, No. 08 Civ. 1237 (RJS), 2009 WL 735072, at *6 (S.D.N.Y. Mar. 20, 2009), contending that "the existence of personal liability for a portion of a company's debt constitutes a concrete and personal motive for committing fraud." Opp. Br. at 30. In *Janel*, a non-class action, securities purchasers alleged that the defendant induced them to purchase by agreeing to become personally responsible for a part of the target company's debts. That situation obviously is not present here. Moreover, a review of the briefs in *Janel* shows that the defendants did not argue the absence of scienter.

Plaintiffs also have failed to plead facts constituting strong circumstantial evidence of conscious misbehavior or recklessness. The unprecedented nature of the position FAS took in August 2008, and the complete absence of any transfer pricing-related charges by the Russian tax authorities, undermine any claim that Mechel or its executives should (or even could) have known about the underlying risks, let alone knowingly or recklessly hidden them from investors. *See Yukos*, 2006 WL 3026024, at *20.

## IV.  Plaintiffs Have Failed To Adequately Plead Loss Causation.

*Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), requires Plaintiffs to plead loss causation, tying the complained-of drop in Mechel's stock price to the revelation of facts allegedly concealed by the Company. Yet Plaintiffs must concede that the market did not react appreciably to FAS's July 15, 2008 announcement that Mechel may have violated Russian antimonopoly laws. On that day, Mechel's share price dropped by only 40 cents, or 0.9 percent. It fully recovered the loss (and then some) the next day.[12] Mechel's share price only began to move later, between July 16 and July 23 (when the overall market also declined), and Plaintiffs admit the "more dramatic drops" took place on July 24 and July 28, when Mr. Putin made his remarks about Mechel's antitrust and tax issues. *See* Opp. Br. at 36-37. The obvious implication of these facts is that the market was not reacting to news of FAS's inquiry, but rather to the news that Mr. Putin suddenly had taken an interest in, and had threatened, Mechel and Mr. Zyuzin.[13]

---

[12]  Plaintiffs also complain about a smaller stock drop on July 23, after Mechel delayed an IPO for a new class of shares. Plaintiffs contend that Mechel delayed this IPO "as investor confidence declined in response to FAS's investigation," Opp. Br. at 7, citing SAC ¶¶ 8, 32, 97, 152, 198. Nowhere, however, do Plaintiffs allege a single fact linking these two events.

[13]  Plaintiffs' opposition (at 8 n.14) accuses Mechel of inventing Mr. Putin's use of the threatening term "zachistit," a Russian word synonymous with "purge." A video of Mr. Putin's comments appears at http://www.youtube.com/watch?v=iRCbGtyfx-k&NR=1. Mr. Putin uses the word "zachistit" at the 1:02 mark. Mechel's omission of this citation

Plaintiffs seek to overcome this implication by asserting that, on July 24, Mr. Putin "explained new facts about the antimonopoly investigation and also told the market that Mechel was involved in a tax avoidance scheme." Opp. Br. at 37. The problem for Plaintiffs, however, is that they cannot point to any truly new facts that Mr. Putin revealed.

With respect to the antimonopoly claims by FAS, Plaintiffs assert (Opp. Br. at 38 & n.40) that Mr. Putin revealed that Mechel sold raw materials in Russia at twice the price of exports. In a context where FAS already had revealed, nine days earlier, that it was reviewing possible monopolistic conduct by Mechel, Mr. Putin's comment that Mechel was charging Russian customers potentially inflated prices — even significantly inflated prices — hardly constitutes a significant revelation of new information. In particular, the statement attributed to Mr. Putin is insufficient to distinguish this case from *In re Omnicom Group, Inc. Sec. Litig.*, 597 F.3d 501 (2d Cir. 2010). In *Omnicom*, the Second Circuit held that a stock drop arising from "a negative characterization of already-public information," does not establish loss causation. *Id.* at 512.

Plaintiffs have even less of a basis to claim loss causation based on the stock drop that followed Mr. Putin's second round of comments on July 28, 2008, when he said Mechel may have been involved in "tax evasion."[14] Mr. Putin's comments prompted a series of news articles comparing Mechel's situation to Mr. Putin's dismantling of Yukos and speculating that Russia could impose very large sanctions on the Company, and Plaintiffs themselves acknowledge that Mechel's stock price dropped in response to this incorrect speculation. In *In re China Life Sec.*

---

from Shvets Decl. ¶ 3 was an oversight for which Mechel apologized to Plaintiffs (and provided the source) on May 25, before Plaintiffs filed their amended opposition brief.

[14] Plaintiffs themselves cited news articles reporting on Mr. Putin's remarks, *see* SAC ¶¶ 94, 99, and their opposition brief purports to describe what "the media reported" about them. Opp. Br. at 8. It thus is incongruous for Plaintiffs to ask the Court not to consider other articles, from equally or more widely-circulated publications, in which the parallels between Mechel's situation and Yukos's were explained in even more detail.

*Litig.*, No. 04 Civ. 2112 (TPG), 2008 WL 4066919, at *7 (S.D.N.Y. Sept. 3, 2008), the court considered similar claims brought after "highly inaccurate" media reports of a possibly large governmental fine against the company preceded a significant stock price drop. Because these news reports were both speculative and wrong, the court held them not to be "disclosures of corrective information" sufficient to support a securities fraud claim. Mechel, similarly, cannot be held responsible for "inflammatory financial press items" beyond its control. *Id.* at *3.

## V. Plaintiffs' Claims Also Fail For Lack Of Materiality.

The market's lack of any appreciable reaction to the original July 15 news that Mechel may have violated Russia's antimonopoly laws turned out to be correct. When FAS ultimately rendered a decision against Mechel in August, it levied a fine of just $34 million — 0.7 percent of Mechel's $4.69 billion in 2008 gross profits. In *VimpelCom*, Russian tax authorities in 2004 assessed $17.6 million in back taxes. That penalty was just 0.8 percent of VimpelCom's $2.15 billion in 2004 *revenues* (not profits) — an amount the court found to be immaterial. *See* 2006 WL 647981, at *5-*6 & n.16, *citing Acito* 47 F.3d at 52. Similarly, *China Life*, 2008 WL 4066919, at *3, found an $8 million fine to be "a very small amount considering the size of CLIC." The Second Circuit, in *ECA & Local 134*, 553 F.3d at 204, followed SEC's guidance in SAB 99 that "the use of a percentage as a numerical threshold, such as 5%, may provide the basis for a preliminary assumption that a deviation of less than the specified percentage with respect to a particular item . . . is unlikely to be material." *See also Landmen Partners Inc. v. Blackstone Group L.P.*, 659 F. Supp. 2d 532, 541 (S.D.N.Y. 2009) (quoting *ECA & Local 134*, finding non-disclosure of problematic transaction involving 0.4 percent of defendant's assets under management not to be material).

Plaintiffs' opposition brief tries to contend that, regardless of the small amount of the penalty, investors would find any "anticompetitive rate-fixing scheme" to be relevant and

14

material, but neither of the cases Plaintiffs cite in support of their argument — *Horizon Lines*, 686 F. Supp. 2d at 416, and *In re Van Der Moolen*, 405 F. Supp. 2d 388, 400-01 (S.D.N.Y. 2005) — contains such a sweeping pronouncement. Opp. Br. at 17. *Horizon Lines* held that the defendants' attribution of outsized success in one geographic market "only to lawful factors," when they *knew* they had committed legal violations, fell "below the level of honesty required by the securities laws." *Id.* at 416. *Van Der Moolen* similarly found generalized risk disclosures to be insufficient, but only because the company had been "*specifically put on notice* of the very conduct*" that regulators *already* had found to be unlawful, and had agreed to pay a large percentage of revenues in fines and restitution. *Id.* at 395-96, 405 (emphasis added). This Court, moreover, recently noted in *In re Noah Educational Holdings, Ltd. Sec. Litig.*, No. 08 Civ. 9203 (RJS), 2010 WL 1372709, at *7 (S.D.N.Y. Mar. 31, 2010), that *Van Der Moolen* is in "tension" with, and less persuasive than, other cases holding that a company's risk warning does not render every single fact pertinent to that risk "material."

## CONCLUSION

For the reasons stated herein, as well as in its opening memorandum of law, defendant Mechel OAO respectfully submits that the Court should dismiss with prejudice all of the claims against it for failure to state a claim under Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and the PSLRA.

Dated: New York, New York
       June 21, 2010

DEBEVOISE & PLIMPTON LLP

By:

**/s/ Jeffrey S. Jacobson**
    Jeffrey S. Jacobson

Jeffrey S. Jacobson
Yeugenia Shvets
DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
(212) 909-6000 (phone)
(212) 909-6386 (fax)

Colby A. Smith
Aaron M. Tidman
DEBEVOISE & PLIMPTON LLP
555 13th Street, N.W.
Washington, DC 20004
(202) 383-8000 (phone)
(202) 383-8118 (fax)

*Attorneys for Defendant*
*Mechel OAO*