UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————

Nº 09 Civ. 3617 (RJS)

—————

BOARD OF TRUSTEES OF THE CITY OF FT. LAUDERDALE GENERAL
EMPLOYEES' RETIREMENT SYSTEM, *ET AL.*,

Plaintiffs,

VERSUS

MECHEL OAO, *ET AL.*,

Defendants.

—————

OPINION AND ORDER
August 9, 2011

—————

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/9/11

RICHARD J. SULLIVAN, District Judge:

Lead Plaintiffs bring this putative securities class action against Defendants Mechel OAO ("Mechel" or the "Company"), a Russian mining and metals company, and three of its officers, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5, promulgated thereunder.

Before the Court is Mechel's motion to dismiss pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(b). For the reasons that follow, the motion is granted.

I.   BACKGROUND[1]

A.   Parties

Lead Plaintiffs – the Board of Trustees of the City of Fort Lauderdale General Employees' Retirement System, Teamsters Local 807 Labor Management Pension Fund, Local 138 Pension Trust Fund, and the City of Westland Police and Fire Retirement System (collectively, "Plaintiffs") – are four retirement system and pension fund plans that purchased Mechel's American

—————

[1] The following facts are taken from the Consolidated Second Amended Class Action Complaint (the "Complaint" or "SAC"). The Court also considers any written instrument attached to the Complaint or documents incorporated therein by reference, legally required public disclosure documents filed with the Securities and Exchange Commission ("SEC"), and documents upon which Plaintiffs relied in bringing the suit. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

Depository Receipts ("ADRs") on the New York Stock Exchange ("NYSE") between October 3, 2007 and July 28, 2008 (the "Class Period").[2] (SAC ¶¶ 18-21.) Plaintiffs bring this putative class action on behalf of themselves and a class of all other persons, excluding Defendants, who purchased Mechel's ADRs on the NYSE during the Class Period. (*Id.* ¶¶ 1, 207.)

Mechel is a Russian company that operates a group of integrated subsidiaries engaged in coal, iron and nickel mining, coal and steel production, power generation, railway freight, and trading. (*Id.* ¶ 27.) Mechel's primary coal producing units during the Class Period included Southern Kuzbass Coal Company OAO ("Southern Kuzbass") and Yakutugol Holding Company OAO ("Yakutugol"). (*Id.* ¶ 29.) Mechel distributed its products through two main sales units: (1) Mechel Trading House ("Mechel Trading"), located in Moscow, which sold Mechel's coking coal and steel products to customers in Russia, and (2) Mechel International Holdings AG ("Mechel International"), located in Switzerland, which exported Mechel's coking coal products abroad.[3] (*Id.* ¶ 30.)

In the spring and summer of 2008, Mechel came under the scrutiny of Russian authorities, including the Russian Federal Anti-Monopoly Service ("FAS") and Russian Prime Minister Vladimir Putin ("Putin"), for alleged violations of Russia's anti-monopoly laws and tax laws. Although no tax assessments were ultimately brought against Mechel, in August 2008, FAS found the Company liable for anti-competitive behavior and imposed certain fines and contracting restrictions. (*Id.* ¶¶ 44, 118, 128-29.) Plaintiffs allege that Mechel violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, by failing to disclose that a portion of the Company's income and revenue during the Class Period derived from unlawful conduct, which, upon discovery, would subject Mechel to significant fines and penalties. (*Id.* ¶¶ 3-4, 142.)

Plaintiffs also bring claims against Igor V. Zyuzin ("Zyuzin"), Stanislav A. Ploschenko ("Ploschenko"), and Vladimir A. Polin ("Polin") (collectively, the "Individual Defendants"), who served as officers and directors of Mechel and its subsidiaries at all relevant times during the Class Period. Zyuzin was Mechel's CEO and Chairman of the Management Board, the Chairman of Southern Kuzbass's Board of Directors, and a member of Yakutugol's Board of Directors. (*Id.* ¶ 23.) Ploschenko was Mechel's CFO. (*Id.* ¶ 24.) Polin was the CEO of Mechel Management Company OOO, Mechel's wholly-owned subsidiary

---

[2] Although the Complaint initially defines the Class Period as October 3, 2007 to July 25, 2008 (SAC ¶ 1), it otherwise treats July 28, 2008 as the end of the Class Period. The Complaint's "Substantive Allegations" section proceeds through July 28, 2008 (*id.* ¶¶ 27-106), followed by a "Post Class Period Events" section commencing on July 29, 2008 (*id.* ¶¶ 107-121). Indeed, since "investors learned *for the first time* of Mechel's tax scheme" on July 28, 2008 (Pls.' Opp'n 9 (citing SAC ¶¶ 10, 40, 100, 158) (emphasis added)), it appears that claims based on the tax avoidance scheme would likely fail to allege loss causation if the Class Period were to end on July 25, 2008. *See Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 173 (2d Cir. 2005). Because the parties have fully briefed this matter under the apparent impression that the Class Period extends through July 28, 2008, the Court will not dismiss the Complaint on the basis of an obvious typographical error. Accordingly, the Court will consider the Class Period to proceed through July 28, 2008.

[3] Coking coal is washed, low-phosphorous bituminous coal used in the production of pig iron, a precursor of steel. (SAC ¶ 28.) Mechel processed coking coal into several different grades of coking coal concentrate. (*Id.* ¶¶ 27-28.)

that managed Mechel's other subsidiaries, and a member of Mechel's Board of Directors. (*Id.* ¶ 25.) Plaintiffs allege that the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Mechel and are liable for Mechel's primary securities fraud violation pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). (*Id.* ¶¶ 226-29.)[4]

## B.   Facts

### 1.   Mechel's Anti-Competitive Conduct

Pursuant to Sections 1, 5, and 8 of Article 10(1) of the Russian Federal Law "On Protection of Competition," Russian companies that occupy a "dominant position" in a product market are prohibited from:

> (1) establishment and maint[enance] of [a] monopolistically high or monopolistically low price for a commodity . . . ;
>
> (5) economically or technologically unjustified refusal or evasion from concluding a contract[5] with individual purchasers (customers) in the case when there are possibilities for production or delivery of the relevant commodity . . . ;
>
> (8) creation of discriminatory conditions . . . .

---

[4] Letters rogatory to serve the Individual Defendants, all of whom reside in Russia, have been returned unexecuted by the Russian Federation. As a result, the Individual Defendants have not been served with the Complaint and therefore do not join in Mechel's motion to dismiss.

[5] As used in the FLPC, "concluding a contract" means entering into a contract. (*See, e.g.*, SAC ¶ 112.)

(SAC ¶ 124 (citing Federal Law No. 135-FZ, "On Protection of Competition," July 26, 2006 (as amended) [hereinafter the "FLPC"] Art. 10(1) §§ 1, 5, 8).)

Plaintiffs allege that as early as March 2008, FAS put Mechel on notice that it held a dominant position in the market for coking coal products, and that FAS had initiated a "non-routine investigation" of Mechel's pricing and contracting practices. (*Id.* ¶¶ 5, 32.) The notice came by way of a series of directives issued by FAS that instructed various Mechel subsidiaries to maintain certain production volumes, supply products without discrimination, and notify FAS prior to certain domestic price increases. (*Id.* ¶¶ 73-74.) On May 15, 2008, FAS issued a press release announcing that it sent directives "to all the major producers of coking coal and coking coal concentrate" as a result of its "concern over potential price increases for coking coal and coal concentrate in the Russian market." (*Id.* ¶ 85 n.2.) Mechel disclosed its receipt of the FAS directives in its Annual Report, filed on SEC Form 20-F on June 19, 2008 (the "Annual Report"). (*Id.* ¶¶ 73-74.)

On July 15, 2008, FAS announced that it had opened a case and charged three Mechel subsidiaries – Mechel Trading, Southern Kuzbass, and Yakutugol – with violating the FLPC. (*Id.* ¶ 91.) According to FAS, these charges stemmed from evidence that (1) Mechel Trading may have unjustifiably suspended coal concentrate delivery to Russian customer Novolipetsk Steel ("NLMK"), (2) Mechel Trading and Yakutugol may have refused to enter into new coal concentrate delivery contracts with NLMK, and (3) Mechel Trading may have established monopolistically high prices for coal concentrate. (*Id.* ¶¶ 91, 125, 151.) On this news, Mechel's ADR share price declined 0.86%, from $46.50 to $46.10. (*See*

Declaration of Yeugenia Shvets, dated April 2, 2010, Doc. No. 31 ("Shvets Decl."), Ex. H at 2.)

Plaintiffs allege that on July 22, 2008, "in response to FAS Russia's mounting investigation," Mechel was forced to cancel an IPO scheduled for the following day. (SAC ¶ 152.) Upon this announcement, Mechel's shares fell 7% from $39.31 to $36.61. (Shvets Decl., Ex. H at 4.) Then, on July 24, Prime Minister Putin personally rebuked Mechel for selling raw materials in Russia at twice the price of its foreign exports. (SAC ¶ 94.) At a government meeting with Russian steel producers, Putin called for anti-monopoly authorities, and, "if need be," the special committee of the Prosecutor General's Office, to investigate Mechel. (*Id.*) Putin also noted that Zyuzin, who had been invited to attend the meeting, "has suddenly fallen ill," and remarked that if Zyuzin did not get well soon "we'll need to send him a doctor and clean up all these problems." (*Id.*) Following Putin's remarks, Mechel's shares plummeted 37.6% from $36.61 to $22.84 per share in the Company's largest ever one-day drop. (*Id.* ¶¶ 94-95.) Mechel experienced another substantial price drop on July 28, when, as described in more detail below, Putin accused it of tax evasion. (*Id.* ¶¶ 100-06.) That same day, the head of FAS announced that FAS "gathered enough evidence" to rule on Mechel's anti-monopoly case "much earlier" than was previously anticipated and stated that "Mechel must be punished." (*Id.* ¶ 100.)

On August 14, 2008, FAS issued a press release and an accompanying judgment (the "Judgment"), finding Mechel Trading, Southern Kuzbass, and Yakutugol liable for violating the FLPC, Art. 10(1) §§ 1, 5, 8. (*Id.* ¶¶ 110, 112; *see* Shvets Decl., Exs. D, J.) The Judgment revealed that FAS initiated its investigation into Mechel's pricing and contracting decisions upon complaints by three Russian customers: NLMK, Altay-Koks OJSC ("Altay-Koks"), and Magnitogorsk Metallurgical Plant OJSC ("Magnitogorsk"). (*See* Shvets Decl., Ex. D at 2-3.) Although FAS previously informed Mechel that its subsidiaries held a "dominant position on the market for coking coal" (SAC ¶ 74; Shvets Decl., Exs. N at 2, O at 1), FAS now specifically defined the relevant market to comprise three particular grades of coal concentrate: K(K9), KO, and OS. (SAC ¶¶ 110, 112.) According to the Judgment, the subsidiaries abused their dominant position with respect to two of these grades, K(K9) and OS+KS[6] by (1) creating "discriminatory conditions" for Russian customers, (2) refusing to enter into a contract with a domestic buyer without economic or technological justification, and (3) maintaining "monopolistically high" prices. (*Id.* ¶ 110.)

As part of its determination that Mechel discriminated against Russian customers, FAS noted that Mechel Trading, the Company's domestic selling unit, had entered into requirements contracts with NLMK and Altay-Koks pursuant to which the parties would agree on the precise volume and spot market pricing of certain grades of coking coal on a monthly basis. (Shvets Decl., Ex. D at 6-9.) Unlike the Company's export contracts, which set specific prices and delivery volumes of coal concentrate in advance, Mechel's domestic contracts were often structured in a way that "permitted [it] to change the volumes and prices unilaterally." (*Id.* at 8-9.) As a result,

---

[6] Neither the Complaint nor the parties' submissions explain the difference between the OS+KS grade and the K(K9), KO, and OS grades. Reading the Complaint in the light most favorable to Plaintiffs, the Court presumes the OS+KS grade to be a subset of the OS grade rather than a grade outside the relevant product market.

in March, June, and July 2008, Russian purchasers paid higher prices for K(K9) concentrate than did foreign export purchasers, who bought K(K9) concentrate pursuant to fixed term contracts entered into in 2007. (*Id.* at 7, 9.)

Mechel's discriminatory conduct also encompassed its "groundless refusal" to supply coking coal concentrate to Altay-Koks and NLMK. (*Id.* at 12.) Specifically, FAS determined that Mechel breached its contractual obligation to deliver K(K9) and OS+KS concentrate to Altay-Koks from August through December 2007. (*Id.* at 8.) Additionally, in May 2008, Mechel refused to take NLMK's monthly order for a June 2008 delivery of K(K9) concentrate. (*Id.* at 7.) On June 18, 2008, Mechel sent NLMK a letter stating that a previously-scheduled delivery of OS+KS concentrate would be indefinitely delayed due to an accident at one of its mines and the redistribution of its remaining concentrate to its related subsidiaries. (*Id.* at 6.) FAS concluded that these refusals were groundless because Mechel was capable of supplying NLMK and Altay-Koks with the requested concentrate, as evidenced by the amount of concentrate it exported through its subsidiaries. (*Id.* at 7-9.) As a result, FAS found that "Russian consumers of coking coal concentrates were placed in an unequal position as compared to the businesses that are part of a single group of entities with Mechel OJSC." (*Id.* at 9.)

FAS also concluded that Mechel refused to enter into a new contract with Altay-Koks in 2008 without "economic[]" or "technological[]" justification in violation of FLPC, Art. 10(1) § 5. (*Id.* at 8-9, 12.) According to FAS, no justification existed for this refusal because Mechel had ample coking coal concentrate, which the Company had been selling abroad. (*Id.*)

Finally, FAS determined that Mechel maintained "monopolistically high price[s]" in violation of FLPC, Art. 10(1) § 1. (*Id.* at 10-12.) According to FAS, from October 2007 to July 2008, Mechel raised the prices it charged to NLMK, Altay Koks, and Magnitogorsk well beyond what was necessary to cover its production costs. (*Id.*) As a result, Mechel increased its profitability from 70% to 550% on sales of K(K9) concentrate and from 70% to 220% on sales of OS+KS concentrate. (*Id.*)

On August 14, 2008, FAS stated that, in assessing a penalty, it would take into account Mechel's admission of liability and cooperation with the investigation. (SAC ¶ 112.) On August 20, 2008, FAS levied a $34 million fine, representing 5% of the culpable subsidiaries' revenues from coking coal concentrate sales in 2007. (*Id.* ¶¶ 119, 128-29.) FAS also ordered Mechel to cut coking coal concentrate prices by 15% beginning in September 2008, and to enter into long-term contracts with domestic customers beginning in 2009. (*Id.* ¶¶ 119, 128-29.)

### 2. Mechel's Tax Code Violations

Article 40 of the Russian Federation Tax Code prohibits "transfer pricing," defined as a "transaction[] between related parties in which there is a 20% or greater price differential between the price charged to the related party and the market price for identical goods or goods of a similar kind." (*Id.* ¶ 139.) Article 40 thus limits a company's ability to avoid taxes or strip profits from one entity to another and empowers the Russian tax authorities to assess penalties for non-compliance. (*Id.* ¶¶ 131, 139.) According to the SAC, Mechel engaged in various transfer pricing schemes during the Class Period that allegedly inflated its revenues and earnings, and

exposed the Company to a substantial risk of tax assessments, civil penalties, and criminal charges.  (*Id.* ¶¶ 101, 131-42.)

Plaintiffs allege that these schemes were partially revealed on July 28, 2008, when Putin accused Mechel of selling raw materials to its own offshore subsidiaries at less than 75% of the domestic market price. (*Id.* ¶¶ 100-06.)  Putin characterized these sales as "a reduction of the tax base within the country" and "tax evasion."  (*Id.* ¶ 101.)  Following these remarks, the Company's shares fell 25.5% from $26.20 to $19.50 a share. (*Id.* ¶ 106.)

In further support of their tax-related allegations, Plaintiffs recite a sampling of Russian customs data showing that between January 1, 2008 and July 25, 2008, Southern Kuzbass charged Mechel International between 51% and 69% less per ton of coking coal product than it charged non-affiliated entities.  (*Id.* ¶¶ 132-33.)  Plaintiffs also allege that in July 2009, the Audit Chamber of Russia announced that it investigated the use of offshore entities by a group of Russian coal exporters that included Mechel and planned on submitting a report to various Russian agencies.  (*See id.* ¶ 50; Declaration of Ximena Skovron, dated May 24, 2010, Doc. No. 35 ("Skovron Decl."), Ex. F.) Finally, the Complaint alleges that throughout 2007 and 2008, Mechel participated in an illegal tax evasion scheme with an unrelated Latvian company named Kompass.  (SAC ¶¶ 121, 134-38.) According to information gleaned from a confidential analyst, Mechel allegedly sold coking coal at below-market prices to Kompass, which subsequently resold the products and returned to Mechel or its insiders a portion of the profits from the resale. (*Id.*)

3.    The Misrepresentations and Omissions

According to the SAC, Mechel failed to disclose its anti-competitive conduct and tax evasion in a large number of Class Period statements that falsely credited the Company's earnings to legitimate price increases and market demand.  (*See id.* ¶¶ 53-90.)  For instance, a December 11, 2007 earnings press release stated that the Company was "witnessing further price increases for coal products on the back of rising demand in Asian markets and infrastructural challenges faced by major coal exporting count[r]ies."  (*Id.* ¶ 57.) Likewise, Mechel's Annual Report attributed "price increases . . . on both export and domestic markets" to "increasing coking coal demand and tight supply . . . due to accidents in several Russian coal mines which caused mine closures and cargo seaport capacity problems in Australia." (*Id.* ¶ 67.)  The SAC alleges that these and other statements were materially false because in discussing the source of Mechel's revenues, they omitted that:  (1) Mechel engaged in unlawful anti-competitive conduct, which could expose the Company to fines and forced entry into below-market long-term contracts; and (2) Mechel artificially inflated its revenue through an offshore trading scheme with its subsidiaries and Kompass to evade taxes in violation of the Russian Federation Tax Code. (*Id.* ¶ 56.)

Plaintiffs also allege that Mechel misrepresented the true likelihood of an enforcement action by Russian antitrust regulators and tax authorities.  Mechel's Annual Report acknowledged receipt of the FAS directives and cautioned that "[i]n the event we are deemed to be abusive of our dominant market position, the FAS may impose certain restrictions and fines with respect to our subsidiaries, which could have an adverse impact upon the operations of

these subsidiaries and materially adversely affect our business and results of operations." (*Id.* ¶ 73.) Plaintiffs allege that this disclosure was materially false and misleading because it did not acknowledge that Mechel was *already* abusing its dominant market position, rendering the warnings meaningless. (*Id*.)

Likewise, the Annual Report cautioned that Russian tax authorities could penalize the Company for violations of Russian transfer pricing rules:

> Vaguely drafted Russian transfer pricing rules and lack of reliable pricing information may potentially affect our results of operations. Russian transfer pricing rules effective since 1999 give Russian tax authorities the right to control prices for transactions between related entities and certain other types of transactions between unrelated parties, such as foreign trade transactions or transactions with significant price fluctuations if the transaction price deviates by more than 20% from the market price. . . . Due to the uncertainties in interpretation of transfer pricing legislation, the tax authorities may challenge our prices and make adjustments which could affect our tax position.

(*Id.* ¶ 70.) The Complaint alleges that these risk statements were false because it was not merely possible, but "probable" that Mechel would be found in non-compliance with Russian tax law in light of its transfer pricing schemes. (*Id.* ¶ 71.)

The SAC further alleges that Mechel failed to disclose the existence and consequences of a "non-routine" FAS investigation into its pricing prior to the July 15, 2008 announcement of the charges. (*Id.* ¶¶ 63-66.) According to the Complaint, Mechel did not promptly disclose that it received the various FAS directives (*id.*), and when it ultimately did so, mischaracterized them as routine inquiries sent to companies holding dominant market positions. (*Id.* ¶ 75.)

Finally, Plaintiffs allege that Mechel falsely represented that its financial statements were prepared in accordance with GAAP when, in fact, the statements failed to properly account for loss contingencies arising from the probability that it would be penalized by Russian anti-monopoly and tax authorities. (*Id.* ¶¶ 143-49.)

C.   Procedural History

This action was initiated by the filing of a putative class action complaint on April 8, 2009. On June 30, 2009, the Court appointed lead plaintiffs and approved their selection of lead counsel. The Consolidated Amended Class Action Complaint ("CAC") was filed on October 29, 2009. On December 15, 2009, the Court held a pre-motion conference with respect to Mechel's contemplated motion to dismiss the CAC, and thereafter granted Plaintiffs leave to amend their complaint.

The SAC was filed on February 19, 2010. Subsequently, on April 2, 2010, Mechel filed the instant motion to dismiss the SAC, which was fully briefed by June 21, 2010, with supplemental letter submissions made by the parties through March 2011.[7]

---

[7] In ruling on the instant motion, the Court has considered Mechel's Memorandum of Law in Support of the Motion to Dismiss ("Def.'s Mem."); Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss ("Pls.' Opp'n"); and Mechel's Reply

## II.   Legal Standards

### A.   Motion to Dismiss

In reviewing a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff. *ATSI Commc'ns Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). To survive a Rule 12(b)(6) motion to dismiss, a complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). By contrast, a pleading that only "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555). If Plaintiffs "have not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### B.   Securities Fraud

A securities fraud complaint must also comply with the heightened pleading standards imposed by Rule 9(b) and the PSLRA. Rule 9(b) requires the complaint to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To meet this standard, the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns*, 493 F.3d at 99 (citation omitted). "Allegations that are conclusory or unsupported by factual assertions are insufficient." *Id.*

In the context of securities fraud actions, the PSLRA sets forth additional pleading requirements. "The statute insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (quoting 15 U.S.C. § 78u-4(b)). Therefore, while courts "normally draw reasonable inferences in the non-movant's favor on a motion to dismiss, the PSLRA establishes a more stringent rule for inferences involving scienter because the PSLRA requires particular allegations giving rise to a strong inference of scienter." *ECA, Local 134 IBEW Joint Pension Trust of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009) (quotation marks omitted).

## III.   Discussion

### A.   Motion to Strike Mechel's Submissions

As an initial matter, Plaintiffs move to strike the following documents and exhibits referenced or submitted by Mechel in connection with this motion: (1) eleven newspaper articles, two reports from

---

Memorandum of Law in Support of the Motion to Dismiss ("Def.'s Reply"), as well as the various declarations and exhibits filed alongside these documents. The Court has also considered the parties' post-briefing correspondence, including Mechel's July 27, 2010 letter and Plaintiffs' July 30, 2010 response; Plaintiffs' March 15, 2011 letter, Mechel's March 15, 2011 response, and Plaintiffs' March 16, 2011 reply; and Mechel's March 31, 2011 letter.

PricewaterhouseCoopers LLP, and a translation of Putin's July 24, 2008 statements (*see* Pls.' Opp'n 12 n.21 (collecting citations)); (2) certain FAS pronouncements and Russian court decisions interpreting them (Shvets Decl., Exs. M, P-S); (3) Russian court rulings in April and May 2008 dismissing pre-Class Period transfer pricing tax assessments against Mechel (*id.*, Exs. V, W); and (4) Russian court rulings upholding Mechel's new long-term contracts at the discounted level set by FAS (*see id.*, Exs. BB-DD).[8]

As previously noted, on a motion to dismiss pursuant to Rule 12(b)(6), a court may only consider "(1) documents attached to or incorporated by reference in the complaint, (2) documents integral to and relied upon in the complaint, even if not attached or incorporated by reference, (3) public disclosure documents required by law to be, and that have been, filed with the SEC, and (4) facts of which judicial notice properly may be taken under Rule 201 of the [Federal Rules of Evidence]." *Campo v. Sears Holdings Corp.*, 635 F. Supp. 2d 323, 328-29 (S.D.N.Y. 2009) (internal citations and quotation marks omitted). Contrary to Mechel's argument, the controlling standard is not whether it would be "incongruous" not to consider similar types of documents as those cited in the Complaint that stand for opposite propositions (Def.'s Reply 13 n.14). Instead, the Court must consider whether Plaintiffs have *relied* on any of these exhibits in drafting the Complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) ("[A] plaintiff's *reliance* on the terms and effect of a document in drafting the complaint is a necessary prerequisite to

the court's consideration of the document on a dismissal motion; mere notice or possession is not enough." (emphasis in original, citation omitted)). Because there is no indication that Plaintiffs relied on the challenged documents or that they are otherwise subject to judicial notice, the motion to strike is granted.

## B. Section 10(b)

Plaintiffs bring claims against Mechel pursuant to Section 10(b) of the Exchange Act and Rule 10b-5, promulgated thereunder. To state a claim for securities fraud under Section 10(b) and Rule 10b-5, the plaintiff must adequately plead: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, 552 U.S. 148, 157 (2008).

Mechel moves for dismissal of the Section 10(b) claims on the grounds that the Complaint fails to sufficiently allege the existence of (1) a material misstatement or omission, (2) a strong inference of scienter, and (3) loss causation. Because the Court agrees that the Complaint fails to plead scienter, it does not assess the remaining grounds for dismissal.

### 1. Scienter

Under the PSLRA, a well-pleaded securities fraud complaint must "state with particularity facts giving rise to a *strong* inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). "The requisite state of mind in a section 10(b) and Rule 10b-5 action is an intent 'to deceive,

---

[8] Plaintiffs erroneously include Exhibit AA within this category of documents. Exhibit AA is a press release issued by Mechel on July 25, 2008 that is reproduced in the Complaint (*see* SAC ¶ 96) and is therefore properly before the Court.

manipulate, or defraud.'" *ECA*, 553 F.3d at 198 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)). Recklessness, defined as "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it," *South Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (internal quotation marks and alterations omitted), is also a "sufficiently culpable mental state for securities fraud" in the Second Circuit, *ECA*, 553 F.3d at 198.

A strong inference of scienter "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. In this Circuit, the requisite strong inference of scienter "can be established by alleging facts to show either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA*, 553 F.3d at 198; *accord ATSI Commc'ns*, 493 F.3d at 99. Alternatively, the Second Circuit has articulated that a strong inference of scienter may arise from sufficient allegations that the defendants:

> (1) benefited in a concrete and personal way from the purported fraud . . . ; (2) engaged in deliberately illegal behavior . . . ; (3) knew facts or had access to information suggesting that their public statements were not accurate . . . ; or (4) failed to check information they had a duty to monitor . . . .

*South Cherry*, 573 F.3d at 110 (quoting *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)). Despite some tension between the opinions, the Court does not read *South*

*Cherry* to implicitly overrule the two-pronged scienter standard applied in *ECA*. *See In re Wachovia Equity Sec. Litig.*, 753 F. Supp. 2d 326, 348 (S.D.N.Y. 2011). Therefore, the Court will apply the two-pronged standard here, mindful that what is required is "not a bare invocation of 'magic words such as 'motive and opportunity'" with respect to intent. *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (citing *Novak*, 216 F.3d at 311).

### a.  Motive and Opportunity

Since it is undisputed that Defendants had the opportunity to commit fraud, the Court begins by considering the motive allegations. Because "[g]eneral allegations that the defendants acted in their economic self-interest are not enough," *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 170 (2d Cir. 2000), a complaint does not plead a strong inference of scienter merely by alleging "[m]otives that are generally possessed by most corporate directors and officers." *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001). "[I]nstead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *Id*. Insufficient motives include "the desire to maintain a high credit rating for the corporation or otherwise sustain the appearance of corporate profitability or the success of an investment, or the desire to maintain a high stock price in order to increase executive compensation." *South Cherry*, 573 F.3d at 109; *accord San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir. 1996). By contrast, insider trading represents a classic example of a "concrete and personal" benefit that suffices to plead motive to commit securities fraud. *See In re PXRE Grp., Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 530 (S.D.N.Y. 2009).

The SAC describes three principal motives for Defendants to inflate Mechel's stock price:  (1) to raise capital for Mechel by attracting investors and lenders; (2) to increase the value of Defendant Zyuzin's substantial personal holdings in Mechel; and (3) to minimize the risk that Zyuzin would lose shares he pledged as collateral for Mechel's debt.  (SAC ¶¶ 192-203.)  For the reasons set forth below, the Court concludes that these motive allegations do not sufficiently establish a strong inference of scienter.

According to the SAC, Mechel took on billions of dollars of debt for several large cash acquisitions that it completed in 2007 and 2008.  (*Id.* ¶ 195.)  To pay down the debt and improve the company's "precarious financial position," Mechel allegedly sought additional financing from lenders and planned to hold two stock offerings in 2008 that were ultimately cancelled.  (*Id.* ¶¶ 195-98.)  Plaintiffs allege that "Mechel's stock price needed to be priced at levels that would attract potential investors and lenders and assure them of the Company's profitability."  (*Id.* ¶ 195.)  While the desire to inflate the price of stock to increase its value in making acquisitions may, in some circumstances, be sufficient to establish a motive for fraud, *see Rothman*, 220 F.3d at 93, here Plaintiffs do not "allege a unique connection between the fraud and the acquisition[s]," *ECA*, 553 F.3d at 201.  Mechel's need to attract investors in order to pay down debt accruing from its prior acquisitions is insufficient to demonstrate scienter because it is common to most for-profit companies.  *See Rombach v. Chang*, 355 F.3d 164, 177 (2d Cir. 2004) (finding no inference of scienter where defendants' motives were to "artificially inflate and maintain the market price of . . . common stock[,]" "complete a previously arranged corporate acquisition[,] . . . and to retire debt"); *San Leandro*, 75 F.3d at 813-

14 (holding that desire to maintain a high bond or credit rating to maximize marketability of a substantial debt issuance does not qualify as sufficient motive); *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) ("The motive to maintain the appearance of corporate profitability, or of the success of an investment, will naturally involve benefit to a corporation, but does not entail concrete benefits" sufficient to establish scienter. (internal quotation marks omitted)).

Plaintiffs further allege that "[t]he threat of breaching . . . loan covenants motivated defendants to promulgate materially false and/or misleading statements in order to avoid triggering loan defaults."  (SAC ¶ 200.)  However, Mechel's need to comply with various financial covenants in its loan agreements is similarly deficient as a motive allegation as they are common to most companies.  *See In re Cross Media Mktg. Corp. Sec. Litig.*, 314 F. Supp. 2d 256, 264-65 (S.D.N.Y. 2004) ("[T]he alleged desires to raise additional capital in a private placement or to maintain compliance with the financial covenants of a company loan agreement . . . are similarly inadequate to support an allegation of intent to commit fraud.").

The SAC's additional allegations of individual motive are directed solely at Zyuzin.  Plaintiffs claim that Zyuzin had a concrete and personal motive to artificially inflate Mechel's stock price and deceive investors because he owned roughly 73% of Mechel in 2008.  (SAC ¶ 192.)  However, the fact that Zyuzin "faced substantial personal financial exposure if the Company's stock price dropped" (*id.*) is precisely the kind of generalized motive that could be imputed to any large shareholder.  *See Kalnit*, 264 F.3d at 139; *In re Yukos Oil Co. Sec. Litig.*, No. 04 Civ. 5243 (WHP),

2006 WL 3026024, at *19 (S.D.N.Y. Oct. 25, 2006) (allegation that defendants owned significant number of shares and received $1.2 billion in dividends failed to differentiate defendants' motives from every other shareholder's generalized desire to maximize stock value). Furthermore, Plaintiffs do not allege that Zyuzin – or any of the Individual Defendants – sold their shares during the Class Period. "Absent some allegation [comparable to insider trading] to explain how a defendant benefits from an inflated stock price," Zyuzin's stock ownership "does not provide sufficient motive to sustain the pleading burden under Rule 9(b)." *Goplen v. 51job, Inc.*, 453 F. Supp. 2d 759, 772 (S.D.N.Y. 2006) (internal citation and quotation marks omitted; alteration in original); *accord In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp. 2d 576, 595 (S.D.N.Y. 2006).

Finally, Zyuzin's pledge of his shares as collateral for Mechel's debt is likewise insufficient to establish a strong inference of scienter. On July 21, 2008, a week prior to the end of the Class Period, Mechel filed a Schedule 13D Form indicating that Zyuzin pledged approximately 26% of his Mechel shares to "lenders" in connection with "certain financings." (SAC ¶ 194.) Plaintiffs allege these financings were made "for the benefit of Zyuzin personally and/or Mechel." (*Id.*) But to the extent Zyuzin was able to obtain a financial benefit from Mechel's inflated stock price upon pledging his shares, such a benefit would be available to any shareholder of a company. *See Johnson v. NYFIX, Inc.*, 399 F. Supp. 2d 105, 114 (D. Conn. 2005) (holding that a CFO's pledge of company stock as collateral for personal loans obtained from the company is insufficient to establish motive because "loans secured with stock are analogous to stock ownership."). As for Zyuzin's personal exposure to Mechel's

performance, the allegations are entirely too speculative to plead scienter. Plaintiffs admit that "the material terms of [the] financings have not been disclosed," (SAC ¶ 194), and the Complaint provides no supporting details to explain how Zyuzin's potential exposure under these financings was connected to misrepresentations that allegedly inflated Mechel's stock price during the Class Period. As this Court previously observed, "speculative allegations regarding personal liability that may *potentially* attach to an individual defendant are insufficient to give rise to a strong inference of scienter under the PSLRA." *Janel World Trade, Ltd. v. World Logistics Servs, Inc.*, No. 08 Civ. 1327 (RJS), 2009 WL 735072, at *6 (S.D.N.Y. Mar. 20 2009) (emphasis in original); *see also Kalnit*, 264 F.3d at 140.

Specifically, because Plaintiffs do not allege *when* the pledges were made, Zyuzin's loss avoidance motive cannot be ascribed to any specific misrepresentations that took place prior to the filing of the Schedule 13D Form on July 21, 2008. Notably, by that date, the market had already learned about the FAS charges. Plaintiffs do not explain how the only alleged misrepresentation made after July 21, 2008 – a July 22, 2008 press release stating that Mechel was entering into new domestic long-term coking coal contracts – was connected to Zyuzin's concern over losing his collateral. Indeed, Plaintiffs allege no specific benefit that Zyuzin would have received from voluntarily placing his shares at risk while knowing that the Company was violating Russian anti-monopoly and tax laws. *See In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 621 (S.D.N.Y. 2005) ("Plaintiffs also fail to allege facts explaining why, if it was aware of Enron's problems, JPM Chase would have continued to lend Enron billions of dollars."). To the contrary,

Zyuzin continued to increase his stock pledges in 2009, well after the disclosure of Mechel's alleged misconduct in this case. (SAC ¶ 194.)

Moreover, even if Zyuzin pledged his shares sufficiently early in the Class Period, Plaintiffs do not allege that Mechel was at risk of defaulting on the unspecified "financings" involving Zyuzin's shares *during* the Class Period. Instead, the allegation that Mechel "was in danger of default" on its debt arises from a June 24, 2009 SEC filing, nearly a year after the end of the Class Period. (*Id.* ¶ 201.) Under these circumstances, the Court finds that Zyuzin's alleged motive to commit fraud during the Class Period, considered together with the other motive allegations, remains far too speculative and attenuated to establish a strong inference of scienter.

b.   Conscious Misbehavior or Recklessness

Where motive is not apparent, a complaint may still raise a strong inference of scienter by identifying circumstantial evidence of conscious misbehavior or reckless disregard for the truth, "though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (internal citation and quotation marks omitted). "Intentional misconduct is easily identified since it encompasses deliberate illegal behavior . . . ." *Novak*, 216 F.3d at 308. A "reckless disregard for the truth" means "conscious recklessness — *i.e.* a state of mind approximating actual intent, and not merely a heightened form of negligence." *South Cherry*, 573 F.3d at 109 (internal citation and quotation marks and alterations omitted). Plaintiffs must plead conduct that "at the least . . . is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger

was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* (quoting *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000) (internal quotation marks and alterations omitted)). Recklessness is sufficiently pled where the plaintiff specifically alleges that defendants either (1) knew facts or had access to information contradicting their public statements, or (2) failed to review or check information they had a duty to monitor. *Novak*, 216 F.3d at 308. However, "'[w]here plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information.'" *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (quoting *Novak*, 216 F.3d at 309).

To plead recklessness in this case, Plaintiffs must show that at the time of the various challenged misrepresentations, Defendants knew or should have known that (1) Mechel's subsidiaries engaged in the anti-competitive behavior and tax evasion scheme alleged in the Complaint, and (2) such conduct was contrary to established Russian law. *See Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003) ("Absent a clear allegation that the defendants knew of the scheme and its illegal nature at the time they stated the belief that the company was in compliance with the law, there is nothing further to disclose. The fact that a defendant's belief or opinion later prove[s] to be wrong in hindsight does not render the statements untrue when made." (internal citation and quotation marks omitted)); *Yukos*, 2006 WL 3026024, at *16, 20 (holding that in light of the contrary Russian law precedent, Defendants were not required to disclose the "speculative possibility" that their actions would be deemed unlawful); *In re Open*

*Joint Stock Co. Vimpel-Commc'ns*, No. 04 Civ. 9742 (NRB), 2006 WL 647981 (S.D.N.Y. Mar. 14, 2006) (*VimpelCom*) (dismissing securities fraud complaint that failed to sufficiently allege how defendants should have known at the outset of a Russian tax investigation that defendants' conduct would be found to be illegal).

In assessing whether Plaintiffs have sufficiently pled recklessness on the part of Defendants, the Court will separately address Plaintiffs' allegations as they pertain to Mechel's anti-competitive conduct and tax evasion schemes.

    i.   Anti-Competitive Conduct

(a)   Knowledge of the Alleged Scheme

Aside from allegations in support of "core operations" and position-based inferences, addressed below, Plaintiffs supply few grounds from which to infer that the Individual Defendants knew about or participated in the anti-competitive behavior described in the FAS Judgment at the time of their alleged misstatements. Indeed, "Plaintiffs should, but do not, provide specific instances in which Defendants received information that was contrary to their public declarations." *Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce*, 694 F. Supp. 2d 297, 299 (S.D.N.Y. 2010).

Significantly, the Complaint does not allege facts demonstrating that Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs of fraud. *See In re Sotheby's Holdings, Inc.*, No. 00 Civ. 1041 (DLC), 2000 WL 1234601, at *7 (S.D.N.Y. Aug. 31, 2000); *accord Novak*, 216 F.3d at 308. Instead, the SAC largely follows a pleading strategy of publishing large block quotes

from Defendants' financial disclosures and press conferences, and alleging that they were false and misleading because they omitted information later contained in FAS directives, press releases, and the FAS Judgment. Thus, Plaintiffs indiscriminately allege that *all* statements discussing Mechel's revenues from October 2007 through the end of the Class Period were false and misleading because they failed to disclose:

> (1) that the Company had engaged in anticompetitive conduct by employing a discriminatory pricing policy for raw material sales between domestic and foreign steel firms; (2) that the Company had engaged in anticompetitive conduct by fixing and maintaining coking coal and/or coking coal concentrate prices at artificially high levels and unreasonably – without economic or technological grounds – refusing to enter into supply contracts or to perform on its existing contracts; (3) that the Company's anticompetitive practices in the coking coal and/or coking coal concentrate market violated Russia's competition law, and as they were discovered, the Company could incur a significant level of fines, be ordered to cut prices and be forced to enter into long-term coking coal and/or coking coal concentrate supply contracts below market prices; [and] (4) that a portion of the Company's income and revenue was derived from anticompetitive conduct, and when such actions were discovered, the Company's margins, income and revenue would significantly decline in future periods . . . .

(SAC ¶ 56; *see also id.* ¶¶ 57-69).

This manner of pleading eschews any effort to identify a period of time within the Class Period when the Individual Defendants, or any other person whose knowledge is attributable to Mechel, became aware of any specific conduct they should have known violated the law. *See Rothman*, 220 F.3d at 91 ("Although the [a]ppellants do not have to fix the exact date and time that [appellees] became aware that recovering royalty payments through future sales would be unlikely, they must supply some factual basis for the allegation that the defendants had reached this conclusion at some point during the time period alleged." (citations omitted)). And threadbare recitations of FAS's conclusions – without corresponding, particularized allegations of the Individual Defendants' knowledge of the underlying anti-competitive conduct during the Class Period – cannot amount to more than an impermissible attempt to plead fraud by hindsight. *Novak*, 216 F.3d at 309.

To show the Individual Defendants' contemporaneous knowledge of the illegal schemes, Plaintiffs predominantly rely on inferences raised by the scope of Mechel's "core operations," as well as the nature of the executive positions held by the Individual Defendants. The Court addresses each inference in turn.

(i) The "Core Operations" Inference

Plaintiffs primarily seek to attribute knowledge of Mechel's misconduct to the Individual Defendants on the grounds that the alleged misstatements and omissions "concerned the Company's core products – coking coal and coking coal concentrate." (*See* Pls.' Opp'n 27-28 (citing *Cosmas v. Hassett*, 886 F.2d 8, 13 (2d Cir. 1989)); *In re Check Point Software Techs. Ltd. Sec. Litig.*, No. 03 Civ. 6594 (RMB), 2006 WL 1116699, at *4 (S.D.N.Y. Apr. 26, 2006); *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 489 (S.D.N.Y. 2004).) In *Cosmas*, the seminal case in the Second Circuit on "core operations" pleading, a company's directors emphasized the importance of the Chinese market as a new source of revenue, while failing to disclose that recently-enacted import restrictions made sales to China impossible. 886 F.2d at 12. The Second Circuit held that knowledge of the import restrictions could be imputed to the individual defendants because sales to China represented "a significant part of [the company's] business," and the restrictions eliminated a "potentially significant source of income for the company." *Id*. at 13. As subsequently articulated by the district court in *Atlas*, this holding meant that "[k]nowledge of the falsity of a company's financial statements can be imputed to key officers who should have known of facts relating to the *core operations* of their company that would have led them to the realization that the company's financial statements were false when issued." *Atlas*, 324 F. Supp. 2d at 490 (emphasis added).

In relying on *Cosmas*, *Atlas*, and *Check Point*, Plaintiffs neglect to acknowledge the considerable tension in this District and elsewhere concerning the continued viability and scope of the "core operations" pleading doctrine after the passage of the PSLRA. *Cosmas* preceded the PSLRA by six years, and the Second Circuit has yet to pass on the independent sufficiency and strength of "core operations" inferences after the PSLRA's enactment. Indeed, courts in this District have charted different trajectories on the use of the doctrine, with several questioning whether scienter can still be pleaded in this manner or, at the very least, distinguishing *Atlas* to its unique facts. *See Brecher v. Citigroup Inc.*, No. 09 Civ. 7359 (SHS), 2011 WL 2209145, at *13 (S.D.N.Y.

June 7, 2011) ("In light of the [PSLRA's] heightened pleading standards, imputing knowledge based simply on the fact that the fraud concerned a firm's core operations is highly doubtful."); *Wachovia*, 753 F. Supp. 2d at 353 (questioning the strength of the core operations inference in the absence of supplemental scienter allegations); *Glaser v. The9, Ltd.*, No. 09 Civ. 08904 (RJH), 2011 WL 1106713, at *19 n.17 (S.D.N.Y. Mar. 28, 2011) ("It is questionable whether the 'core operations' doctrine has survived the PSLRA at all."); *In re NovaGold Resources Inc. Sec. Litig.*, 629 F. Supp. 2d 272, 304 (S.D.N.Y. 2009) ("The plaintiff attempts to impute an inference of scienter to each defendant by virtue of the fact that the alleged fraud concerned 'core' business operations, [citing *Atlas*], but the Second Circuit has not endorsed this theory."); *JP Morgan Chase*, 363 F. Supp. 2d at 628 (declining to apply "core operations" doctrine for the "accounting treatment" of certain trades as loans); *accord Plumbers and Pipefitters Local Union No. 630 Pension-Annuity Trust Fund v. Arbitron Inc.* No. 08 Civ. 4063 (JGK), 2010 WL 3733909, at *14 (S.D.N.Y. Sept. 24, 2010); *In re eSpeed, Inc. Sec. Litig.*, 457 F. Supp. 2d 266, 294 n.209 (S.D.N.Y. 2006).[9]

Other courts in this District continue to cite *Atlas* and the "core operations" inference with approval, *see, e.g.*, *In re Reserve Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310, 322-23 (S.D.N.Y. 2010); *In re Dynex Capital Inc. Sec. Litig.*, No. 05 Civ. 1897

(HB), 2009 WL 3380621, at *15 (S.D.N.Y. Oct. 19, 2009), though often to bolster other substantial grounds for scienter. For instance, in *Check Point*, the initial complaint was dismissed for failure to identify any specific report or statement supporting the assertion that defendants knew of facts or had access to information contradicting their public statements. *Check Point*, 2006 WL 1116699, at *1. The court subsequently held that the amended complaint survived dismissal, noting that knowledge of the performance of the company's "most important product" related to Check Point's "core business operations." *Id.* at *4. However, the court also premised its holding on "(new) allegations contained in the SAC [that] cure[d] the scienter deficiencies," including detailed information conveyed by former company employees concerning meetings, teleconferences, sales results and sales projections that provided Defendants with access to contrary information. *Id.* No such particularized information has been pleaded here.

Thus, while the Court considers circumstantial allegations pertaining to the Individual Defendants' knowledge of Mechel's key products as part of its holistic assessment of the scienter allegations, *see Tellabs*, 551 U.S. at 326, in the absence of Second Circuit guidance, the Court does not find them to be independently sufficient to raise a strong inference of scienter. *See Wachovia*, 753 F. Supp. 2d at 353. Plaintiffs rely on the significance of coking coal concentrate sales to Mechel's business – constituting over 55% of Mechel's revenues in 2008 – to allege that Zyuzin, Ploschenko, and Polin "were sufficiently knowledgeable about the Company to know that their statements concerning the Company's core products were false." (SAC ¶ 191.) But the Complaint does not supply supporting allegations about the significance of Mechel

---

[9] Uncertainty over the continued viability of the "core operations" doctrine is also reflected in post-PSLRA decisions in other Circuits, several of which have expressed doubt that knowledge of a fraud pertaining to a core business operation can necessarily be imputed to senior officers. *See South Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 867 (5th Cir. 2003).

Trading's contracting and pricing decisions for the K(K9) and OS+KS concentrate sold to NLMK, Altay-Koks, and Magnitogorsk to the Company's core business. *Cf. Atlas*, 324 F. Supp. 2d at 496 (applying "core operations" inference where the concealed fraud was so large it required a $363 million earnings restatement, reducing the company's retained earnings from $185 million to an accumulated deficit of $178 million, and contributing to the company's bankruptcy). Without such allegations, there is no cognizable limit to the scope of the "core operations" inference suggested by Plaintiffs, which would potentially sweep in knowledge of *all* customer contract terms, price levels, delivery schedules, and other operational details for every grade of coking coal concentrate. Because such a result would eviscerate the cogent and compelling inference of scienter required by *Tellabs*, the Court declines to find an inference of recklessness based on these allegations. *Wachovia*, 753 F. Supp. 2d at 361.

Plaintiffs further contend that Defendants "demonstrated their knowledge of the Company's pricing, long-term contracts and profitability when they chose to speak about these topics in detail." (Pls.' Opp'n 27.) However, in the absence of particularized allegations that Defendants had access to specific contradictory information, *see PXRE*, 600 F. Supp. 2d at 536, this argument does not carry the inference across the finish line. The Court declines to presume that Defendants' knowledge of some facts in these broader subject areas (*see, e.g.*, SAC ¶¶ 58, 63, 65), extends to the more narrow pricing and contracting decisions concerning NLMK, Altay-Koks, and Magnitogorsk about which Defendants did not speak.

(ii)   Position-Based Inferences

The Complaint further avers that "under applicable Russian labor laws, [the Individual Defendants] had certain enumerated duties as officers of Mechel that (1) would have exposed [them] to the Company's illegal activities by virtue of carrying out those duties and (2) required [them] to have knowledge of applicable Russian competition and tax laws." (*Id.* ¶ 166.) However, courts in this District "have long held that accusations founded on nothing more than a defendant's corporate position are entitled to no weight." *Plumbers & Steamfitters Local 773 Pension Fund*, 694 F. Supp. 2d at 300; *see Teamsters Allied Benefit Funds v. McGraw*, No. 09 Civ. 140 (PGG), 2010 WL 882883, at *11 (S.D.N.Y. Mar. 11, 2010) ("Courts have routinely rejected the attempt to plead scienter based on allegations that because of defendants' board membership and/or their executive managerial positions, they had access to information concerning the company's adverse financial outlook." (internal citations and quotation marks omitted)); *accord In re MBIA, Inc. Sec. Litig*, 700 F. Supp. 2d 566 (S.D.N.Y. 2010); *In re Sec. Capital Assurance, Ltd. Sec. Litig.*, No. 07 Civ. 11086 (DAB), 2010 WL 1372688 (S.D.N.Y. Mar. 31, 2010).

While Russian labor law may generally require corporate officers to know "applicable regulations" and "the organization of production" (SAC ¶ 188), these legal obligations do not establish that the Individual Defendants were actually privy to, or failed to monitor, specific statements or reports contradicting their public statements. As such, these position-based allegations are substantively indistinguishable from those routinely held insufficient to plead scienter. *See Sotheby's*, 2000 WL 1234601, at *7 ("It is well-

established that boilerplate allegations that defendants knew or should have known of fraudulent conduct based solely on their board membership or executive positions are insufficient to plead scienter."). For similar reasons, generalized allegations about the Individual Defendants' "educational backgrounds" and "extensive experience" in the coal industry (SAC ¶ 190) do not raise an inference that the Individual Defendants were aware of Mechel's anti-competitive conduct.

### (iii)  The FAS Directives

Finally, Plaintiffs point to Mechel's receipt of various FAS directives from March to June 2008 as evidence of Defendants' contemporaneous knowledge of Mechel's anti-competitive conduct. These directives ordered Mechel to support certain production volumes, provide, to the extent possible, equal supply terms to customers, and notify FAS prior to certain price increases. (*See, e.g.*, *id.* ¶ 73.) The Court more fully discusses the import of these directives below, in the context of Plaintiffs' allegation that Mechel knew about and failed to disclose the existence of a "non-routine [FAS] investigation." (*Id.* ¶ 5.) For present purposes, however, there is no serious dispute that the directives did not caution Mechel about the particular contracting and pricing practices FAS later found to be unlawful. Indeed many of these practices – such as Mechel's breach of contract with NLMK in June 2008 – had not even occurred at the time the directives were sent. Therefore, the Court finds that Mechel's receipt of these generalized directives is not sufficient to establish a strong inference of scienter.

### (b)  Knowledge of Illegality

Even if Plaintiffs could establish Defendants' knowledge of the underlying contracting and pricing practices, the SAC nevertheless fails to demonstrate that Defendants knew or should have known that these practices constituted a violation of the FLPC.[10]  It is well established that securities laws do not impose a duty on corporate officials to be clairvoyant; company personnel "are only responsible for revealing those material facts reasonably available to them." *Novak*, 216 F.3d at 309. In the context of securities fraud actions brought against companies who were found to violate ambiguous Russian laws, courts in this District have scrutinized whether defendants had access to clear case law precedent or some other way to have foreseen the regulators' actions. *See Yukos*, 2006 WL

---

[10] In their opposition papers, Plaintiffs briefly argue that Mechel's nondisclosure of the underlying conduct is actionable even if Mechel could not predict its unlawfulness. According to Plaintiffs, the relevant omissions concern "Mechel's true source of income and revenue – its undisclosed pricing and contracting practices, not its failure to disclose the possibility of enforcement." (Pls.' Opp'n 17-18.) However, the SAC does not allege why the relevant pricing and contracting decisions with Altay-Koks, NLMK, and Magnitogorsk would have been independently material to investors *without* the prospect of adverse consequences from Russian authorities. *See Acito*, 47 F.3d at 53 (no duty to disclose results of prior government inspections without a clear indication that "adverse consequences would ensue."). Nor does the SAC allege that Mechel materially misreported its actual income from the underlying transactions. *See In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp. 2d 452, 469-70 (S.D.N.Y. 2006) ("Absent an allegation that MMC reported income that it did not actually receive, the allegation that a corporation properly reported income that is alleged to have been, in part, improperly obtained is insufficient to impose Section 10(b) liability."). As such, the Court cannot find that Defendants acted recklessly in failing to disclose its pricing and contracting practices absent an awareness that they were in violation of Russian law.

3026024, at *16 ("Plaintiffs have failed to allege the existence of any precedent to support their contention that Yukos made material misrepresentations relating to its compliance with the [relevant Russian tax rule]."); *VimpelCom*, 2006 WL 647981, at *8 ("None of the facts set forth in the CAC support the conclusion that VimpelCom officers knew (or should have known) that the August 2004 tax inspection would result in adverse consequences to VimpelCom or that the company's interpretation of tax laws related to VAT was 'highly unreasonable.'" (citing *Novak*, 216 F.3d at 308).)

Plaintiffs contend that Mechel should have foreseen FAS's application of the FLPC to its conduct because the relevant laws "are clear, specific and enforced aggressively by the Russian authorities, as demonstrated by the publicly reported proceedings for similar violations previously brought by FAS Russia and tax authorities against Mechel as well as companies in the same or related industries and thus would have been known to defendants." (SAC ¶ 166.)[11]  After careful review of the FLPC – substantially amended only eleven months prior to the beginning of the Class Period (*id.* ¶ 31) – and the FAS Judgment, the Court is unpersuaded.

Under the FLPC, determinations of relatively ambiguous concepts like "monopolistically high prices," "economically or technologically unjustified refusal[s]," and "discriminatory conditions" entail complex, fact-intensive determinations by a government regulator vested with broad

discretion.  (*See* FLPC Art. 10(1) §§ 1, 5, 8.) In the absence of particularized allegations showing why these determinations were foreseeable to the Individual Defendants during the Class Period, their failure to disclose them did not constitute conscious misbehavior or recklessness.  For instance, Plaintiffs do not allege facts or precedent showing why it would have been *ex ante* foreseeable that a 70% profit on the sale of one grade of concentrate to a specific customer did not constitute a "monopolistically high price," but an increase to 220% profit would be actionable.[12]  Nor do Plaintiffs demonstrate why it would have been obvious to Mechel that entering into fixed-price contracts with foreign buyers and spot-price contracts with domestic customers might constitute discrimination whenever the fluctuating domestic prices exceeded the prices set well in advance for foreign buyers.  (*See* Shvets Decl., Ex. D at 7, 9.)  The broad FLPC definition of discriminatory conditions – encompassing "conditions for access to the [] goods market, conditions for production, exchange, consumption, acquisition, sale, or other transfer of a good under which a business or several businesses are placed in an unequal position compared to another business or other businesses" – provides little guidance in resolving ambiguities in

---

[11] Although this allegation can be read to suggest that FAS (in conjunction with the tax authorities) brought charges against Mechel prior to the summer of 2008, the Complaint only describes FAS proceedings against *other* companies (SAC ¶ 188), and does not allege the existence of any prior FAS action against Mechel (*id.* ¶ 166).

[12] The FLPC provides that a "monopolistically high price" is a price that (1) "exceeds the price which, in a competitive goods market comparable in amount of goods being sold during a specific period, . . . is set by businesses that do not belong to the same group as the buyers or sellers of the good and do not hold a dominant position in a comparable market," or (2) "exceeds the sum of expenses and profit, necessary for production and sale of that good."  (FLPC, Art. 6(1)).  Although FAS appears to have applied the second prong of the test in its judgment against Defendants, the record before the Court does not indicate how FAS's evaluation of a "necessary" but not excessive amount of profit would have been foreseeable to Defendants.

this area. (*See* FLPC, Art. 4(8).) Absent clear precedent, the Court harbors similar doubts as to the obviousness of a FAS determination of an "economically and technologically unjustified refusal" to enter into a contract or supply products. *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 272 (S.D.N.Y. 2008) ("Given the evident ambiguity in the ESRB's rules, Lead Plaintiffs' mere allegation that Take-Two violated the ESRB's rules does not give rise to a strong inference that [defendants] *knew* that Take-Two had violated those rules."); *In re Bristol-Myers Squibb Sec. Litig.*, 312 F. Supp. 2d 549, 567 (S.D.N.Y. 2004) (finding no inference of scienter for the company's erroneous financial reporting and subsequent restatement where the relevant accounting treatment was not "the subject of prior accounting rules or literature" and "involve[d] evaluation of a variety of factors and a number of complex judgments." (citation omitted)).

Plaintiffs offer two 2005 cases, *FAS v. Eurocement Group* and *FAS v. Gazprom Group*, as precedent for FAS's actions. (SAC ¶ 182.) These cases – brought prior to the significant revisions to the FLPC in 2006 – have limited probative value other than showing FAS's willingness to enforce the anti-monopoly law in 2005. (*Id.* ¶ 183.) Indeed, *Eurocement* was subsequently overturned by a Russian court (*see* Pls.' Opp'n 19), and *Gazprom* took an entirely different approach to determining a monopolistically high price than in the present case (*see* Shvets Decl., Ex. Y (comparing a company's weighted average prices to growth in per capita income, nominal wages, and pensions).) Thus, Plaintiffs have not alleged with particularity that Defendants knew or had access to information presaging FAS's findings of

liability.[13]  *See Yukos*, 2006 WL 3026024, at *15.

The Court finds it significant that Mechel generally disclosed to investors that it entered into both "spot and long-term contracts" and that it sought to "increase prices on the spot basis" after certain long-term contracts ended. (SAC ¶ 58.) These disclosures run contrary to the suggestion that the Defendants were trying to conceal conduct they knew to be unlawful. Likewise, Mechel sent a letter to NLMK in June 2008, expressly stating that it was redistributing coking coal concentrate to its related companies, a fact that further undermines the inference that the Company believed it was engaging in illegal discrimination. (Shvets Decl., Ex. D at 6.) Indeed, Mechel's Annual Report disclosed the Company's receipt of the FAS directives, cautioned investors that the FLPC "is vague in certain parts and subject to varying interpretations," and

---

[13] The parties devote considerable briefing to the foreseeability of FAS's decision to redefine the relevant product market to comprise three specific grades of coking coal in August 2008 – a fact that ultimately has little bearing on the scienter inquiry. Although Mechel strenuously argues that it could not have foreseen the redefinition, it neglects to consider that the unpredictability of that determination would only be dispositive of scienter *if* Mechel's contracting and pricing practices were not otherwise actionable under the FLPC. Significantly, FAS's redrawing of the product market did not transform Mechel from a non-dominant competitor to a dominant competitor. (*See* Shvets Decl., Ex. N at 2 (stating that Mechel subsidiaries held a dominant position in the market for coking coal under the prior definition); *id.* Ex. O at 1 (same).) Moreover, the record before the Court does not demonstrate how the redefinition itself materially affected FAS's interpretation of the FLPC and its assessment of the penalties. Thus, while the Court finds considerable ambiguity in the application of the relevant FLPC provisions as a general matter, the mere unforeseeability of FAS's redefinition of the relevant product market cannot constitute anything more than supplemental evidence of FAS's broad discretion under the FLPC.

warned that "[i]n the event [Mechel is] deemed to be abusive of [its] dominant market position, the FAS may impose certain restrictions and fines with respect to [its] subsidiaries, which could have an adverse impact upon the operations of these subsidiaries and materially adversely affect our business and results of operations." (Annual Report, at 18-20.)[14]

Finally, Plaintiffs emphasize that, as reported in FAS's August 14, 2008 press release, Mechel admitted to violating the anti-monopoly law. (*See* SAC ¶ 112; Pls.' Opp'n 11, 24.) While an admission of liability may, as a general matter, weigh in favor of an inference of scienter, it bears noting that Plaintiffs do not allege that Mechel admitted to a *knowing violation* of Russian law. As such, the admission does little to demonstrate the Company's fraudulent intent *during* the Class Period. The obvious, and more compelling, alternative inference is that, in light of Prime Minister Putin's personal scrutiny and veiled threats (SAC ¶ 94), coupled with the prospect of a reduced penalty that might accompany an admission of liability (*id.* ¶ 112), the Company and its executives had strong personal and economic motivations not to contest the FAS Judgment regardless of its unforeseeability. Indeed, with the Russian government's "catastrophic" dismantlement of the Russian oil company *Yukos* as a backdrop (*id.* ¶¶ 166, 179), Zyuzin would have been especially hard pressed to ignore the ominous connotation of Putin's offer to send him a "doctor" to rectify Mechel's problems (*id.* ¶ 94). Accordingly, in light of the evident ambiguities in the FLPC and the absence of clear precedent as to its applicability to the

facts here, the Court is unpersuaded that Mechel's *post facto* admission of liability demonstrates that it engaged in "*deliberately illegal behavior*," *Novak*, 216 F.3d at 311 (emphasis added), or acted with a "reckless disregard for the truth," *South Cherry*, 573 F.3d at 109, at the time of the alleged statements sufficient to plead scienter.

(c)   The FAS Investigation

Plaintiffs also allege that Defendants failed to disclose the existence and consequences of a FAS investigation in the lead up to the July 15, 2008 announcement of the charges. According to the Complaint, Mechel was put on notice as early as March 2008 by a series of FAS directives that FAS commenced a "non-routine investigation" into its pricing and contracting practices. (SAC ¶ 32.) However, nothing in the FAS directives indicates that FAS suspected Mechel of breaching the FLPC, or that FAS was investigating the conduct later described in the Judgment. Indeed, the March 2008 directives expressly stated that they were sent *in response* to Mechel's petition for approval of its acquisition of interests in Yakutugol. (*See, e.g.*, Shvets Decl., Exs. O at 1, N at 1.) Significantly, the Judgment did not mention *any* of the directives, much less hold that they were violated in any respect. (*See id.* Ex. D.) Instead, it expressly attributed the grounds for initiating the case against Mechel to complaints from Russian customers for Mechel's conduct occurring as late as July 2008. (*See id.* at 2-3.)

Plaintiffs nevertheless claim that, as a result of a May 15, 2008 FAS press release, Mechel should have been aware that the directives were sent in the course of a "non-routine investigation." (Pls.' Opp'n 5-6.) In that press release, however, FAS announced that it sent inquiries "to *all* the major producers of coking coal and coking coal

---

[14] The Court may consider the full text of SEC filings referenced in the Complaint on a motion to dismiss. *See ATSI Commc'ns*, 493 F.3d at 98.

concentrate" due to "concern over potential price increases for coking coal and coal concentrate in the Russian market." (SAC ¶ 85 n.2 (emphasis added).) Significantly, the press release did not disclose any specific investigation of Mechel, or even mention the Company by name. Moreover, even assuming *arguendo* that the press release could somehow be read to indicate that FAS began a specific "non-routine" investigation of Mechel, this information was disclosed to the market by way of the public FAS release itself and would have triggered no further duty of disclosure on Mechel's part. *See Sable v. Southmark/Envicon Capital Corp.*, 819 F. Supp. 324, 333 (S.D.N.Y. 1993) ("The naked assertion of concealment of material facts which is contradicted by published documents which expressly set forth the very facts allegedly concealed is insufficient to constitute actionable fraud." (internal citation and quotation marks omitted)); *White v. Melton*, 757 F. Supp. 267, 272 (S.D.N.Y. 1991) ("The Court must dismiss a complaint founded on allegations of securities fraud if the allegedly omitted or misrepresented information was in fact appropriately disclosed.").

Moreover, Mechel *actually disclosed* its receipt of directives sent from March through May 2008 in its Annual Report on June 19, 2008, along with the possible consequences of a future FAS determination that it violated Russian anti-monopoly law. (*See* SAC ¶ 73.) Although Plaintiffs allege that the disclosure should have been made earlier, nothing about its timing – made nearly a month before FAS brought a case against Mechel – supports an inference of recklessness. *See Acito*, 47 F.3d at 53 ("Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud."). Likewise, the Court does not find that Defendants acted recklessly in failing to

immediately disclose two additional directives issued on June 23, 2008 that "substantially repeat[ed]" the requirements of the prior directives. (SAC ¶ 119.) Accordingly, the Complaint fails to allege why Mechel should have known that the FAS directives portended a specific investigation, much less that the investigation would result in any liability. *See VimpelCom*, 2006 WL 647981, at *6 ("Without a ballpark estimate of liability, we fail to see how disclosure of the mere existence of the inspection would provide useful information to investors who had already been warned about the fact that VimpelCom operated in a risky regulatory environment.").[15]

### ii.   The Tax Evasion Scheme

According to the Complaint, Mechel inflated its earnings by making below-market sales to its own offshore subsidiaries, thereby violating the transfer pricing provisions of Article 40, and exposing the Company to a substantial risk of claims for unpaid back taxes, criminal charges, and civil penalties and fines. (SAC ¶ 140.) As previously noted, Article 40 permits the Russian tax authorities to assess taxes on transactions between "related persons" in which "the prices of goods, works or services applied by the parties to a transaction deviate . . . more than 20 per[]cent from the market price of identical

---

[15] Plaintiffs also allege that Mechel failed to disclose the consequences of the FAS investigation with respect to the cancellation of Mechel's July 23, 2008 IPO. (*See* SAC ¶ 87.) However, while Plaintiffs frequently repeat that the IPO was cancelled "in response to FAS Russia's mounting investigation" (*see id.* ¶¶ 8, 12, 32, 87, 92, 152), repetition is not a substitute for particularity under the PSLRA. Assuming *arguendo* that Mechel had a threshold duty to disclose the reasons for the cancellation, Plaintiffs entirely fail to supply particularized allegations about those reasons.

(homogenous) goods (works or services)." (*Id.* ¶ 173.)

Plaintiffs primarily rely on statements by Putin to establish that Mechel violated transfer pricing laws and that Defendants were reckless in not disclosing that fact. (*Id.* ¶¶ 100-06, 131.) Specifically, on July 28, 2008, Putin attacked Mechel for "exporting its product at a fraction of the domestic market price." (*Id.* ¶ 104.) According to Putin, while the domestic price for the unspecified product was 4,100 rubles, Mechel sold it to "themselves across the border, for 1,100 rubles." (*Id.*) Putin characterized these sales as "tax evasion," the effect of which was to "creat[e] a shortage on the domestic market and lead[] to an increase in the price of metallurgical products." (*Id.* ¶ 101.)

Although Putin's position as Prime Minister may have provided him with special access to information about Russian companies, his characterization of Mechel's sales as tax evasion cannot – without more – establish securities fraud liability in this case. It bears noting that in his reported comments, Putin did not specifically state that Mechel violated the transfer pricing laws (as opposed to some other provision of the Tax Code), or indicate whether the products at issue were "homogenous" as required by Article 40. (SAC ¶ 173.) Moreover, although Putin's comments set off a flurry of speculation by analysts regarding the possible consequences to Mechel "*[i]f the* [tax] authorities [found] that products for export were *in fact* underprice[d]," (*id.* ¶ 109 (emphasis added)), it is important to note that no such finding ever followed.

The Complaint does not allege that Russian tax authorities announced an investigation of Mechel, much less charged and found Mechel liable for any transfer

pricing violations, either in the immediate aftermath of Putin's July 2008 statements or in the 18 months following the end of the Class Period.[16]   Under these circumstances, the Complaint's recitation of Putin's comments fails to allege that Mechel committed transfer pricing violations with the requisite particularity.   Because these allegations "[do] not present facts indicating a clear duty to disclose, [the] scienter allegations do not provide *strong* evidence of conscious misbehavior or recklessness." *Kalnit*, 264 F.3d at 144; *see In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 678 (S.D.N.Y. 1990) ("Defendants cannot be held liable for failing to 'disclose' what would have been pure speculation."). Furthermore, there are no particularized allegations that the Individual Defendants even knew about the alleged tax violations prior to Putin's public statements. *Cf. Yukos*,

---

[16]   Although Plaintiffs concede that Russian tax authorities have not brought any charges against Mechel, they argue that "[t]he Investigations Committee of the Prosecutor General's Office initiated a criminal investigation and that investigation is still pending." (Pls.' Opp'n 10 (citing SAC ¶¶ 52, 107); *see also* SAC ¶ 120.) In support of that allegation, the Complaint cites a July 29, 2008 news article reporting Russian Prosecutor General Yury Chaika as saying, "We also looked into this situation. It is a scandalous thing when a company sells products to foreign markets four times cheaper than on the domestic one. An investigation *[into criminal liability]* is underway but this does not mean that any radical measures should be taken on this issue." (SAC ¶ 107 (emphasis added).) However, the bracketed text on which Plaintiffs premise their claims of an ongoing *criminal* investigation does not appear in the article reporting Chaika's remarks. Indeed, the full article, which is properly before the Court, plainly indicates that Chaika was referring to the then-pending *FAS* investigation for anticompetitive behavior. In fact, in the very next line of the article, Chaika is quoted as saying that "[t]he Russian Prosecutor General's Office for now is *not participating* in the investigation at Mechel." Russia & CIS Business and Financial Newswire, July 29, 2008, *available at* WESTLAW, 7/29/08 RUSCISBSFINW 15:02:48 (emphasis added).

2006 WL 3026024, at *20 ("The Complaint makes no particularized allegation that [Yukos's CFO] knew about Yukos' tax strategies from 2000 through 2003 or the nature and structure of its affiliated regional trading companies.").

Plaintiffs' reliance on Russian customs data does not alter this analysis. The alleged "sampling of egregious transfer pricing transactions by Southern Kuzbass" comprises two selected days in which the Mechel subsidiary sold an unspecified grade of coking coal to Mechel International at prices significantly below those it charged to two other customers. (SAC ¶ 133.) Plaintiffs do not allege that the products were "identical (homogenous) goods" or that the price Mechel charged to the two other customers was the "market price" as required by Article 40. (*Id.* ¶ 173.) Moreover, as Plaintiffs admit, this data is "[p]ublicly available," and the Russian government could certainly have brought charges if it determined that Mechel actually violated the transfer pricing law. (*Id.* ¶ 132.)

Plaintiffs also cite a July 2009 report by the Audit Chamber of Russia that analyzed data from a regional customs office concerning use of offshore entities and price levels set by several coal exporters, including Mechel. (*Id.* ¶ 50.) But the Audit Chamber did not single out Mechel for any particular pricing level or practice; instead it reported that the *average* price of goods charged by the exporters was lower than the average world market price in a period spanning all of 2008 and a portion of 2009. (*Id.*; Skovron Decl., Ex. F at 3.) Because the report did not identify any of Mechel's actual pricing and contracting practices within the Class Period, much less draw a connection to the Individual Defendants' knowledge of the same, it does not raise an inference of recklessness.

The SAC's allegations concerning Mechel's conspiracy with the Latvian company Kompass, while colorful, likewise fail to establish a strong inference of scienter. The alleged scheme is relayed primarily by a confidential witness, described only as "an analyst with over ten years experience in analyzing sources in Latvia, the Latvian business community and its key players." (SAC ¶ 134.) The Court may rely on information from confidential witnesses in resolving a motion to dismiss under the PSLRA "provided [the confidential witnesses] are described . . . with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Novak*, 216 F.3d at 314; *accord Freudenberg v. E*Trade Fin. Corp.*, 712 F. Supp. 2d 171, 196 (S.D.N.Y. 2010). Of course, experience in "analyzing sources," without more, falls far short of the particularity needed to substantiate the confidential witness's knowledge. Furthermore, the confidential witness does not describe any communications with the Defendants or provide grounds to believe they were aware of the alleged scheme. *See Local No. 38 Int'l Bhd. of Elec. Workers Pension Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 460 (S.D.N.Y. 2010).

Finally, the Complaint refers to the Russian government's treatment of Yukos as "a highly publicized case that began with an investigation into that company's transfer pricing practices and ended in the dismantling of the company by the Russian government in 2007 (i.e., prior to the Class Period), and thus would have been known to [the Individual Defendants] as a prime example of the inherent and substantial risks involved in [their] illegal conduct." (SAC ¶ 166.) But the Yukos prosecution weakens, rather than bolsters, Plaintiffs' argument that the Individual Defendants recklessly

disregarded the truth about Mechel's tax liabilities. As Plaintiffs are well aware, the "highly publicized" nature of that case stemmed from the Russian government's widely-perceived pursuit of "retribution" against Yukos President Mikhail Khodorkovsky as a result of his political activities rather than from any transfer pricing violations. *See Yukos*, 2006 WL 3026024, at \*1, 14. In fact, the Russian tax authorities ultimately did not hold Yukos liable under Article 40, a fact Judge Pauley found significant in dismissing the securities fraud action that followed. *Id.* at \*14. In the present case, notwithstanding Putin's explicit remarks, the Russian authorities have not even taken the initial step of bringing transfer pricing charges against Mechel. In other words, Plaintiffs have not "adequately allege[d] that it was probable that the Tax Ministry would assert its authority under Article 40 to challenge the prices [Mechel] implemented in these transactions." *Id.* Thus, after careful review of the tax-related allegations, the Court finds that they have not raised an inference of conscious recklessness by the Defendants.

### iii.   GAAP Claims

The Complaint asserts that Mechel falsely represented that its financial statements were prepared in accordance with GAAP, when, in reality, they did not properly account for loss contingencies arising from probable penalties by Russian anti-monopoly and tax authorities. (SAC ¶¶ 143-49.) It is well established that "'generally accepted accounting principles' are far from . . . a canonical set of rules," but rather "tolerate a range of 'reasonable' treatments, leaving the choice among alternatives to management." *Thor Power Tool Co. v. C.I.R.*, 439 U.S. 522, 544 (1979). As such, isolated allegations of GAAP violations or accounting irregularities are insufficient to state a securities fraud

claim. *Novak*, 216 F.3d at 309. "Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." *Id.* (internal citations and quotation marks omitted). Because the alleged GAAP violations are, at their best, largely duplicative of Mechel's alleged failure to appreciate and disclose the likelihood of Russian enforcement actions, the Court finds that they do not establish the requisite fraudulent intent. *See ECA*, 553 F.3d at 200.

### iv.   *Tellabs* Analysis

Although the Court has discussed each of the alleged facts relevant to scienter individually, it must ultimately evaluate "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 323. Viewing the Complaint in its totality, the Court is left with the firm conviction that Plaintiffs have failed to demonstrate such a strong inference of scienter here.

Even if the allegations pertaining to Zyuzin's personal exposure to Mechel's performance, the importance of coking coal to the Company's business, and Mechel's post-Class Period admission of liability, among other things, raise *some* inference of scienter, the inference is insufficiently "strong" for purposes of the PSLRA, as it is not "as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. Specifically, the inference of scienter is undermined by the absence of particularized facts demonstrating that any of the Individual Defendants, or other persons whose intent could be imputed to Mechel, knew about the subsidiaries' alleged anti-competitive conduct and tax evasion at the time of the misrepresentations.

25

Moreover, there are no indications that Mechel was trying to conceal conduct it believed to be illegal:  to the contrary, the Company expressly sent a letter to one of its Russian customers stating its intent to redistribute products for the benefit of its related companies – an intent FAS later found to be "discriminatory." (Shvets Decl., Ex. D at 6-7.)  Mechel also openly admitted that price disparities existed between domestic and foreign markets (SAC ¶ 65) and that it sought to increase prices on spot-price contracts (*id.* ¶ 58).  Indeed, even if, as Plaintiffs argue, the March 2008 FAS directives can be read to have put Mechel on notice of an ongoing investigation of its conduct, the fact remains that Mechel disclosed those directives nearly a month *before* FAS brought its charges.  (*See id.* ¶ 73.)

Taken collectively, the facts alleged in the Complaint lead to the unmistakable and obvious conclusion that Defendants, like their counterparts in *Yukos* and *VimpelCom*, were forced to navigate the "uncertain" and at times treacherous "terrain for individuals and companies doing business" in Russia.  *VimpelCom*, 2006 WL 647981, at *8.  That they failed to predict the wrath of the Prime Minister or the regulatory pronouncements that followed thereafter does not mean that Defendants acted with an intent to "deceive, manipulate, or defraud," *ECA*, 553 F.3d at 198, or that they engaged in "deliberate illegal behavior," *Novak*, 216 F.3d at 308, or acted with a "conscious" and "reckless disregard for the truth," *South Cherry*, 573 F.3d at 109.  To the contrary, the far more compelling inference is that Defendants simply failed to anticipate FAS's evolving interpretation of a facially vague statute of recent vintage with limited judicial and regulatory precedent or guidance.  To be sure, such a failure ultimately carried stark financial consequences, including a single-day loss of $5 billion in market capitalization after Putin's scathing attack on Mechel and its CEO (SAC ¶ 108).  But the inability to anticipate future events, no matter how costly, does not amount to fraudulent intent or conscious recklessness under the PSLRA.  *See South Cherry*, 573 F.3d at 109 (conscious recklessness is "not merely a heightened form of negligence" (internal quotation marks and alterations omitted)).

Having considered all the facts alleged in the Complaint, the Court concludes that Plaintiffs have not pleaded a strong inference of scienter, and that Plaintiffs' 10(b) claim must be dismissed.

2.   Remaining Section 10(b) Elements

Because the Complaint fails to plead a strong inference of scienter, Mechel's motion to dismiss the Section 10(b) claim is granted.  Accordingly, the Court does not assess the remaining elements of Plaintiffs' Section 10(b) claim.

C.   Section 20(a) Claims

Plaintiffs also bring claims against the Individual Defendants pursuant to Section 20(a) of the Exchange Act.  Section 20(a) imposes liability on individuals who control Section 10 violators.  *See* 15 U.S.C. § 78t(a).  To assert a *prima facie* case under Section 20(a), a plaintiff "must show a primary violation by the controlled person and control of the primary violator by the targeted defendant, and show that the controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person."  *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996) (internal citations and quotation marks omitted).   Because the Complaint has not stated a primary violation under Section 10(b) and Rule 10b-5, the

Section 20(a) claims must likewise be dismissed. *Rombach*, 355 F.3d at 177-78.

### D.   Leave to Replead

At the close of their memorandum in opposition, Plaintiffs seek leave to amend the Complaint in the event the motion to dismiss is granted. (*See* Pls.' Opp'n 39-40.) While Rule 15(a) "'provides that leave to amend shall be freely given when justice so requires, the Court has broad discretion in deciding whether or not to grant such a request.'" *DeBlasio v. Merrill Lynch & Co., Inc.*, No. 07 Civ. 318 (RJS), 2009 WL 2242605, at *41 (S.D.N.Y. July 27, 2009) (quoting *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, No. 06 Civ. 12967 (PAC), 2008 WL 2414047, at *2 (S.D.N.Y. June 12, 2008)). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to [Rule] 12(b)(6)." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 258 (2d Cir. 2002); *see also Chill*, 101 F.3d at 272 ("[F]utility is a 'good reason' to deny leave to amend.").

A party seeking leave to amend must provide some indication of the substance of the contemplated amendment in order to allow the Court to apply the standards governing Rule 15(a). *See Horoshko v. Citibank, N.A.*, 373 F.3d 248, 249 (2d Cir. 2004). "In the absence of any identification of how a further amendment would improve upon the Complaint, leave to amend must be denied as futile." *In re WorldCom, Inc. Sec. Litig.*, 303 F. Supp. 2d 385, 391 (S.D.N.Y. 2004). Moreover, "Rule 15(a) is not a shield against dismissal to be invoked as either a makeweight or a fallback position in response to a dispositive motion." *DeBlasio*, 2009 WL 2242605, at *41. Plaintiffs have already amended their Complaint twice in this matter, most recently following a pre-

motion conference on the instant motion to dismiss.   Absent any indication of the substance of the proposed amendment and in light of the Complaint's fundamental scienter deficiencies, the Court denies Plaintiffs' request to amend its pleading as futile.

### III.   CONCLUSION

For the foregoing reasons, Mechel's motion to dismiss is GRANTED, and Plaintiffs' request for leave to amend is DENIED.   The Clerk of the Court is respectfully directed to terminate the motion located at document number 29 and close this case.[17]

SO ORDERED.

RICHARD J. SULLIVAN
United States District Judge

Dated:  August 9, 2011
         New York, New York

* * *

Plaintiffs are represented by John J. Rice and Shannon M. Matera, Robbins Geller Rudman & Dowd LLP (San Diego), 655 West Broadway, Suite 1900, San Diego, CA 92101, Jeffrey Simon Abraham, Mitchell M.Z. Twersky, and Ximena R. Skovron, Abraham Fruchter & Twersky LLP, One

---

[17] As required by the PSLRA, the Court also finds that the parties and counsel in this matter have complied with Rule 11(b).   *See* 15 U.S.C. § 78u-4(c)(1); *Rombach*, 355 F.3d at 178 ("The PSLRA mandates that, at the end of any private securities action, the district court must 'include in the record specific findings regarding compliance by each party and each attorney representing any party with each requirement of Rule 11(b).'" (citation omitted)).

Penn Plaza, Suite 1910, New York, NY
10119.

Defendant Mechel is represented by
Aaron Michael Tidman and Jeffrey S.
Jacobson, Debevoise & Plimpton, LLP
(NYC), 919 Third Avenue, 31st Floor New
York, NY 10022.